## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RICHARD C. GORDON | : | CIVIL NO.  3:01cv1656(MRK) |
| | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| COMMISSION ON HUMAN RIGHTS | : | |
| AND OPPORTUNITIES, ET AL. | : | |
| | : | |
| *Defendants* | : | November 10, 2004 |

### DEFENDANTS' RULE 56(a)(1) STATEMENT OF FACTS

COMES NOW the defendant  and for its Rule 5(a) (1) statement of facts states as

follows:

INTRODUCTION

1.      Richard Gordon is a black male of Jamaican origin who formerly resided

in Bloomfield, CT. (Ex. 1, Third Amended Complaint, ¶ 9; Ex. 4, CHRO Response to

EEOC Charge, p. 16, ¶ 3).

2.      Defendant Cynthia Watts Elder is a resident of the state of Connecticut

and the former Executive Director of the Commission on Human Rights and

Opportunities ("CHRO"). Ms. Watts Elder served as the permanent Executive Director

from July 1999 until August 2003. (Ex. 4, CHRO Response, p. 16, ¶ 9; Ex. 43,  Affidavit

of Donald Newton, ¶ 6).

3.      Defendant Donald Newton is a resident of the state of Connecticut and is

currently employed as the Chief of Field Operations for the CHRO. He has been

1

employed by the CHRO for over 30 years and has held his current position since the fall of 1999.  (Ex. 43, Newton Affidavit, ¶'s 2-3).

4.      Defendant Dr. Pamela Libby is currently employed by the Connecticut Department of  Administrative Services ("DAS"). She is the Personnel Assessment Manager for DAS, and has held that position dating before 1999.  Pamela Libby was never served with service of process, nor did she ever authorize anyone to accept service of  process on her behalf.  (Ex. 44, Affidavit of Pamela Libby, ¶'s 2-3).

5.      On June 7, 1996, Richard C. Gordon was hired as a temporary student law clerk by the Connecticut Commission on Human Rights and Opportunities ("CHRO") working 35 hours a week.  The CHRO is a state agency established pursuant to C.G.S. 46a-51, et seq. (Ex. 4, CHRO Response, pp. 9, 16 [¶ 6]; Ex. 42, Affidavit of Susie Carlson, ¶ 4).

6.      On October 18, 1996, Richard Gordon became a "durational" employee in the same classification-- law clerk.  (Ex. 4, CHRO Response, p. 9; Ex. 42, Carlson Affidavit, ¶ 4).

7.      Under state statutes, a  temporary appointment is one that is established for less than six months. Because the position is for a short time period, no formal candidate list is necessary as compared to "permanent" classified positions that require a formal hiring process and candidate list.  (Ex. 3, DAS Response to EEOC Charge, pp. 11-12).

8.      A "durational" position is established for a set period of time with a certain ending date, upon which the employee's job ends, if not renewed. (Ex. 3, DAS Response, pp. 11-12).

9.      Richard Gordon was assigned as law clerk to the CHRO Investigative Unit at its West Central regional office in Waterbury and was supervised by Regional Manager Femi Bogle-Assegai. (Ex. 4, CHRO Response,  pp. 17-18 [¶'s 16-18]; Ex. 36, Deposition of Gordon, Vol. I, pp. 32:17-33:16).

AUGUST 1996 TO JULY 2000

10.      In August 1996, Mr. Gordon returned to law school and expressed an interest in remaining as a law clerk. Accordingly, the CHRO renewed his durational status through May 1999, when he graduated from Touro Law School in New Jersey. During the school year Mr. Gordon worked part-time for the CHRO in the West Central regional office. (Ex. 4, CHRO Response, pp. 17-18 [¶'s 18-20]; Ex. 36, Gordon Depo., Vol. I, pp. 16:22-17:6).

11.      Upon graduating from law school, Gordon's supervisor recommended that he be hired as a permanent or durational Assistant Commission Counsel 1 position ("ACC-1").  At the time, the CHRO used  the ACC-1 position in the regional offices interchangeably with the Human Rights Officer Representative ("HRO") position. Both positions basically investigated complaints of discrimination for the agency. (Ex. 37, Gordon Depo., Vol. III, p. 318:15-22; Ex. 47, Memo from Femi Bogle-Assegai to Cynthia Watts Elder, dated May 5, 1999; Ex. 4, CHRO Response, p. 18 [¶ 22]; Ex. 43, Newton Affidavit, ¶ 5).

12.      In May 1999, the then Deputy Director for Enforcement , Jewel Brown authorized paying the plaintiff at the rate of a full time "durational" ACC-1 position even though he was still classified as a law clerk.  No change in state classification was submitted by the CHRO to the Department of Administrative Services ("DAS").  DAS

never approved this change in pay for the plaintiff.  It is the agency  (in this case the

CHRO) which is responsible for administering the payroll system.  (Ex. 4,  CHRO

Response, p. 10; Ex. 44, ¶ 7).

13.     Between 1991 and 1999, the CHRO had developed the practice of using

durational positions to meet its needs. The CHRO hoped to convert durational employees

into permanent positions as budget and staffing needs permitted.  DAS and OPM (Office

of Policy and Management) must approve the creation of additional permanent positions

(Ex. 4, CHRO Response, pp. 10-11; Ex. 43, Newton Affidavit, ¶ 7).

14.     The CHRO was fortunate to be able to renew the durational status of

employees beyond the period initially contemplated.  (Ex. 4, CHRO Response, p. pp. 10-

11).

15.     In July 1999, Cynthia Watts Elder, a black female, was permanently

appointed as the Executive Director of the CHRO.  (Ex. 4, CHRO Response, p. 10; Ex.

