**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| RICHARD C. GORDON | : | CIVIL NO. 3:01cv1656(MKK) |
| | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| COMMISSION ON HUMAN RIGHTS | : | |
| AND OPPORTUNITIES, ET AL. | : | |
| | : | |
| *Defendants* | : | November 10, 2004 |

**MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

**I.      INTRODUCTION**

This is an employment discrimination case filed by a former employee of the

Commission on Human Rights and Opportunities (hereinafter "CHRO") who worked as a

student law clerk and as an investigator from June13, 1996 until he resigned effective

April 6, 2001 in order to take a higher paying job in Newark, New Jersey. (Facts ¶ 54).

The plaintiff's complaint is very confusing, and the plaintiff has failed to take a single

deposition in this case. Juxtaposed to the plaintiff's unsubstantiated allegations are the

facts showing that the plaintiff was a victim of circumstance and his own careless and

often stupid behavior. He was not discriminated or retaliated against. His own admission

of key facts combined with a dearth of any actual evidence to support his allegations

necessitate summary judgment.

In contrast, the plaintiff was always treated very well by CHRO and the

defendants herein throughout his employment. For example, he was allowed to switch

back and forth from part time to full time depending upon school vacations and breaks

(Facts ¶ 10), he was given a "good" performance appraisal by the defendants on September 1, 2000 (Facts ¶ 56), and he was paid at the same hourly rate as CHRO attorneys from the date of his law school graduation in June 1999, even though he was still in a durational law clerk position (Facts ¶ 12).  In spite of the faith and trust placed in plaintiff by defendants, they discovered to their horror very soon after he left his CHRO job that:

1.  Plaintiff signed a Stipulation with the Connecticut Statewide Grievance Committee in which he admitted engaging in the unauthorized practice of law (while working at CHRO) as charged in Grievance #00-034.  (Facts ¶ 98).

2.  Plaintiff falsified his time records at CHRO, such that he essentially stole $858 worth of pay, and defendants had to try to recover that amount from him.  (Facts ¶ 96).

3.  Plaintiff notarized the signature of parties to CHRO cases, and twice notarized his <u>own</u> signature on CHRO documents, despite the fact that such an act is obviously illegal, and plaintiff was not and never has been a member of the Connecticut Bar.  (Facts ¶ 93).

4.  Plaintiff's application for membership to the Connecticut Bar was put on hold when Shaddy Kessing, the Director of the Connecticut Bar Examining Committee, discovered that plaintiff had used CHRO postage to mail his application and other documents.  (Facts ¶ 79).

5.  Plaintiff misrepresented himself to be a member of the Connecticut Bar while employed at CHRO.  (Facts ¶ 83).

6.  Plaintiff never bothered to inform the CHRO Central Office that he was leaving his job; he simply failed to show up for work on April 9-13, 2001 and then backdated a resignation letter dated April 6, 2001 which was mailed to CHRO in an envelope postmarked April 16, 2001.  (Facts ¶¶ 88, 71, 72).

7.  Plaintiff applied on April 5, 2001 for FMLA leave allegedly to take care of his ailing mother from April until July 2001, despite the fact that: a) he knew that his sister and his nephew lived with his mother and took care of her; b) he knew he was starting a new job in Newark, New Jersey on April 9, 2001 and was moving there, and c) he had never told CHRO that he had taken another job and that he would be moving to New Jersey.  (Facts ¶¶ 66-76, 129).

8.  Plaintiff began working for a new boss, Acting Regional Manager Robert Brothers, Jr. on March 30, 2001, but plaintiff never told Brothers that he was leaving his job, that he was starting a new job in Newark, New Jersey on April 9, 2001, that he felt he was being constructively discharged or even that was unhappy in any way with his job.  (Facts ¶ 65).

9.  Plaintiff attempted to use sick leave at CHRO on April 9, 10, and 11, 2001 even though he had started his new job in Newark, New Jersey on April 9, 2001 and had not so informed CHRO.  (Facts ¶¶ 67, 68).

10.  By May 15, 2001, Robert Brothers, Jr. reviewed all of plaintiff's case files for purposes of reassignment.  He discovered that plaintiff had many complaints made about him by unhappy CHRO parties, that he had done

3

no work at all on most of his case files, and that the work he did do on others showed numerous errors, disorganized material and incomplete work. (Facts ¶ 87).

11.   Plaintiff sent a check for $100 on January 11, 2002 along with a letter in which he said her was reimbursing the state for "services he used in emergent situations during my tenure," and in which he admitted using state resources for his personal use. (Facts ¶ 97).

Surprisingly, even after the plaintiff's behavior surfaced, he has continued to pursue this lawsuit even in the face of warnings from undersigned counsel that sanctions would be sought against him, particularly for the claim against defendant Newton whose only act was to cooperate with the Bar Examining Committee pursuant to a written release executed by Gordon. Specifically, the Bar Examining Committee sent a copy of an executed release signed by plaintiff to the defendant Donald Newton, and requested information from Newton about Gordon. (Facts ¶ 81). Donald Newton responded by sending documents to Bar Examining Committee which evidenced plaintiff holding himself out as a member of the Connecticut Bar and confirming that plaintiff did not have permission from CHRO to use state resources for his personal use. (Facts ¶¶ 83-86). Despite being shown a copy of said release in his deposition in this case, plaintiff has refused to drop any of his claims against Donald Newton in his individual capacity, and therefore, sanctions are requested as explained infra. In addition to plaintiff's claims that defendants defamed him and tried to keep him from being admitted to the Connecticut Bar, the plaintiff also tries to make an issue out of every perceived slight (most of which

4

involve jobs he never bothered to apply for) during his five years of employment at CHRO.