43, Newton Affidavit, ¶'s 6).

16.     Donald Newton was named Chief of  Field Operations in the fall of 1999

and has held that position to this date. As Chief of Field Operations, he is responsible for

supervising the Regional Managers who oversee the CHRO regional offices. (Ex. 43,

Newton Affidavit, ¶ 2).

17.     By the summer of 1999, the CHRO had five durational employees,

including Richard Gordon, who was the only person being paid as a durational ACC-1.

The plaintiff's durational status was extended from February 10, 2000 until June 15, 2000

and from June 15 to June 30, 2000.  (Ex. 4, CHRO Response, p. 10; Ex. 42,  Carlson

Affidavit, ¶'s 4,6).

18.    After reviewing the agency's staffing needs, Cynthia Watts Elder decided to pursue the course of continuing to fill vacancies of permanent authorized staff as they occurred from outside sources and to the extent possible, work to convert the existing durational positions into permanent ones. (Ex. 4, CHRO Response, pp. 10-11; Ex. 43, Newton Affidavit, ¶ 7).

19.    Director Watts Elder was concerned that the agency might be misusing the durational positions.  Deciding not to simply allow the durational employees to loose their jobs when their terms expired,  Watts Elder wanted to convert the durational employees into permanent positions.  In July 1999, she was misquoted in a newspaper article speaking about the hiring practices of her predecessor, but made no reference to the plaintiff.  (Ex. 4, CHRO Response, p. 11; Ex. 51, Journal Inquirer Article).

20.    During the period of December 1999 through March 2000, the CHRO was engaged in a dialogue with the Office or Policy and Management (OPM)  to obtain additional "permanent" staff positions. (Ex. 4, CHRO Response, p. 11).

21.    In late 1999 and early 2000, two permanent ACC-1 vacancies occurred, one in the West Central Region (where Gordon worked) and one in the CHRO Special Enforcement Unit.  Richard Gordon did not apply for either of these positions.  Had he applied and been hired, the job requirement for an ACC-1 requires that upon appointment to a permanent position, the employee must either be admitted to the Connecticut Bar or obtain admission to the Connecticut Bar with one year of appointment. (Ex. 4, CHRO Response, pp. 20-21 [¶'s 32-33]; Ex 42, Carlson Affidavit, ¶'s 10-11, 19; Ex. 37, Gordon Depo., Vol. II, pp. 157:21-158:4; Ex. 38, Gordon Depo., Vol. III, p. 324:7-11; Ex. 44, Libby Affidavit, ¶ 30).

22.    In November 1999, the ACC-1 position in the Special Enforcement Unit was filled by a Hispanic Male.  On March 24, 2000, a black female who was already admitted to the Connecticut Bar was hired for the ACC-1 position in the West Central region. (Ex. 42, Carlson Affidavit,  ¶'s 13 & 16).

23.    In late 1999, DAS notified CHRO that it had begun a SCOPE study of the state jobs, including the HRO and ACC-1 positions. This was an analysis of state job classifications based in part on actual job duties as mandated by both statute and Collective Bargaining Agreements. (Ex. 3, DAS Response, p. 12; Ex. 44,  Libby Affidavit, ¶ 4).

24.    According to Gordon, all ACC-1 positions were involved in the SCOPE study, not just him.  Gordon filled out a detailed job duties questionnaire, as did other CHRO employees such as Stacey Owens. (Ex. 37, Gordon Depo., Vol. II, pp. 217:20-218:8; Ex. 48, Job Duties Questionaire of Stacey Owens).

25.    The plaintiff has no evidence that anyone from the CHRO attempted to influence the outcome of the SCOPE study. (Ex. 37,  Gordon Depo., Vol. II, pp. 219:5-220:4).

26.    As part of several attempts to convert durational positions into permanent ones, on March 9, 2000 the CHRO had contacted DAS requesting to reclassify the plaintiff  from a *durational law clerk to a permanent* ACC-1 position.  This was the first time that DAS learned that former Deputy Director Brown had approved that the plaintiff be paid as a full time durational ACC-1, dating back to June 1999. (Ex. 3, DAS Response, p. 12, Ex. 4, CHRO Response, p. 10-11; Ex. 44, Libby Affidavit, ¶'s 6-7).

27.    In early April 2000, Cynthia Watts Elder wrote to the durational employees, including the plaintiff, informing them of CHRO's efforts to convert their durational status into permanent positions.  Her letter was sent to all durational employees and did not state that a change was imminent.  (Ex. 4, CHRO Response, pp. 11, 21 [¶ 40] & 44 [Ex. I].

28.    On April 27, 2000, DAS notified the CHRO that through the SCOPE study its preliminary analysis had concluded that the CHRO was misusing the ACC-1 position in its regional offices because the work performed by both the ACC-1 and HRO employees was identical. Regional offices were not using the ACC-1 job classification to perform legal work as required by the job specification.  (Ex. 4, CHRO Response, pp. 12, 48 [¶ 22] & 51; Ex. 44, Libby Affidavit, ¶ 8).

29.    DAS informed CHRO at that time that the agency either had to reassigned all of the ACC-1's in its regional offices to legal duties or the ACC-1 position would be "red circled," with the practical effect being that any future requests to fill vacancies in the regional offices with the ACC-1 job classification would be rejected. (Ex. 4, CHRO Response, pp. 48 [¶ 4] and 51; Ex. 44, Libby Affidavit, ¶ 9; Ex ).

30.    The plaintiff was informed by DAS stating that the CHRO was misusing the ACC-1 classification in the regional offices. He recalls getting the document sometime around April 27, 2000. (Ex. 38, Gordon Depo., Vol. III, pp. 319:11-23, 322:1-6; Ex. 40, Gordon Depo. Vol. V, 674:13-17).