Early in 2000, before she had knowledge of the above issues concerning plaintiff's outrageous activities at work, defendant Watts Elder (working with other CHRO employees) tried to convert the plaintiff's durational position (which was set to expire no later than June 30, 2000) into a permanent Assistant Commission Counsel 1 (ACC-1) position. (Facts ¶¶ 19, 26). However, through a series of unique circumstances and the plaintiff's own carelessness, the plaintiff ended up with a job as an investigator trainee (hereinafter HRO Trainee) which was permanent, but which did not pay as much as an ACC-1. (Facts ¶ 53). The series of events which resulted in the plaintiff taking the HRO trainee job had nothing to do with race, color, national origin, gender or retaliation, as discussed infra. It resulted only from a decision on April 27, 2000 by the Connecticut Department of Administrative Services (hereinafter DAS) to stop hiring attorneys to do investigations of cases in the CHRO regional offices. (Facts ¶¶ 28-30).

It should be noted that plaintiff had several chances to apply for permanent ACC-1 positions and HRO Representative positions long before the April 27, 2000 decision by DAS, such as the ACC-1 jobs filled by Joseph Lopez and Roxanne Sinclair the Affirmative Action job filled by Joanne Steinnagel, and the HRO Representative job filled by Paul Tomszewski, none of which he ever even applied for. (Facts ¶ 21, 118, 119). Once DAS made its decision not to allow CHRO to hire any more ACC-1's in the Regions, the plaintiff's only hope of obtaining a permanent job at that time was to apply for the HRO Representative position or the HRO Trainee job. (Facts ¶ 32). The facts show that plaintiff simply failed to file the proper paperwork with DAS for the HRO

Representative exam, and as a result, the defendant Dr. Pamela Libby had no choice but to reject plaintiff's application for that exam. (Facts ¶ 49). However, the plaintiff then sought the HRO Trainee permanent position, and the defendants hired him in that position effective July 1, 2000. (Facts ¶ 51). The bottom line is that the plaintiff <u>did get</u> a permanent state job (HRO Trainee), which would have allowed him to be promoted to HRO Representative within two years. (Facts ¶ 53). The plaintiff did work as an HRO Trainee from July 1, 2000 until his resignation. (Facts ¶ 55). Plaintiff's resignation letter was mailed on April 16, 2001 effective April 6, 2001, yet the plaintiff claims constructive discharge. (Facts ¶ 72). At almost the same time, the defendants discovered the above facts (numbered 1 through 11) which probably would have resulted in plaintiff's termination. (Facts ¶ 100). The fact remains, however, that during his employment with CHRO, plaintiff was never suspended, demoted, terminated or subjected to any adverse employment action. (Facts  99).

For the reasons that follow, none of the plaintiff's claims can survive summary judgment.

## II.    <u>FACTS</u>

The plaintiff has made many factual allegations in his complaint, but he has no evidence to support them. As noted previously, he did not even bother to take a single deposition in this case to try to find evidence to support his claims.

By contrast, the defendants took many depositions and submit portions thereof, along with Affidavits from Cynthia Watts Elder, Donald Newton, Dr. Pamela Libby, Susan Carlson, Robert Brothers, Jr., and Sandra Scharr, as well as more than 100 documents, to support their Rule 56(a) Statement of Facts, which need not be repeated

here. However, it is worthwhile to refute the pertinent factual allegations which appear in the plaintiff's complaint.

The plaintiff alleges in paragraph 13 of his complaint that he was "involuntarily terminated on or about March 2001". It cannot be disputed that plaintiff <u>voluntarily</u> resigned his position (effective April 6, 2001 in a back dated letter), or that he took another higher paying job in Newark, New Jersey on April 9, 2001 without telling his boss Robert Brothers. In fact, even though the plaintiff knew as early as March 16, 2001 that he would be leaving his CHRO job, he actually applied for FMLA leave on April 5, 2001, and it was approved in part on April 11, 2001 because the defendants did not know he was leaving. (Facts ¶¶ 66-76). The plaintiff's letter of resignation made no mention of constructive discharge or discrimination. (Facts ¶ 74). The plaintiff never told his boss (Brothers) that he felt that he was being forced out of his job, or even that he was unhappy with it. (Facts ¶ 65).

In paragraphs 18-19, and 25 of his complaint, the plaintiff alleges that on or about June 18, 1999 CHRO hired or promoted him to a durational position of ACC-1, and that he was promised that his durational position would be made permanent "shortly". Not so. The fact is that CHRO simply began paying him at the ACC-1 pay rate even though DAS had not approved what CHRO hoped would be his reclassification from Student Law Clerk. (Facts ¶¶ 12, 13, 14, 17, 18, 19, 20). In paragraph 20, the plaintiff alleges that "meanwhile, CHRO, acting through Cynthia Watts Elder and Dr. Pamela Libby, hired white and American-born women who were lesser qualified than plaintiff on a permanent basis as ACC-1's . . ." The fact is that Cynthia Watts Elder only hired two ACC-1s for the Regional Offices during her entire tenure at CHRO (Dr. Libby did not

7

make these decisions), and those were Roxanne Sinclair (B/F) and Joseph Lopez (H/M), neither of whom are white females. (Facts ¶¶ 21, 22). Both Sinclair and Lopez were Connecticut Bar members when hired, making them better qualified than plaintiff, although plaintiff could have, but never did apply for either of these two permanent ACC-1 positions. (Facts ¶¶ 21, 22, 101, 102, 103).