31.    Since the CHRO had established the practice of using ACC-1 employees in the regional offices as HRO investigators and could not reassign the duties of any of the regional ACC-1 positions, DAS "red circled" the position and rejected the CHRO's

attempt to reclassify the plaintiff from a durational position into a permanent ACC-1 position. DAS advised the CHRO to halt the process because any attempt to reclassify the plaintiff into an ACC-1 position would be rejected. (Ex. 4, CHRO Response, pp. 12-13 & 48 [¶4]; Ex. 43, Newton Affidavit, ¶ 8).

32.    Preferring to keep the plaintiff from losing his job, the agency was faced with the options of having the plaintiff take the test for a *permanent classified competitive* HRO position or hire the plaintiff as an HRO Trainee in a *classified permanent non-competitive position*. Both positions paid less than the ACC-1 position, but were better than unemployment. (Ex. 3, DAS Response, p. 13).

33.    At the request of Personnel Officer Susie Carlson and as a courtesy to Mr. Gordon, Donald Newton informed the plaintiff that DAS had red circled the ACC-1 position and to avoid losing his durational position in June 2000, he should apply to take the HRO examination for a competitive permanent classified HRO representative position. (Ex. 38, Gordon Depo., Vol III, pp. 342:8-13; Ex. 43, Newton Affidavit, ¶ 9).

34.    A successful examination would have put Mr. Gordon on an approved list for HRO positions and give the plaintiff a chance to be hired into a permanent HRO position.  (Ex. 44, Libby Affidavit, ¶ 12).

35.    The first part of the written examination announcement outlined the "Minimum Qualifications Required." The second part, "Application/Examination Procedure," outlines in detail the documents and information that applicants are required to submits. The instructions specifically states: "Applicants who do not submit the required application and examination materials by the closing date will not be admitted

into the examination and will not have the right to appeal this decision." (Ex. 4,CHRO

Response, p. 47; Ex. 44, Libby Affidavit, ¶ 13).

36.    The May 2000 HRO Representative examination  was an "Experience and

Training" examination meaning that the examination materials constitute the examination

itself.  A failure to submit all of the required materials an information is the equivalent  to

not showing up for the examination.  (Ex. 3, DAS Response, pp. 13-15; Ex. 44, Libby

Affidavit,  ¶ 13).

37.    An application for the HRO examination was NOT an application for a

position. The exam material constituted an application for entrance into the examination,

upon which the materials would be graded and those who passed the examination would

be placed on the list from which the CHRO would hire they had positions to fill. (Ex. 3,

DAS Response, p. 14; Ex. 44, Libby Affidavit,  ¶ 13).

38.    On April 28, 2000, CHRO Personnel Manager, Susie Carlson, as a

courtesy to the plaintiff, faxed a copy of the necessary HRO examination application and

instructions to him so he could apply for the HRO Representative examination. Ms.

Carlson faxed 13 pages. (Ex. 3, DASpp. 84-86, 106-117; Ex. 43, Newton Affidavit ¶ 11;

Ex. 42, Carlson Affidavit, ¶ 9 and pp. 9-17).

39.    On Monday, May 1, 2000, Carlson spoke with the plaintiff to confirm that

he had received the fax of April 28, 2000. The only page the plaintiff identified as

missing was a page from the March 2000 PLD-1 form. Carlson then faxed that one page

to Gordon.  (Ex. 3, DAS Response, pp. 84-87, 106-117).

40.    On Tuesday May 2, 2000, at the plaintiff's request, Carlson faxed him a

blank employment application form (PLD-1).  Carlson reminded the plaintiff that his

application had to be postmarked no later than May 3, 2000. (Ex. 3,  DAS Response, pp. 86-87, 106-117; Ex. 42, Carlson Affidavit, p. 12 [¶ 13]).

      41.     The plaintiff has no evidence that defendant Newton knew whether Carlson sent the correct number of  pages, as Gordon contends. (Ex. 40, Gordon Depo., Vol. V, p. 700:1-8).

      42.     The plaintiff failed to submit the necessary materials for the May 2000 examination for the HRO Representative position and his application for entrance into the examination was denied by Dr. Libby.  His application was one of  16 out of  55 submitted to be rejected for the same reason, incomplete examination materials. (Ex. 3, pp. 33 [¶ 41] & p. 75; Ex. 44, Libby Affidavit, ¶ 16).

      43.     The plaintiff's durational status was set to expire in June 2000 and he knew would be out of a job. (Ex. 38, Gordon Depo., Vol. III, pp. 319:2-4, 320:19-22).

      44.     Instead of just letting the plaintiff's employment end in June 2000, Cynthia Watts Elder hired the plaintiff in a lower paying, but permanent, HRO Trainee position, that provided permanent status and the opportunity to advance to higher positions. (Ex. 3, DAS Response, p. 17; Ex. 44, Libby Affidavit, ¶ 26-27).

      45.     On June 6, 2000, Dr. Pam Libby, the Personnel Assessment Manager for DAS, met with the plaintiff.  Dr. Libby did not know Gordon's race, ethnic origin or color prior to that time. She explained the exam announcement, the examination requirements and the appeals process.  Dr. Libby gave the plaintiff a copy of C.G. Reg. § 5-221-a-1, which provides that the rejection of an application for an examination based on an incomplete application cannot be appealed.  (Ex. 38, Gordon Depo., Vol. III, pp. 334:14-18, 339:7-25; Ex. 44, Libby Affidavit,  ¶ 17-18).