The plaintiff alleges in paragraph 21 that "defendants allowed at least one white American born woman who failed to obtain a license to practice law in Connecticut within one year of her hire to hold an ACC-1 position." Again, this is just not true. The only person who was hired into a permanent ACC-1 position, who was not a Connecticut Bar member, during Cynthia Watts Elder's tenure was Dawne Westbrook, and she is a black female. (Facts ¶ 102). Westbrook <u>did</u> become a member of the Connecticut Bar (on May 14, 1999) within one year of her appointment on October 9, 1998. (Facts ¶ 102).

In paragraph 22, the plaintiff alleges that CHRO should not have changed the Affirmative Action position from full time to part time. However, the plaintiff never applied for this position at all.

In paragraph 25, the plaintiff alleges that "on or about March 21, 2000, plaintiff applied for a permanent position of Assistant Commission Counsel 1 (ACC-1) with CHRO." This is not true. All the plaintiff did on or about that date was to fill out a "Duties Questionnaire" as part of the SCOPE study being conducted by DAS, which involved all ACC-1 positions. (Facts ¶ 24). Permanent ACC-1's filled out the same forms. (Facts ¶ 28). This was certainly <u>not</u> an application for employment. (Facts ¶ 24). Plaintiff alleges in paragraph 27 that defendants' "motives in pursuing a review of all

ACC-1 positions" was to discriminate, and this is absurd.  SCOPE is mandated by statute, and none of the defendants had any control over it.  (Facts ¶ 23).  Out of the last seven ACC-1's hired by CHRO, only one was a white male.  (Facts ¶ 102).  Cynthia Watts Elder is a black female.  (Facts ¶ 15).  Plaintiff's allegations in paragraphs 28 and 29 about his "protests" are untrue, but also irrelevant, because the only basis for his first Amendment claim is a 1997 law school paper.  (Facts ¶ 111).

Plaintiff's claims in paragraphs 30 and 31 are irrelevant, because DAS made its decision to red circle the ACC-1 jobs on April 27, 2000, the day <u>before</u> plaintiff passed the Connecticut Bar Exam.  (Facts ¶ 28).  All of the plaintiff's claims in paragraphs 32-43 concerning the HRO Representative exam have been completely refuted in defendant's Facts ¶¶ 33-49.  Plaintiff's allegations in paragraph 44 that exceptions were made for white females in personnel hiring decisions is refuted by Facts ¶ 50 and ¶¶ 105-108, and his allegation in paragraph 45 (assuming it involved Susan Hom) is irrelevant since transfers never require loss of salary and plaintiff never sought a transfer anyway.  Plaintiff's labor grievance in paragraph 46 was denied.  (Facts ¶ 58).  Paragraphs 47-49 of the complaint are irrelevant.  Paragraph 50 involves the hiring of Paula Tomaszewski in December 1999 for an HRO Representative position in Norwich, but plaintiff never applied for it.  (Facts ¶ 118).  Defendants did secure a permanent job for plaintiff at CHRO, contrary to paragraph 51 (Facts ¶ 53).  Plaintiff's constructive discharge claims in paragraph 52 are belied by the sworn statement of his supervisor, Robert Brothers, Jr. (Facts ¶ 65).  Plaintiff admitted in his deposition that he has no evidence to support paragraphs 53, 54 or 56 (Facts ¶ 85).  Contrary to plaintiff's claims in paragraphs 57-59 that Watts Elder defamed him (for which he has no evidence), she asked DAS and OPM

9

to convert his durational job to permanent employment and finally <u>did</u> get him a permanent job. (Facts ¶¶ 19, 20, 26, 27, 32, 52 and 53). Plaintiff's claims in paragraphs 60 and 61 involve other employees and other lawsuits which are irrelevant to the present case. Thus, all of the plaintiff's conclusory factual allegations have been refuted.

## III.    STANDARD OF REVIEW

A motion for summary judgment is granted when there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. <u>American Int'l Group, Inc. v. London American Int'l Corp.</u>, 664 F.2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). Nonetheless, "the statutory purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir.) <u>cert. denied</u>, 474 U.S. 829 (1985).

This is not to say that de minimis evidence is sufficient to overcome summary judgment. Speaking to this issue in <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), the United States Supreme Court stated:

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant 's explanation, no rational fact finder could conclude that the action was discriminatory. **For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the**

**plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.**

Id. at 148. (emphasis added).   The plaintiff's own admissions will show that his claims are not supported by admissible evidence, and the defendants' evidence clearly shows that they are entitled to summary judgment.