46.     Dr. Libby further explained to the plaintiff that other applicants had been rejected for the same reason and to make an exception for him would be unfair to other applicants. (Ex. 44, Libby Affidavit, ¶ 's 16-18).

47.     In June 2000, the plaintiff sent a letter to Dr. Pam Libby,  dated June 9, 2004, accusing the CHRO of sending him incomplete information about the examination. (Ex. 3, DAS Response, p. 69).

48.     In addition to the stated job examination announcement, information about the examination requirements and procedures were also available at DAS offices and the DAS internet site, through a 24 hour automated DAS phone system, and at the Connecticut Department of Labor offices, and the examination announcement posted at the CHRO offices. (Ex. 3, DAS Response, p. 16; Ex. 44, Libby Affidavit,  ¶ 21).

49.     On June 19, 2000, Dr. Libby responded to Mr. Gordon's letter informing him that allowing him to submit late application materials would be a violation of the application procedure that is enforced for examinations. (Ex. 3, DAS Response, p. 72; Ex. 44, Libby Affidavit, ¶ 22).

50.     Dr. Libby did not make an exception to the examination requirements for a white female as the plaintiff contends. (Ex. 44, Libby Affidavit, ¶'s 23-25).

51.     In July 2000, the plaintiff was hired by the CHRO as a permanent employee classified as an HRO Trainee.  (Ex. 42, Carlson Affidavit, p. 8 [Ex. A]).

52.     The plaintiff was not demoted.  The HRO trainee position was an actual offer to hire him in a PERMAMENT position, the only permanent position that was available to the plaintiff because he did not complete the examination for the HRO Representative position. (Ex. 44, Libby Affidavit, ¶'s  27-28).

53.     The decision to hire the plaintiff as an HRO trainee provided the plaintiff with the crucial opportunity for permanent employment with a state agency, that also enabled him to take advantage of promotional opportunities. (Ex. 43, Newton Affidavit, ¶ 13; Ex. 44, Libby Affidavit, ¶ 27).

54.     The plaintiff accepted the HRO trainee position at the CHRO. His salary went from $52,000 to $38,000. When he began his new job in New Jersey in April 2001, his salary was $48,000 and was then raised to 51,000. (Ex. 38, Gordon Depo., Vol. III, pp. 430:8-431:23).

55.     From July 2000 until April 2001, the plaintiff continued to work in the West Central Regional Office. (Ex. 43, Newton Affidavit, ¶ 14).

56.     In September 2000, the plaintiff received an "overall" good service rating from Femi-Bogle-Assegai, which was signed off by defendants Newton and Watts-Elder. (Ex. 5, Service Evaluation dated 9/1/00; Ex. 43, Newton Affidavit, ¶ 15).

57.     It was not until December 2000 that issues with the plaintiff's work performance began to surface. On December 22, 2000, the plaintiff was counseled about unusually high absences. He was placed on a medical certificate requirement to justify any extended absences due to a medical condition. On February 1, 2001, the regional manager reported to the central office twenty "aged" cases that were not being handled expeditiously. Many aged cases had been assigned to the plaintiff. (Ex. 6, Letter to Gordon from L. Appleton, dated 12/22/00; Ex. 7; Ex. 43, Newton Affidavit, ¶ 17).

58.     The plaintiff filed a grievance regarding what he described as a demotion to the HRO trainee position, which was actually his hire in a permanent state position. The hearing officer found that Gordon was not performing legal work and denied his

grievance.  (Ex. 8, Grievance Form dated 7/7/00; Ex. 9, Step III Grievance Ruling, 12/15/00).

59.     On February 26, 2001, the plaintiff made hand written notes about a pending grievance against him for the Unauthorized Practice of Law in connection with his application to the Connecticut Bar. Gordon wrote that he called one of his former married law school professors, with whom he had been having an affair, stating that he believed that her husband "must have sent a letter to the CT bar saying I threatened him." (Ex. 34, Plaintiff's Notes, p. 2; Ex. 35, Letter from Ronald Smith to Gordon, dated 8/3/99).

60.     On March 16, 2001, the plaintiff informed Manager Femi Bogle-Assegai that he had accepted a position as an Assistant Corporation Counsel in New Jersey and would be leaving the agency. Bogle-Assegai announced to the West Central staff on that date that Gordon was leaving the agency. (Ex. 11, Gordon Notes, dated 3/16/01; Ex. 36, Gordon Depo, Vol. I, pp. 7:21-25; Ex. 50, Deposition of Femi Bogle Assegai, pp. 117:25-118:15).

61.     March 16, 2001 was also the date that the plaintiff's job offer in New Jersey was approved by the Newark Corporation Counsel. His salary in New Jersey matched what he had been paid at the ACC-1 level as a durational law clerk employee at the CHRO. (Ex. 12, City of Newark Records, p. 5; Ex. 36, Gordon Depo., Vol. I, p. 12:2-14).

62.     The plaintiff did not inform the defendants that he was resigning his position.  He testified that he assumed that his Manager, Femi Bogle-Assegai, had

notified the CHRO central office. (Ex. 38, Gordon Depo., Vol. III, pp. 371:24-372:4, 373:12-21, 380:19-24).

63.    According to the plaintiff, he was scheduled to begin his new job in Newark, New Jersey on April 9, 2001. (Ex. 37,  Gordon Depo., Vol. II, pp. 206:14-207:7).

64.    In late March 2001, the CHRO terminated the West Central Regional manager for stealing state time. CHRO employee Robert Brothers was temporarily assigned to serve as the Acting Regional Manager of the CHRO West Central region. One of the investigators that Brothers supervised was Richard Gordon. (Ex. 41, Affidavit of Robert Brothers, ¶ 4; Ex. 43, Newton Affidavit,  ¶ 18).