## IV.  <u>ARGUMENTS</u>

### A.    TITLE VII AGAINST CHRO

#### 1.    PLAINTIF FAILED TO OBTAIN A RIGHT TO SUE LETTER FROM THE DEPARTMENT OF JUSTICE.

The plaintiff admits in paragraph 4 of his complaint that he only has a right to sue letter from the EEOC, and one from CHRO.  (The CHRO release only authorizes suit in state court pursuant to Conn. Gen. Stat. § 46a-100 and 46a-101)  The law is clear that when a government agency such as CHRO is a defendant, the plaintiff must obtain a right to sue letter from the DOJ.  See 42 U.S.C. § 2000e-5(f)(1).  In fact, the plaintiff failed to allege in his compliant that he ever even attempted to obtain the letter from DOJ, and the courts have held that failure to at least make the attempt to obtain one is fatal.  <u>Thames v. Oklahoma Historical Society</u>, 646 F. Supp. 13, 16 (W.D. Okl. 1985), <u>affirmed</u>, 809 F.2d 699 (10th Cir. 1985).  <u>See also</u> <u>Fouche v. Jekyll Island State Park</u>, 713 F.2d 1518, 1524 (11th Cir. 1983); <u>Solomon v. Hardison</u>, 746 F.2d 699 (11th Cir. 1984); <u>Ward v. Florida Dept. of Juv. Justice</u>, 194 F. Supp. 2d 1250, 1257 (N.D. Florida 2002).

11

**B.** **THE PLAINTIFF'S CLAIMS UNDER TITLE VII ARE LIMITED TO THOSE MADE IN HIS CHRO AND EEOC COMPLAINTS**

It is well established that the federal court has jurisdiction under Title VII only over claims made in the CHRO/EEOC charge or claims which are reasonably related thereto. <u>Smith v. American President Lines, Ltd.</u>, 571 F.2d 102, 107 (2d Cir. 1978). In the present case, the CHRO complaint was filed on August 29, 2000 with CHRO. (Facts ¶ 116). It cannot be disputed that the CHRO complaint (#0130100) was never amended to plead constructive discharge or anything else that allegedly took place after August 29, 2000. (Facts ¶ 117). A review of that complaint affidavit reveals the following claims:

1.  In paragraph 27, the plaintiff alleged that "Respondent [CHRO] hired American females on a permanent basis for the identical job complainant was hired as durationally [which plaintiff claims in paragraph 25 was ACC-1];

2.  In paragraphs 28-31, plaintiff claims that CHRO discriminated against him by hiring Paula Tomaszewski as an HRO Representative;

3.  In paragraphs 32-35, plaintiff claims that CHRO discriminated against him by hiring Roxanne Sinclair;

4.  In paragraph 42, plaintiff claims that he "relied in good faith upon respondent's promise to make all durational position permanent. . . ;

5.  In paragraph 44, plaintiff claimed that Respondent "retaliated against complainant because of his on-white status by hiring him durationally, then demoting him . . . ;

12

6.    In paragraphs 45-64, plaintiff claimed that CHRO caused his application for the HRO Representative position to be rejected because Susan Carlson sent him an incomplete application;

7.    In paragraph 65, the plaintiff claimed that CHRO retaliated against him and discriminated against him based on race, national origin, gender and age by failing to hire him as a ACC-1;

8.    In paragraph 66, the plaintiff claims that CHRO retaliated against him and discriminated against him on race, national origin, gender, and age by demoting him from durational ACC-1 to permanent HRO Trainee.

These eight claims also appear in the plaintiff's federal complaint, except for his age discrimination claim which he dropped.  All eight claims are addressed below.

### C.    ALL EIGHT OF THE PLAINTIFF'S CLAIMS UNDER TITLE VII MUST BE DISMISSED FOR LACK OF EVIDENCE.

#### 1.    PLAINTIFF'S CLAIM THAT CHRO HIRED ONLY WHITE FEMALES AS PERMANENT ACC-1'S IS INVALID.

It is well established that plaintiff's Title VII claims must be analyzed under the McDonnell-Douglas standard.  In order to defeat a motion for summary judgment on a claim of disparate treatment based on race, national origin and gender, the plaintiff must prove:

> (1) he is a member of a protected class; (2) he "applied and was qualified for a job for which the employer was seeking applicants"; (3) he was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications.

13

<u>McDonnell-Douglas v. Green</u>, 411 U.S. 792, 802 (1973).  Plaintiff's problem is that he never did apply for the ACC-1 position, and therefore he cannot establish a prima facie case on this claim.

The Second Circuit Court of Appeals recently clarified the "application requirement" as follows:

> We read McDonnell Douglas and Burdine generally to require a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion.  This general mandate ensures that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer.  Moreover, we believe if generally requesting a promotion in an annual review were sufficient to established a prima face case, employers would be unfairly burdened in their promotion efforts.  Rather than simply considering individuals who have specifically applied for a promotion, an employer would additionally have to keep track of all employees who have generally expressed an interest in promotion and consider each of them for any opening for which they are qualified but did not specifically apply.

<u>Brown v. Coach Stores, Inc.</u>, 163 F. 3d 706, 710 (2d Cir. 1998).  Furthermore, it is undisputed that the only two permanent ACC-1's hired during Cynthia Watts elder's tenure as CHRO Executive Director were Roxanne Sinclair (B/F) and Joseph Lopez (H/M).  (Facts ¶¶ 102, 103).  This fact certainly refutes plaintiff's claim that only white females were hired for this job.  Neither Sinclair nor Lopez were white females.  Moreover, the plaintiff failed to apply for either of these two permanent ACC-1 positions, one of which (filled by Sinclair) was in the same regional office where the plaintiff worked.  (Facts ¶¶ 21, 22).

## 2. PLAINTIFF'S CLAIM REGARDING TOMASZEWSKI FAILS.

It is undisputed that the plaintiff never applied for the permanent HRO Representative position which was filled by Paula Tomaszewski (Facts ¶ 118). Therefore, this Title VII claim fails pursuant to <u>Brown v. Coach Stores,</u> <u>supra</u>.