65.    During the week or so in March 2001 when Robert Brothers supervised Gordon, he met with the plaintiff to discuss a case that the plaintiff was handling. At no time during that meeting or during any of the conversations that Robert Brothers had with the plaintiff did Gordon indicate that he felt he was being forced out of his job or that he was unhappy with his position. (Ex. 41, Brothers Affidavit,  ¶ 6).

66.    On April 5, 2001, Richard Gordon sent a letter to the CHRO requesting unpaid full time Family Medical Leave to allegedly take care of his ill mother knowing that he already accepted a position in New Jersey. (Ex. 15, Letter from Gordon dated April 5, 2001; Ex. 16, Request for FMLA; Ex. 37, Gordon Depo., Vol. II,  pp. 206-208).

67.    Despite the fact that he was scheduled to begin a new job in New Jersey on April 9, 2001, the plaintiff represented that he was taking April 6 and 9 as "sick days." Mr. Gordon was not at work on April 6, 9, 10 & 11, 2001. (Ex. 37, Gordon Depo, Vol. II, pp. 198:9-17, 206:14-207:7, 208:11-24; Ex. 41, Brothers Affidavit, ¶ 7).

68.     The plaintiff did not call the CHRO business office to say that he was not taking a sick day on April 9, 2001 because he was starting a new job in New Jersey. (Ex. 39, Gordon Depo., Vol. IV, p. 517:11-17).

69.     The plaintiff admits that has no evidence that defendant Libby had any involvement with his request for FMLA leave.  (Ex. 38, Gordon Depo., Vol. III, p. 388:11-18).

70.     On April 11, 2001, the CHRO Business Manager notified the plaintiff by written letter that his request for FMLA leave was approved on a part-time basis because the medical information submitted did not support full-time unpaid leave. (Ex. 16, Letter to Gordon from Leanne Appleton, dated 4/11/01).

71.     The plaintiff did not contact the business manager to say that he had started a new job on April 9, 2001.  Because he failed to show up for work on April 6, 9, 10 & 11, 2001, on April 12, 2001 the agency notified Gordon that he that it needed a medical note for the 4 days of sick leave.   (Ex. 41, Brothers Affidavit, ¶ 7; Ex. 18, letter to Gordon from Leanne Appleton, dated 4/12/01).

72.     On approximately April 16, 2001, the agency received a letter from the plaintiff back dated to April 6, 2001 [but referencing the letter he received from the agency on April 11, 2001] in which he notified the CHRO that he was resigning his HRO Trainee position effective April 6, 2001.  (Ex. 19, Letter from Gordon to CHRO, postmarked 4/16/01).

73.     In his letter of resignation, the plaintiff did not tell the agency that he had started a new job on April 9, 2001, a date for which he requested a sick day when he was actually working in New Jersey.  Instead, he asserted that because his request for 12

weeks of unpaid FMLA was not approved in total, he was leaving because his request for unpaid FMLA time was "frustrated" by the agency and only granted on an "intermitted basis." (Ex. 19, Letter from Gordon to the CHRO, dated 4/9/01; Ex. 37, Gordon Depo., Vol. II, p. 197:5-8).

74.     The plaintiff's April letter of resignation to the CHRO made no reference to any claim of discrimination or constructive discharge. (Ex. 19, Resignation Letter).

75.     The plaintiff actually started work in New Jersey on April 9, 2001, knowing full well that he had requested a sick day for April 9th to care for his mother. (Ex.39, Gordon Depo., Vol. IV, p. 512:8-12, Ex.37, Gordon Depo., Vol. II, p. 208:11-24).

76.     The CHRO central office was unaware that Richard Gordon was resigning his position until it received his back dated letter of April 6, 2001, post marked April 16, 2001.  (Ex. 42, Carlson Affidavit, ¶ 26; Ex. 43, Newton Affidavit, ¶ 21-22).


APRIL 16 – TO PRESENT DATE

77.     Just prior to the plaintiff's departure from the CHRO, Defendant Donald Newton received a phone inquiry from Mr. Shaddy Kessing, the Administrative Director of the Connecticut Bar Examining Committee.  It was Mr. Kessing's role to gather information about the character and fitness of applicants to the Connecticut Bar. (Ex. 20, Affidavit of Shaddy M. Kessing, ¶'s 1-5; Ex. 43, Newton Affidavit, ¶ 23).

78.     In April 2001,  Mr. Kessing called the CHRO Waterbury office to gather some information about the bar application of Richard Gordon. (Ex. 20, Kessing Affidavit, ¶ 4).

79.     According to Mr. Kessing, Richard Gordon had submitted supplemental information to his bar application using postage meter labels coming from the CHRO Waterbury office.  Mr. Kessing called the Waterbury office and was referred to Donald Newton. Mr. Kessing then called Mr. Newton to inquire about whether Gordon had permission to use state resources in connection with his bar application. (Ex. 20, Kessing Affidavit,  ¶'s 4-5; Ex. 43, Newton Affidavit,  ¶'s 25-26).

80.     The plaintiff admits that no one gave him permission to use the CHRO postage meter for personal use. (Ex. 38, Gordon Depo., Vol. III, p.361:20-25).

81.     On April 9, 2001, Shaddy Kessing sent a letter on behalf of the Bar Examining Committee to Donald Newton at the CHRO.  In that letter Mr. Kessing requested information about Mr. Gordon. The letter also specifically stated:

> Additionally, the Committee is interested in learning whether the applicant has held himself
> Out or is holding himself out as an attorney admitted to practice law in Connecticut, in connection
> employment at the CHRO and any action you may have taken against the applicant.