## 3. PLAINTIFF'S CLAIM REGARDING ROXANNE SINCLAIR FAILS.

It is undisputed that the plaintiff never applied for the permanent ACC-1 job which was filled by Roxanne Sinclair. (Facts ¶¶ 21, 22). Therefore, this Title VII claim fails pursuant to <u>Brown v. Coach Stores, Inc.</u>, <u>supra</u>.

## 4. PLAINTIFF'S CLAIM THAT HE RELIED ON THE PROMISE TO MAKE HIS JOB PERMANENT FAILS.

Plaintiff's claim that he relied upon alleged representations to make his durational job permanent must fail for the same reasons that the plaintiff's claim in <u>Brown v. Coach Stores</u>, <u>supra</u>, failed. He never actually applied for positions when they opened up. He could have applied for Tomaszewski's position but did not. He could have applied for Sinclair's and Lopez' positions but did not. He decided to sit around and wait, hoping that CHRO's efforts to convince DAS and OPM to make the durational positions permanent would succeed, but the fact that DAS and OPM decided not to do so does not give rise to a Title VII claim. The plaintiff assumed the risk by failing to apply for any of the ACC-1 or HRO Representative jobs.

15

Finally, it must be noted that no one ever made a flat out promise to give the plaintiff a permanent ACC-1 position, nor could they do so. All anyone could promise was to try, and they did try. A promise <u>to try</u> is not something that can be enforced pursuant to colleteral estoppel or any other legal theory. See <u>Stewart v. Cendant Mobility</u>, 267 Conn. 96 (2003). In his deposition, plaintiff admitted that he didn't know if Watts elder had any authority to tell him that durational positions were going to be made permanent. (Facts ¶ 121).

### 5.    PLAINTIFF'S RETALIATION CLAIM FAILS.

In order to prevail in a Title VII retaliation claim, the plaintiff must prove "(1) that he was engaged in protected activity by opposing a practice made unlawful by Title VII, and (2) that the employer was aware of that activity, and (3) that he suffered an adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse action." <u>Galdieria Ambrosini v. National Realty</u>, 136 F.3d 276, 292 (2d Cir. 1998). In the present case, the plaintiff has failed to produce evidence of ANY of these four requirements, nor can he do so. Plaintiff was not engaged in any protected activity, nor does he allege that the employer was aware of him engaging in any such activity. In fact, in his deposition, the plaintiff testified that he did not believe his federal lawsuit included a retaliation claim. (Facts ¶ 122). Furthermore, he did not suffer any adverse action because once his durational job ended on June 30, 2000, he was hired as a full time permanent HRO Trainee on July 1, 2000.

**6.    PLAINTIFF'S CLAIM CONCERNING HIS INCOMPLETE APPLICATION FOR HRO REPRESENTATIVE EXAM FAILS.**

As <u>Brown v. Coach Stores, Inc.</u>, <u>supra</u> teaches us, the plaintiff was responsible for filling out the application for HRO Representative and filing it, and he did not do so in this case. The application form in question is available all over the State of Connecticut, and it is available on-line, and through a 24 hour automated phone system. (Facts ¶ 48). Plaintiff is a well educated man. (Facts ¶ 10). Furthermore, Susie Carlson <u>did</u> send him the complete application in two sections by FAX, although she had no obligation to do so. (Facts ¶ 40). Plaintiff simply never filed a complete application for the exam, and it must be noted that an application for an exam is <u>not</u> an application for a position. (Facts ¶¶ 37, 42).

**7.    PLAINTIFF'S CLAIM THAT CHRO FAILED TO HIRE HIM AS A PERMANENT ACC-1 FAILS.**

As previously noted, the plaintiff failed to apply for any of the permanent ACC-1 jobs that opened up. (Facts ¶¶ 21, 22). The attempt by CHRO to convert his durational law clerk job into a permanent position (which would then have had to be reclassified to an ACC-1) does not fulfill the application requirement in <u>Brown v. Coach Stores</u>, <u>supra</u>. CHRO had no authority to make him a permanent ACC-1 without DAS/OPM approval, which never happened. (Fact ¶ 13).

**8.    PLAINTIFF'S DEMOTION CLAIM FAILS**

The plaintiff was a durational student law clerk in the spring of 2000, and when that position expired on June 30, 2000 he was hired by CHRO as a permanent HRO Trainee. (Facts ¶¶ 51, 52). When a state employee is in a durational position that

17

expires, and then is <u>hired</u> into a different, new permanent position, he cannot characterize that transition as a demotion.  (Facts ¶¶ 7, 8).  The plaintiff's attempt to characterize these events as a "demotion" do not make it so, especially since he has failed to offer any evidence to dispute the facts submitted by the defendants.  (Facts ¶¶ 51, 52).

> **D.    ASSUMING ARGUENDO THAT PLAINTIFF IS ALLOWED TO MAKE A CONSTRUCTIVE DISCHARGE CLAIM, THAT CLAIM ALSO FAILS.**

If the plaintiff is allowed by this Court to claim (even though he never amended his CHRO charge to raise this issue) that he was constructively discharged on April 6, 2001 when  he left CHRO for a higher paying job in Newark, New Jersey, his claim fails. The plaintiff cannot show that his working conditions at CHRO were so intolerable that a reasonable person would have felt compelled to leave.  <u>Spears v. Missouri</u>, 210 F. 3d 850, 854-5 (8th Cir. 2000).  Constructive discharge is determined by an objective standard, not the employee's subjective feelings.  <u>Coffman v. Tracker Marine</u>, 141 F.3d 1241, 1247 (8th Cir. 1998).  In fact, the plaintiff's supervisor at the time he left, Robert Brothers, Jr., stated in his Affidavit in this case that when he met with the plaintiff during the first week of April 2000, the plaintiff never indicated that he felt he was being forced out of his job or even that he was unhappy with his position.  (Facts ¶ 65).  In his letter of resignation, the plaintiff never mentioned anything resembling constructive discharge. (Facts ¶ 74).  Therefore, the plaintiff cannot establish a prima facie case of constructive discharge, even if the Court allows him to make this claim.