(Ex. 20, Kessing Affidavit, ¶ 6; Ex. 43,  Newton Affidavit¶ 27; Ex. 21, Letter to Donald Newton from Shaddy Kessing, dated 4/9/01; Ex. 38, Gordon Depo., Vol. III, p. 362:9-20).

82.     Along with the letter to Mr. Newton was an executed release and waiver by Richard C. Gordon authorizing any person, officer, official, organization or association to disclose information to the Bar Examining Committee, which also expressly released any individual from liability who cooperated with and disclosed information to the Bar Examining Committee. (Ex. 22 Release and Waiver; Ex. 38, Gordon Depo., Vol. III, pp. 356:4-358:8).

83.     On May 1, 2001,  Donald Newton responded to the inquiry from the Bar

Examining Committee by submitting examples of CHRO documents in which Richard C. Gordon notarized his own signature in Connecticut as a Commissioner of the Superior Court and held himself out as attorney at law on CHRO stationary. (Ex. 20, Kessing Affidavit, ¶ 7; Ex. 23; Ex. 43, Newton Affidavit, ¶ 30; Ex. 23, letter to Shaddy Kessing from Donald Newton, dated 5/1/01).

84.    Shaddy Kessing never met Donald Newton, nor has each man ever visited the other's office. Kessing and Newton would not  know each other if they saw the other on the street.  Gordon does know if Kessing and Newton ever spoke in person. (Ex. 20, Kessing Affidavit, ¶ 10; Ex. 43, Newton Affidavit,  ¶ 31; Ex. 39, Gordon Depo., Vol. IV, pp. 454:22-455:4).

85.    The plaintiff admits that he has no evidence that Donald Newton ever contacted the Statewide Grievance Committee. (Ex. 38, Gordon Depo., Vol. III, p. 367:12-18; Ex. 39, Gordon Depo., Vol. IV, 459:21-460:2; Ex. 40, Gordon Depo., Vol. V., pp. 646:13-16).

86.    On May 10, 2001, Donald Newton wrote to Richard C. Gordon to inform him that the CHRO was requesting reimbursement for Gordon's unauthorized use of the CHRO mailing meter in the amount of  $16.04. (Ex. 24, Letter from Donald Newton to Richard Gordon).

87.    On May 15, 2001, Robert Brothers reported to Donald Newton that a review of the files assigned to Richard Gordon showed numerous errors, disorganized material, un-filed records, incomplete work or no work product at all (Ex. 25, Memorandum from Robert Brothers to Donald Newton ; Ex. 41, Brothers Affidavit, ¶ 8).

88.     On May 21, 2001, CHRO Personnel Officer Susie Carlson wrote to Richard C. Gordon to inform him that he had not resigned in "good standing" under State policy Sec. 5-243-1(a)(1) because he failed to give the required two weeks notice. (Ex. 26, Letter from Susie Carlson to Richard Gordon, dated 5/21/01 ).

89.     Despite Richard's Gordon's request for 12 weeks of unpaid FMLA leave on April 5, 2001 and his attempt to take sick leave for the days April 6 & 9, Gordon responded to Ms. Carlson in a letter dated May 31, 2001, by stating that he had given notice to his supervisor in March 2001 that he was leaving. (Ex. 27, Letter from Gordon to the CHRO, dated 5/31/01; Ex. 39, Gordon Depo, Vol. IV, pp. 617:20-618:4).

90.     On May 31, 2001, Daniel B. Horwich, on behalf of the Statewide Grievance Committee wrote a letter to Richard C. Gordon's attorney informing him of the Committee's decision regarding UPL grievance, #00-023, which had been filed by the Bar Examining Committee in April 2001.   The defendants had no involvement in or knowledge of this grievance that had been pending against the plaintiff.  (Ex 28, letter to Richard Gordon from Daniel Howich; Ex. 36, Gordon Depo., Vol. I, pp. 19:18-23:2; Ex. 39, Gordon Depo, Vol. IV, pp. 479:21-480:1).

91.     On June 27, 2001,  Howard E. Emond, Jr, the Deputy Director of the Connecticut Bar Examining Committee, sent a letter to Daniel B. Horwich, Bar Counsel for the Statewide Grievance Committee, referring the information Mr. Newton had provided in May 2001 about Mr. Gordon in response to the Examining Committee's inquiry. Donald Newton never contacted, and was unaware of Mr. Emond's letter to the Statewide Grievance Committee. (Ex. 29, Letter from Howard Emond to Daniel Horwich, dated 6/27/01; Ex. 43, Newton Affidavit, ¶ 32).

92.     The plaintiff doesn't know who generated the concern that he was using the state postage meter for personal use, but admits that he did use the CHRO postage meter for his bar application materials. (Ex. 37, Gordon Depo., Vol. II, pp. 233:20-234:20).

93.     On June 28, 2001, Daniel B. Horwich sent a letter to Richard C. Gordon informing him of grievance #00-034 in which he was being investigated for the Unauthorized Practice of Law in Connecticut for taking legal acknowledgements in Connecticut as a Commissioner of the Superior Court when he was not admitted to practice law in Connecticut or was a licensed notary. (Ex. 30, Letter from Daniel Horwich to Richard C. Gordon, dated 6/28/01; Ex. 36, Gordon Depo., Vol. I, p. 28:5-16).

94.     On September 6, 2001, Cynthia Watts Elder, the Executive Director of the CHRO, wrote to Richard C. Gordon to inform him about the results of an audit that was done of the time records for the CHRO West Central regional office staff. (Ex. 31, Letter from Watts Elder to Richard Gordon, dated 9/6/01; Ex. 43, Newton Affidavit, ¶ 36).