It should be noted that there is a likely reason why the plaintiff left his CHRO employment, and it does not involve discrimination, retaliation, or constructive discharge. That reason is that the plaintiff knew that Robert Brothers, and then others at CHRO,

would soon discover all of plaintiff's deficiencies that Mr. Brothers described in his letter to Donald Newton dated May 15, 2001, including the fact that he had done no work at all on most of his files. (Facts ¶ 87).

### A. Plaintiff's Title VII Claims Which Appears For The First Time In His Federal Complaint, And Which Are Vague, Cannot Be Considered.

The only difference between the Title VII claims made by the plaintiff in his CHRO complaint and those he makes in his federal complaint is that his federal complaint adds several very vague allegations concerning selective enforcement (Facts ¶ 63a and b, 64b), hostile work environment (Facts ¶ 63j), inadequate training (Facts ¶ 63l), failure to promulgate effective policies (Facts ¶ 63k, o, 64a) and inadequate supervision and discipline (Facts ¶ 63m, n). It is the defendants' position that these allegations must all be dismissed because they go well beyond the allegations in the plaintiff's CHRO complaint. They certainly do not grow out of it. Furthermore, they are so vague that they violate FRCP 8(a) which requires a short and plaint statement of the plaintiff's claim, and FRCP 8(c) which requires that each averment must be "simple, concise, and direct." For example, in the plaintiff's claim that CHRO selectively enforced policies (Complaint ¶ 63, b, 64b) the plaintiff fails to identify one single policy that he believes was selectively enforced, or how it adversely affected him. Surely, these allegations must all be dismissed pursuant to Rule 8(a) and (e), and Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The defendants have the right to be apprised of the claims being made against them. <u>Rodriguez v. Doral Mortgage Corp.</u>, 57 F.3d 1168, 1171 (1st Cir. 1995). Furthermore, plaintiff has not offered any evidence to support any of these new claims.

19

### E.     THE CLAIM AGAINST DR. PAMELA LIBBY IN HER INDIVDIUAL CAPACITY MUST BE DISMISSED FOR LACK OF SERVICE OF PROCESS.

Defendant Dr. Pamela Libby contests personal jurisdiction under Rule 12(b)(5) for the lack of proper service of process.  The summons and complaint were not served on her.  The Second Circuit has held that a motion to dismiss for lack of personal jurisdiction must be granted if the plaintiff fails to serve a copy of the summons and complaint upon the defendants.  Schaeffer v. Village of Ossining, 58 F.3d 48, 49-50 (2d Cir. 1995).  Federal Rule 4(e) provides that service upon an individual may be made by in-hand service, abode service, by request to waive, or pursuant to the law of the state in which the district is located.  See, Fed. R. Civ. P. 4(e) and (f).  In Connecticut, service may be made on an individual by in-hand service or abode service.  Conn. Gen. Stat. § 52-57(a).  In the present case, the docket sheet shows no return of service upon Dr. Libby in her personal capacity.

In the present case, defendant Libby executed an affidavit stating ***that she was not served personally and no one was authorized to except service of process for her  in her individual capacity.***  (Facts ¶ 4).

 Even if it were the case that the complaint was left at the DAS office, leaving the complaint there did NOT effectuate service upon this individual defendant who has also been sued in her individual capacity.  In their Answer to the Third Amended Complaint, defendant Libby raised the issue of a lack of personal jurisdiction pursuant to Rule 12(b)(4) and 12(b)(5). (Ex. 2, Defendant's Answer to Third Amended Complaint, p. 11).

This same situation occurred in the case of Bishop v. State of Connecticut, et al, Case No.3:01CV1140(AVC) (D. Conn.).  In Bishop, the individual defendants were not served personally. The summons were left with an agency official who had no authority to accept service for the defendants in their personal capacities.  The defendants raised the issue of personal jurisdiction in their answer to the complaint and then moved for summary judgment.  In granting the defendant's motion, Judge Covello correctly

observed that a challenge to personal jurisdiction is not waived if raised in the operative

answer. See Rule 12 (b). Also, once raised, the burden is upon the plaintiff to prove that

personal service was properly perfected.

In sum, the lack of service of process upon defendant Libby requires that the case

against her be dismissed.

> **F.    THE PLAINTIFF'S §§ 1983 AND 1981 CLAIMS AGAINST
> DEFENDANTS WATTS ELDER, NEWTON AND LIBBY IN
> THEIR OFFICIAL CAPACITIES ARE BARRED BY THE
> ELEVENTH AMENDMENT AS A SUIT AGAINST THE
> STATE.**

The plaintiff has sued defendants Watts Elder, Newton and Libby in both their

official and individual capacities. (Complaint, Exhibit 1, ¶'s 6-8).  Any claim against

these defendants in their official capacities must be dismissed because the state is not a

"person" within the meaning of section 1983 and the Eleventh Amendment bars such

claims.