95.     The CHRO audit of CHRO employees in the Waterbury office showed a discrepancy between Richard Gordon's time sheets and the computerized entry access card printout showing the detailed activity of  CHRO employees. (Ex. 31; Ex. 43, Newton Affidavit, ¶ 36).

96.     On September 6, 2001, Cynthia Watts Elder wrote a letter to Richard C. Gordon informing him of the discrepancy in his time sheets and requesting repayment of approximately $858.97.  Gordon never responded to Ms. Watts Elder's letter. (Ex. 31; Ex. 43, Newton Affidavit, ¶'s 37-39).

97.     On January 11, 2002, Richard C. Gordon sent a check to the State of Connecticut Comptroller in the amount of $100.00 to reimburse the state "services he used in emergent situations during my tenure."  Gordon admitted to using state equipment. (Ex. 32, Letter to State Comptroller from Richard Gordon; Ex. 37, Gordon Depo., Vol. II, p. 224:17-20).

98.     On  July 9, 2002, Richard C. Gordon entered into a Stipulation of Facts and Disposition with the Statewide Grievance Committee in which he admitted to the unauthorized practice of law in Connecticut as set for in Grievance #00-034. (Ex. 33; Ex. 36, Gordon Depo., Vol. 1, 25:1-25; Ex. 39, Gordon depo., Vol. IV, p. 459:3-8; Ex. 40, Gordon Depo., Vol. V, p. 647:8-17).

99.     The plaintiff was never disciplined by the defendants. He was never suspended, demoted or terminated. (Ex. 38, Gordon Depo., Vol. III, p. 398:22-399:3; Ex. 43, Newton Affidavit, ¶ 40).

100.     Had defendant Newton been fully aware prior to Gordon's departure that he had represented himself as Commissioner of the Superior Court, that his work files were incomplete or deficient, that he had used state resources or that his payroll sheets were inaccurate, Newton would have initiated disciplinary action, up to and including termination. (Ex. 43, Newton Affidavit, ¶ 41).

101.     As of March 9, 2001, Richard Gordon was not, and is not to this date, admitted to the Connecticut Bar.  Even if he had been hired as permanent ACC-1 on March 9, 2000 as the CHRO had requested from DAS, the plaintiff would have been fired or forced to take a lower paying job in March 2001 because he was not admitted to the Connecticut Bar within the one year requirement. (Ex. 42, Carlson Affidavit ¶ 14; Ex.

43, Newton Affidavit, ¶ 42; Ex. 37, Gordon Depo., Vol. II, pp. 157:21-158:24, 178:4-24;

Ex. 38, Gordon Depo., Vol. III, p. 324:7-11).

102.     CHRO records relating to the hire of permanent ACC-1 candidates PRIOR

to the position being "red circled" by DAS on April 27, 2000 [meaning that it was closed

to new hires] indicate the following hires and bar admission dates:

| HIRE DATE | | NAME | BAR ADMISSION |
|---|---|---|---|
| 10/9/98 | B/F | Dawne Westbrook | 5/14/99 |
| | B/M | Mortimer Malcolm | 1/5/98 |
| | A/F | Susan Hom | 12/11/92 |
| | B/F | Afrieda Gaither | 11/21/97 |
| | W/M | Thomas Mullins | 11/22/96 |
| 11/5/99 | H/M | Joseph Lopez | 6/7/97 |
| 3/24/00 | B/F | Roxanne Sinclair | 10/9/79 |

(Ex. 42, Carlson Affidavit, ¶'s 12-13).

103.     Since April 27, 2000 when DAS "red circled" the ACC-1 position, the

CHRO has not hired any employees in the ACC-1 classification for the regional offices.

(Ex. 42, Carlson Affidavit, ¶ 29).

104.     In fact, in 2003, two regional office ACC-1 employees, Roxanne Sinclair

and James Malcolm, were laid off due to budget reductions. When these two employees

were recalled back to work in 2004, neither was permitted to return to the ACC-1 job

classification because of the position being "red circled." Sinclair and Malcolm were

forced to take lower permanent positions and HRO Representative or HRO Trainee. (Ex.

42, Carlson Affidavit, ¶ 29).

105.     The Plaintiff alleges that he was rejected for the HRO Representative

examination by Dr. Libby when a white employee who he claims was similarly situated

to him, Paula Ross, was given admission to the examination. (Ex. 44, ¶ 24-25).

106.     The DAS records show that Paula Ross was not similarly situated to the

plaintiff, nor was she given admission to the HRO Representative examination after submitting an incomplete application. (Ex. 44, Libby Affidavit, ¶ 24-25).

107.    DAS records reflect that Ms. Ross only applied to take the HRO Representative examination once, in 1990. She submitted a complete application and her examination was graded at 93. (Ex. 44, Libby Affidavit, ¶'s 24-25; Ex. 45).

108.    In April 2000, Paula Ross applied for the Affirmative Action Program Manager examination. Her application was rejected by DAS because she did not submit the required materials, similar to Richard Gordon. (Ex. 44, Libby Affidavit, ¶ 24-25; Ex. 45, DAS Examination records for Paula Ross).

109.    The plaintiff contends that he wrote a law school paper in 1997 about a "Bill of Attainder", which was protected speech. But Gordon has no evidence that any of the defendants saw the paper in 1997. (Ex. 40, Gordon Depo., Vol. V, pp. 636:6-637:18).

110.    The 1997 paper was written two years before Watts Elder became Executive Director. (Ex. 40, Gordon Depo., Vol. V, pp. 637:20-25).