Section 1983 only authorizes the imposition of liability against a "person" who

acting under color of state law violates another person's federally protected rights.  The

Supreme Court in Will v. Michigan Dept. of State Police, 491 U.S. 58, 109 S.Ct 2304,

105 L.Ed.2d 45 (1989), has made clear that neither State agencies nor State officials

acting in their official capacities are "persons" under section 1983.  Thus, to the extent

that the defendant has been sued in his official capacity for damages and retrospective

relief under section 1983, state officials acting in their official capacities are not

"persons" subject to section 1983 liability. Gaby v. Board of Trustees of Community

Technical Colleges,  348 F.3d 62 (2nd Cir. 2003).

Furthermore, the Eleventh Amendment to the United States Constitution bars the

State of Connecticut from being sued under 42 U.S.C. § 1983.  The Eleventh Amendment

provides "[t]he Judicial power of the United States shall not be construed to extend to any

suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const., Amend. XI.  The well accepted rule of law is that 42 U.S.C. § 1983 does not abrogate the Eleventh Amendment immunity of states, including suits against state agencies.

The established law is that the Eleventh Amendment also bars an action for damages against Newton, Watts Elder and Libby in their official capacity.

> "The Eleventh Amendment bars a suit against state officials when the 'state is the real, substantial party in interest.'"  Pennhurst State School & Hospital v. Halderman, supra, ___ U.S. at ___, 104 S.Ct at 908, quoting Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945).  Thus a suit which seeks a money judgment "which must be paid from the state treasury is barred by the Eleventh Amendment," even though it is nominally asserted against an individual official.  Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974).  Since plaintiff seeks money damages from the individual defendants "in their official capacity" for acts performed within the scope of their respective offices, recovery, if any, will be from the state treasury; thus the bar of the eleventh amendment applies.

Daisernia v. State of New York, 582 F.Supp. 792, 799 (N.D.N.Y. 1984).  The Eleventh Amendment clearly bars the plaintiff's request for compensatory damages, punitive damages, attorney fees and costs against the defendants in their official capacities because such a claim is essentially a suit against the state, acting through the three defendants in their official capacities.

The same analysis applies to the plaintiff's section 1981 claim against these defendants in their official capacities.  According to numerous courts in the Second Circuit, the Eleventh Amendment bar of suits against the state applies to section 1981 claims.  Yoonessi v. State Univ. of New York, 56 F.3d 10 (2d Cir. 1995); Reed v. State of Connecticut Department of Transportation, 2000 U.S. Dist. Lexis 6271 (D.Conn. 2000); Chada v. Connecticut Medical Examining Board, 1999 U.S. Dist. Lexis 18939 (D.Conn. 1999); Daisernia v. State of New York Department of Corrections, 582 F.Supp.

792, 799, 803 (N.D.N.Y. 1984) (Section 1981 does not abrogate the sovereign immunity of the states).

Since a claim premised upon § 1981 against defendants Watts Elder, Newton and Libby in their official capacities is a suit against the state, the Eleventh Amendment bars such actions. Accordingly, Counts 2 and 4 of the complaint making reference to Sections 1983 and 1981 are barred and must be dismissed.

### G.  THE PLAINTIFF CANNOT PROVE A PRIMA FACIE CASE ESTABLISHING A VIOLATION OF THE EQUAL PROTECTION CLAUSE.

The plaintiff's equal protection claim is somewhat amorphous because it does not clearly identify the facts upon which this claim is premised. A careful reading of the complaint includes many superfluous facts, opinions and speculation on the plaintiff's part.  However, the basic contention by the plaintiff is that he was treated differently than others because of his race, color, gender and national origin.

There is no dispute that the plaintiff was initially given a durational (no guarantee of continued employment)  position in 1999, that was extended several times and set to expire in June 2000. (Facts ¶¶ 33, 43).  There is also no dispute that the plaintiff was hired into a permanent CHRO position as an HRO Trainee in July 2000 because Watts Elder's (a black female) attempt to convert the plaintiff's durational position into a permanent ACC-1 job classification was rejected by DAS and the plaintiff carelessly failed to submit the necessary examination materials for a permanent HRO position. (Facts ¶ 42).

Other than his permanent employment in a lower praying position than he wanted (and which he incorrectly claims that he was promised), the plaintiff cannot point to any _legally recognized_ adverse action that he claims resulted from the conduct of defendants

Newton Watts-Elder and Libby[1]  At best, the plaintiff testified to a litany of things he disliked and his perception that he was treated differently than others because they (defendants) are a "motley crew."   But that is not evidence of an equal protection violation.

A.     The defendants submit that the plaintiff cannot show a violation of his right to equal protection.  The essence of one's right to equal protection "is that persons similarly situated with respect to challenged government action shall be treated similarly."  Smith v. U.S. Parole Com'n, 814 F.Supp. 246, 247 (D.Conn. 1993).  Employees are similarly situated if there is an "objectively identifiable basis for comparability' … a reasonable close resemblance of the facts and circumstances." Ramos v. Marriott International, Inc., 134 F. Supp. 2d 328, (S.D.N.Y. 2001); quoting Graham v. Long Island Rail Road, 230 F.3d 34, 40 (2d Cir. 2000).  This does not mean that all people must be treated identically.  Rather to prevail on his equal protection claim, the "plaintiff must show that he (she) was treated differently because of his ethnicity, national origin, race, or his membership in another suspect class."  See Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 143-44 (2d Cir. 1993); Carrero v. New York City Housing Authority, 890 F. 2d 569, 577 (2d Cir. 1989).  The requirement of discriminatory intent or purpose "…implies that the decision maker, … selected or reaffirmed a particular course of action at least in part 'because,' not merely 'in spite of' its adverse effects … upon a member of a protected group."  Personnel Administrator of

---

[1]     Within the context of a § 1983 action, once under color of state law is established, an equal protection claim parallels a Title VII claim for disparate treatment. Feingold v. State of New York, et al., 366 F.3d 138, 159 (2d Cir. 2003). It is axiomatic that for there to be such a claim some type of adverse action beyond the plaintiff's personal suspicions and speculation is required. Plaintiff's feeling that he was disliked or carefully scrutinized is not enough.

Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).

The applicable case law makes clear that the plaintiff's equal protection claim is without merit.  First, plaintiff cannot prove that he was treated differently by Newton, Watts Elder or Libby than a similarly situated white female employee.

Dr. Libby testified that she rejected the plaintiff's application for the HRO examination because his material was incomplete. Contrary to the plaintiff unfounded assertion, Dr. Libby did not admit to that examination a white female who also submitted incomplete materials. (Facts ¶¶ 46, 50).  More accurately, the records show that the person to whom he compares himself on this issue, Paula Ross, was not similarly situated. Ms. Ross applied for the HRO examination in 1990, some 10 years earlier, and her material were complete.  In 2000, Ross submitted materials to DAS for a different examination, that of Affirmative Action Manager, Ross' application was rejected because it was not complete, just like Gordon. (Facts ¶106, 107 and 108).  More compelling is the fact that the plaintiff was one of 16 applicants to the May 2000 HRO examination who was rejected for submitting incomplete materials. (Facts ¶ 42). So the plaintiff was not singled out by defendant Libby, at all and certainly not because of his race, color, gender or ethnic background. His current claim is simply an attempt to cover up his own careless conduct.

Plaintiff equal protection claim against Watts Elder relates to the hiring of other employees into the ACC-1 and HRO positions in late 1999 and early 2000. There were several permanent positions available in the regional offices in late 1999 and early 2000, but the plaintiff chose NOT to apply for any of those positions.  (Facts ¶¶ 21, 22, 118).

He can hardly claim that he was discriminated against for a position for which he never applied.

It is also noteworthy to mention that even if the plaintiff had been hired into a permanent ACC-1 position in late 1999 or early 2000, the job specifically requires admission to the Connecticut bar within one year of the date of permanent appointment. (Facts ¶101). Gordon admits that as of this date, some four years later, he is not admitted to the Connecticut bar. (Facts ¶ 101). In response, he claims as part of this lawsuit that other employees were given more time to fulfill the one year requirement. He compares himself to a black female, Dawne Westbrook. However, the records show that Ms. Westbrook was hired into a permanent ACC-1 position on October 9, 1998, and was admitted to the Connecticut bar on May 14, 1999, well within the one year requirement. (Facts ¶ 102). CHRO records show the same for all the ACC-1 hired dating back to 1998. (Facts ¶ 102). Plaintiff claim on this point is specious.

Plaintiff's civil rights claim against defendant Newton is even more amorphous. There is no evidence that defendant Newton has any control over the actual hiring of individuals within the regions, nor did he have any involvement in the decision to reject the plaintiff's incomplete examination materials that he submitted to DAS for an HRO position. The plaintiff admits that Newton was unaware what information Personnel Officer Susie Carlson faxed to the plaintiff in late April 2000 regarding the HRO examination. (Facts ¶ 41). There is simply to evidence showing that defendant Newton treated the plaintiff differently than other similarly situated employees because of his race, color, ethnic origin or gender. Ironically, it was Donald Newton who at the request of Susie Carlson, encouraged the plaintiff to apply for the HRO examination after

26

learning that DAS had rejected the CHRO's request to reclassify Gordon into a permanent ACC-1 position. (Facts ¶ 33). Newton could have just let Gordon's durational job expire and he would have been out of a job. (Facts ¶ 32). Instead he sought to help Gordon, and it is thrown back in his face through this frivolous claim.

B.    The plaintiff cannot prove discriminatory intent on the part of the defendants. The decision of DAS to "red circle" the ACC-1 position (essentially freeze all hiring by CHRO for regional offices) cannot be imputed to any of the individual defendants. (Facts ¶¶ 28, 29, 30). DAS is NOT a party to this lawsuit. Furthermore, there is no cross imputed liability for decisions made by independent actors from different state agencies.

Dr. Libby testified in her affidavit to both her conduct and to the basis for her decisions. (Facts ¶¶ 45-50). Prior to meeting Gordon in June 2000, she had never met him and did not know his race, color or ethnic background. (Facts ¶ 45). Gordon admits that Dr, Libby had no involvement in his request for FMLA leave. (Facts ¶ 69). He also has no evidence to support his contention that one or more white female applicants for the HRO examination in May 2000 were admitted by Dr. Libby despite submitting incomplete materials. (Facts ¶ 50). Sixteen of 55 applicants for the May 2000 HRO examination were also rejected for the same reason as Gordon. (Facts ¶ 42). Gordon was careless and inattentive to the examination requirements, and now he wants to blame a person who is not even a defendant in the case (Susie Carlson) for allegedly sending him an incomplete application. (Facts ¶¶ 38, 39). Even if it was true that he received an incomplete application, there is no evidence of any conspiracy between the defendants that could conceivably impute liability to the individual defendants. Again, if anything,