111.    The 1997 paper is the lone basis for the plaintiff's First Amendment claim. (Ex. 40, Gordon Depo., Vol. V, pp. 638:7-13).

112.    None of the individual defendants ever saw the plaintiff's 1997 law school article. (Ex. 39, Gordon Depo., Vol. IV, p. 494:11-14; Ex. 40, Gordon Depo., Vol. V, pp. 638:1-4, 719:1-5; Ex. 46, Defendant response to plaintiff's interrogatories).

113.    Regarding the plaintiff's claim that he did not receive proper training about not notarizing his own signature, the plaintiff admits that he never went to his supervisor to complain about a lack of training. Femi Bogle Assegai denies ever seeing CHRO documents in which Gordon notarized his own signature or held himself out as a

attorney. (Ex. 37, Gordon Depo., Vol. II, pp. 278:1-14, 283:18-21; Ex. 50, Bogle-Assegai Depo., 121:11-123:10).

114.    The plaintiff admits that he has no evidence that his rejection for the Connecticut Bar had anything to do with Donald Newton's letter of May 2001. (Ex. 39, Gordon Depo., Vol. IV, p. 450:3-8).

115.    The plaintiff could not name any protected activity he engaged in that he claims resulted in retaliatory conduct by the defendants.  (Ex. 39, Gordon Depo., Vol. IV, pp. 490:310, 493:12-23, 496:16-25).

116.    The plaintiff's complaint of discrimination against the CHRO was filed on August 29, 2000 after he was hired as an HRO Trainee. (Ex. 39, Gordon Depo., Vol. IV, p. 508:17-21; Ex.4, CHRO Response).

117.    The CHRO charge of discrimination was limited to his hire as an HRO Trainee in July 2000, the alleged denial of an ACC-1 and HRO position in 2000 and the rejection of his application for the May 2000 HRO Representative examination.  The CHRO complaint, Case No. 0130100,  was never amended to plead constructive discharge or retaliation. (Ex. 4, pp. 1-8).

118.    In December 1999, the CHRO hired a white female, Paula Tomaszewski, for an HRO Representative position in Norwich.  The plaintiff never applied for this position because he wasn't interested in it. (Ex. 4, CHRO Response, p. 11; Ex. 39, Gordon Depo., Vol. IV, 523:3-524:11; Ex. 42, Carlson Affidavit, ¶'s 16-17).

119.    Richard Gordon never applied at any time for a Affirmative Action Manager position. (Ex. 42, Carlson Affidavit,  ¶ 18).

120.    Donald Newton never made any representations to Gordon about any anticipated permanent positions, nor could he because both DAS and OPM have to approve any request to add permanent positions. (Ex. 43, ¶ 7).

121.    Gordon Admits that he doesn't even know if Watts Elder had the authority to tell him that durational positions were going to be made permanent.  (Ex. 36, Gordon Depo., Vol. I, pp. 120:25-121:16).

122.    Gordon admits that his retaliation claim is based on the fact that he filed a CHRO complaint in August 2000 and he is simply black. He does not believe that his federal lawsuit includes retaliation. (Ex. 39, Gordon Depo. Vol. IV, pp. 490:3-10, 495::12-23, 496:16-25 and 501:23-502:12).

123.    Gordon claims that his damages are the loss in income of 12-15,000 dollars and the hardship this put on paying his bills. (Ex. 39, Gordon depo., Vol. IV, pp. 443:8-444:2).

124.    Despite the claim of a financial hardship, Gordon was prepared to take 12 weeks of unpaid FMLA leave. (Ex. 39, Gordon Depo., Vol. IV, pp. 444:12-446:14).

125.    At no time did anyone from the Connecticut Bar Examining Committee inform Gordon that his denial of admission to the bar was because of the information Newton provided to the Committee at its request. (Ex. 39, Gordon Depo., Vol. IV, p. 450:3-8).

126.    Plaintiff premises his due process claim on a property interest. (Ex. 39, Gordon Depo., Vol. IV, p. 514:6-18).

127.    During the plaintiff's deposition on July 22, 2004, defense counsel informed that plaintiff and his attorney that defendant Newton would be seeking fees and

sanctions for the frivolous action brought against him. (Ex. 39, Gordon Depo., Vol. IV, p. 454:1-8).

127.    Gordon admits that CHRO employees Roxanne Sinclair was hired as a permanent ACC-1 and Paula Tomazewski was hired as an HRO representative PRIOR to DAS red circling the ACC-1 position in April 2000. (Ex. 37, Gordon Depo., Vol. II, p. 168:7-15).

128.    Since resigning his position at the CHRO moving to New Jersey in April 2000, the plaintiff has changed job to that of a Public Defender, at a salary of $56,000. (Ex. 38, Vol. III, pp. 432:21-433:6).

129.    Gordon's sister, Monica Reid and her daughter, have lived with and cared for the plaintiff's mother on a daily basis for over ten years, just as when Richard Gordon lived with his mother and sister. (Ex. 52, Deposition of Monica Reid, pp. 7:1-9:18, 13:15-15:12).

DEFENDANTS,

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:    _____
        Joseph A. Jordano  (ct 21487)
        Assistant Attorney General
        55 Elm Street
        Hartford, CT 06141-0120
        Tel: 860-808-5340
        Fax: 860-808-5383
        email: Joseph.Jordano@po.state.ct.us

## **CERTIFICATION**

The undersigned hereby certifies that on the  10th day of  November, 2004, a true

and accurate copy of the foregoing was sent by United State mail, postage prepaid, to the

following:

Igor I. Skorsky, Jr.
P.O. Box 38
Unionville, CT 06085

_____
Joseph A. Jordano
Assistant Attorney General