the plaintiff was victim of circumstance and his own carelessness. He could have applied for open ACC-1 and HRO positions, but chose not to do so. (Facts ¶¶ 21, 22, 118).

Several additional facts highlight the absurdity of the plaintiff's suggestion that Newton, Watts Elder and Libby were racially and culturally biased toward him. Watts-Elder (who is a black female, Facts ¶ 2) attempted to get the plaintiff reclassified from his durational position into a permanent ACC-1 position in early 2000. (Facts ¶¶ 19, 20). When DAS finally rejected CHRO's request to reclassify Gordon into an ACC-1 position based on the SCOPE study showing that his duties did not warrant such a classification, Gordon was encouraged by Newton to apply for the HRO examination so he would have a job. (Facts ¶ 33). After Gordon messed up the HRO examination application through inattention and stupidity, Watts Elder hired him into a permanent position as an HRO Trainee. (Facts ¶ 44). Gordon worked in that job until April 2001, when he left for a higher paying position in New Jersey. (Facts ¶ 55). Before he left his position, Watts Elder and Newton approved a "good" job evaluation for Gordon. (Facts ¶ 56). In sum, the plaintiff's equal protection claim is without merit.

**H.    THERE IS NO EVDIECNE TO SUPPORT THE PLAINTIFF'S  CLAIM  THAT HE WAS RETALIATED AGAINST FOR EXERCISING HIS FIRST AMENDMENT RIGHT TO FREE SPEECH**

The plaintiff's allegation regarding a First Amendment retaliation claim is somewhat stilted because there are no substantive allegations showing the basis for this claim. During his deposition, the plaintiff admitted that the only basis for his First Amendment claim is speech in the form of a law school paper he wrote about CHRO executive

Director Louis Martin in 1997, some two years before Cynthia Watts Elder even arrived

at the CHRO.[2]  (Facts ¶¶ 110-112).

## A.    Burden of Proof

"A public employee's right to freedom of speech is not absolute."  <u>Berheim v.

Litt</u>, 79 F.3d 318, 324 (2d Cir. 1996).  Although it is beyond doubt that a public employer

may not retaliate against their employees for exercising their right to free speech, see,

e.g., <u>Connick v. Myers</u>, 461 U.S. 138, 146-47, 103 S.Ct. 1624, 75 L.Ed.2d 708 (1983);

<u>Mount Healthy City School Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 97 S. Ct. 568, 50

L.Ed.2d 471 (1977); <u>Pickering v. Board of Educ.</u>, 391 U.S. 563, 568, 88 S. Ct. 1732, 20

L.Ed.2d 811 (1968), government employees only "have a limited right under the First

amendment to speak on matters of public concern."  <u>Sheppard v. Beerman</u>, 94 F.3d 823,

827 (2d Cir. 1996).  This is because:

> Government agencies are charged by law with doing particular tasks.
> Agencies hire employees to help do those tasks as effectively and
> efficiently as possible.  When someone who is paid a salary so that she
> will contribute to an agency's effective operation begins to do or say
> things that detract from the agency's effective operation, the government
> employer must have some power to restrain her.

<u>Waters v. Churchill</u>, 511 U.S. 661, 674-75 (1994).  Thus, the Supreme Court has

recognized that "… the State's interests as an employer in regulating the speech of its

employees 'differ significantly from those it possesses in connection with regulation of

the speech of the citizenry in general.", <u>Connick v. Myers</u>, 461 U.S. at 140, quoting

<u>Pickering</u>, 391 U.S. at 568, and that the government as an employer has "far broader

powers" to regulate the speech of its employees than it has to regulate the speech of the

---

[2]    Plaintiff CHRO complaint relating solely to his  hire as a permanent HRO trainee was
filed on August 29, 2000, several months after he was hired in that permanent position.
The charge was never amended to add any claims.

public at large.  <u>Waters</u>, 511 U.S. at 671.  "The problem … [is] arriving "at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.  <u>Id</u>.

In order for a public employee to make out a claim that he has been subjected to discipline in retaliation for First Amendment activity, he must demonstrate "that:  (1) his speech was constitutionally protected [by the First Amendment], (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination.  <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d Cir. 1999); <u>Blum v. Schlegel</u>, 18 F.3d 1005, 1010 (2d Cir. 1994).  If the employee is able to meet this burden, "the employer is given an opportunity to establish by a preponderance of the evidence that it would have taken the same action even in the absence of the protected speech."  <u>Lewis v. Cowen</u>, 165 F.3d 154, 163 (2d Cir.) <u>cert. denied</u>, 528 U.S. 823, 120 S.Ct. 70 (1999), <u>citing</u> <u>Mount Healthy</u>, 429 U.S. at 287; <u>see also</u> <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d Cir. 1999).

> **1.    Speech That Does Not Address A Matter Of Public Concern Is Not Protected By The First Amendment.**

"In determining whether employee speech is protected by the First Amendment, a court first must decide whether the speech addresses a matter of public concern."  <u>Lewis v. Cowen</u>, 165 F.3d at 161.  "The requirement that the speech at issue involve matters of public concern 'reflects both the historical evolvement of the rights of public employees, and the common-sense realization that government offices could not function if every employment decision became a constitutional matter.'"  <u>Ezekwo v. NYC Health &</u>

Hospitals Corp., 940 F.2d 775, 781 (2d Cir. cert. denied, 502 U.S. 1013 (1991), quoting Connick, 461 U.S. at 143. If the employee's speech is not on a matter of public concern, meaning that it "cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary." Connick, 461 U.S. at 146; Lewis, 165 F.3d at 161. In such cases, there is no First Amendment violation. See Connick, 461 U.S. at 146; Zaky v. United States Veterans Administration, 793 F.2d 832, 838 (7th Cir.), cert. denied, 479 U.S. 937 (1986)("[t]he reasons behind an employment decision will not be scrutinized unless a speech or other conduct can be 'fairly characterized as constituting speech on a matter of public concern'"). As stated by the Supreme Court:

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

Connick, 461 U.S. at 147.

> 'Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." Lewis, 165 F.3d at 163, see also Connick, 461 U.S. at 147-48 and n.7.[3] In order to be protected, "[a]n employee's speech must not merely relate generally to a subject matter that is of public interest, but must 'sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government."' Moore v. City of Wynnewood, 57 F.3d 924, 932 (10th Cir. 1995), quoting Wilson v. City of Littleton, Colorado,

---

[3]     In order for the court to make this assessment, the employee must identify with particularity exactly what constitutes his "speech." Dennison v. County of Frederick, Virginia, 921 F.2d 50, 53-54 (4th Cir. 1990), cert denied, 501 U.S. 1218 (1991); Hartman v. Board of Trustees of Community College District 508, 4 F.3d 465, 471 (7th Cir. 1993). A general course of conduct that does not involve the expression of any idea or opinion, or evidence an intent to convey a particularized message, is not sufficient to evoke the protection of the First Amendment. Dennison, 921 F.2d at 54.

31

732 F.2d 765, 768 (10th Cir. 1984).  In other words, "[w]hat is actually said on [a] topic must <u>itself</u> be of public concern."  <u>Wilson</u>, 732 F.2d at 769 (emphasis added).  Speech "not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest."  <u>Connick</u>, 461 U.S. at 148 n.8.

In analyzing this issue, "the court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose."  <u>Lewis</u>, 165 F.3d at 163-64.  As the Supreme Court has repeatedly emphasized, not every bureaucratic complaint is a matter of public concern:

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark – and certainly every criticism directed at a public official – would plant the seed of a constitutional case ….  The First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

<u>Connick</u>, 461 U.S. at 149,  Thus, the employee grievances about employment policies or working conditions do not constitute matters of public concern.  <u>Luck v. Mazzone</u>, 52 F.3d  475 (2d Cir. 1995); <u>Ezekwo v. NYC Health & Hospitals Corporation</u>, 940 F.2d 775 (2d Cir.), <u>cert denied</u>, 502 U.S. 1013 (1991).  Even grievances accusing an employer of illegal activity are not matters of public concern if the employee's motivation is personal, as it was in the present case.  <u>See</u>, <u>e.g.</u>, <u>Ezekwo</u>, 940 F.2d at 781 (plaintiff's complaints of sex and race discrimination were not matters of public concern because plaintiff's "primary aim was to protect her own reputation and individual development as a doctor"); <u>Saulpaugh v. Monroe</u>, 4 F.3d 134, 143 (2d Cir. 1993), <u>cert denied</u>, 510 U.S. 1164 (1994)(employee's allegations of sexual harassment did not state a First Amendment claim because they were "personal in nature and generally related to

her own situation"); <u>Knowlton v. Greenwood Indep. School Dist.</u>, 957 F.2d 1172, 1178

(5th Cir. 1992)(cafeteria workers' complaints about serving meals at board meetings

without pay, although relating to violations of the Fair Labor Standards Act, addressed

"private, not public concerns").

      In addition to content, the court must consider the form and context of an

employee's speech.  In general, speech that is made on the job, is not addressed to a

public audience, or is delivered in the course of an employee's official duties is not

speech on a matter of public concern.  For example, in <u>Volberg v. Pataki</u>, 917 F. Supp.

909 (N.D.N.Y.), <u>aff'd</u>, 112 F.3d 507 (2d Cir. 1996), the court held that the general

counsel of the New York Department of Environmental Conservation was not speaking

on a matter of public concern when she sent a memo to her supervisors, cautioning them

that attorney layoffs in the agency would have a disparate impact on minority attorneys,

because the employee was stating her views in her capacity as general counsel.

According to the court, "the First Amendment does not, under ordinary circumstances,

protect an at-will high-level policy-making employee from being fired because of job-

related opinions and ideas [she] expresses as part of [her] employment." <u>Id</u>. 917 F. Supp.

at 916.

        **2.**      **Even if the speech relates to a public concern, the disruptive
effect of the speech outweighs any First Amendment
protection.**

      The next step in analyzing the plaintiff's First Amendment claim requires the

court to apply the "<u>Pickering</u> balancing test" to determine, as a matter of law, whether the

employee's interest in expressing himself is outweighed by the state's interest in avoiding

disruption in the workplace.

Even if an employee's speech is on a matter of public concern, it is not protected by the First Amendment if the employee's interest in expressing himself, as a citizen, is outweighed by the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.  See Waters, 511 U.S. at 668; Connick, 461 U.S. at 142; Pickering 391 U.S. at 568.

Factors that are relevant to the court's balancing process include the "manner, time and place" of the employee's speech and that context in which it arose.  Connick, 461 U.S. at 152-53.  For example, the government's interest is greater "when an employee directly confronts his supervisor with objectionable language than when an employee engages in equivalent speech on his own time and not in front of co-workers."

Even assuming arguendo  that the plaintiff law school paper on the subject of a "Bill of Attainder" could conceivably constitute public speech, the plaintiff cannot prove that any of the defendants were aware of the article, much less that it impacted the DAS decision to "red circle" the ACC-1 position or the subsequent conduct of the individual defendants.  None of the defendants knew about the article. (Facts ¶ 112). The plaintiff's only evidence is his assertion that he was told that the article was widely circulated within the CHRO. However, any suggested proximate relationship between a 1997 law school article and business decisions made in 2000, some three years later, amounts to a metaphysical stretch.   This is even more apparent given that Watts Elder wasn't employed by the CHRO until 1999 and Dr. Pam Libby has never been employed by the CHRO.  (Facts ¶ 2, 4).

34

## I.   THE PLAINTIFF'S HAS NO EVIDENCE TO SUPPORT A DUE PROCESS CLAIM.

The plaintiff's due process claim is premised on violation of alleged property and liberty interests. He contends that as a durational employee he had a property interest in future permanent employment as an ACC-11.  He also asserts that his liberty interest in his reputation was unconstitutionally violated.

Traditionally, due process claims are reviewed under a two-step process.  First, the court must determine whether the nature of the alleged interest is one within the "liberty or property" language of the Fourteenth Amendment. Morrissey v. Brewer, 408 U.S. 471, 481 (1972); Fuentes v. Shevin, 407 U.S. 67 (1972).  Second, if the court finds that the plaintiff herein has established that she has been deprived of a protected property interest, then the court must consider what process is due to protect that interest. Morrissey v. Brewer, 408 U.S. at 481.  "The hallmark of property ... is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" Logan v. Zimmerman Brush, 455 U.S. 422, 430 (1982).  "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interest that a person has already acquired in specific benefits." Board of Regents v. Roth, 408 U.S. 564, 576 (1972) (emphasis added).  In Roth, the Supreme Court further stated:

> To have a property interest and a benefit, a person must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.  It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.

Id. at 577.

35

These property interests are not created by the Constitution, but rather, derive "from the existing rules or understandings that stem from an independent source such as state law  -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id.; See Cleveland Bd. Of Educ. v. Loudermill, 470 U.S. 532, 538, 105 S.Ct. 1487 (1985).

In the present case, the Connecticut statutes and the collective bargaining agreement governing the plaintiff's position plainly create such a property interest for many permanent positions in the classified service under the State Personnel Act, Conn. Gen. Stat. §5-193 et seq., but create no such property interest for durational employees such as the plaintiff.  The due process protections of a position in the classified service are created by the provisions of Conn. Gen. Stat. §5-240(c) which provide in pertinent part:

> A permanent employee shall be given written notice of such dismissal at least two weeks in advance of the employee's dismissal...

However, the due process protections for classified positions set forth in Conn. Gen. Stat. §5-240(c) are superseded by the terms of any applicable collective bargaining agreement entered into between the State of Connecticut and ASFCME  pursuant to Conn. Gen. Stat. §5-278(e). That statute provides:

> Where there is a conflict between any agreement or arbitration award approved in accordance with the provisions of sections 5-270 to 5-280, inclusive, on matters appropriate to collective bargaining, as defined in said sections, and any general statute or special act, or regulations adopted by any state agency, the terms of such agreement or arbitration award shall prevail...

The Supreme Court has recognized that a collective bargaining agreement may also give rise to a protected property interest. <u>Cleveland Bd. Of Education v. Loudermill</u>, 470 U.S. at 538-539; <u>Brock v. Roadway Express, Inc.</u> 481 U.S. 252, 262, 107 S.Ct. 1740 (1987); <u>Caruso v. City of New York et al.</u>, 1999 U.S. Dist. LEXIS 9204(decided June 14, 1999); <u>Moffitt v. Town of Brookfield</u>, 950 F.2d 880, 885 (2d Cir. 1991).  However, a collective bargaining agreement will give rise to a property right only when that agreement explicitly provides that an employee can be discharged only "for cause." <u>Caruso</u>, supra., citing <u>Moffitt v. Town of Brookfield</u>, 950 F.2d at 885 (collective bargaining agreement gave rise to a property interest because the agreement "guaranteed that [the plaintiff] could not be fired without just cause"; <u>Recchia-Hansemann v. BOCES</u>, 901 F. Supp. 107, 110 (E.D.N.Y.)(where collective bargaining agreement gave an employee the right to a hearing before discharge but did not state that the employee could only be fired for cause, no property right exists). Moreover, the provision of procedural protections, taken alone, does not create substantive rights.  <u>Caruso v. City of New York</u>, supra, discussing <u>Yale Auto Parts, Inc. v. Johnson</u>, 758 F.2d 54, 58 (2d Cir. 1985)("The mere existence of reasonable procedures entitling a person to a hearing ... does not give rise to an independent substantive liberty interest.") <u>Fleury v. Clayton</u>, 847 F.2d 1229,1231 (7th Cir. 1988)("There is neither a 'liberty' not a 'property' interest in procedures themselves.")

In the present case, the plaintiff grieved his hiring in the HRO Trainee position versus the higher paying ACC-1 position in July 2000. (Facts ¶ 58). The matter proceeded to a step III hearing, the result of which was resulting by the Labor Relations Officer which stated in part:

> **Article 3, Section two clearly indicates that durational appointments carry no guarantee of continued employment and the cited portion of that article. Section three also deals with provisional appointments which are not at issue hear. <u>This was not a disciplinary action</u>, so Article 16 does not apply.** (Emphasis added).

(Facts ¶58). The plaintiff had no contractual right under the applicable union contract or any state statute to permanent state employment, much less a guarantee of a specific position. It was indeed his hope, and at one time that of defendant Watts Elder, that the plaintiff could obtain a permanent ACC-1 position, but due to factors beyond the defendants' control, that did not occur. The plaintiff was not denied due process because he had no legally recognized property interest in an ACC-1 position.

The plaintiff's due process claim premised on a liberty interest is even more confusing and obtuse. Plaintiff alleges in paragraph 65 of the Third Amended Complaint that his reputation was harmed. (Ex. 1, ¶ 65). Beyond that singular paragraph, the only references to alleged defamatory conduct appears in paragraphs 53 - 59 of the Third Amended Complaint. (Ex. 1, ¶ 53-59). Accordingly the defendants will attempt to respond to the plaintiff overly general allegations on this theory.

It is recognized law that an "individual's constitutionally protected liberty interest is implicated when the government, in terminating a person's employment imposes upon such a person a stigma which restricts his ability to obtain future employment." <u>Brandt v. Board of Co-op. Education Services</u>, 845 F.2d 416, 417 (2d Cir. 1988). In order to prove

38

such a claim, a plaintiff must prove that the stigmatizing information is false and that it was made public by the government official. <u>Gentile v. Walker</u>, 562 F.2d 193, 197 (2d Cir. 1977). Imposition of the stigmatization must occur in connection with the termination. <u>Id.</u>

Recently, the Second Circuit in a case that involved allegations of wrongdoing that were being investigated, the court rejected a liberty interest claim. Essentially the court recognized that the material was equate to an actual defamatory wrongdoing to carry the e4ncessary stigma to sustain a liberty interest claim. <u>See, S & D Maintenance Co., Inc. v. Goldin</u>, 844 F.2d 962 (2d Cir. 1988). From these cases it become clear that to sustain a constitutional claim based on the denial of a liberty interest, the plaintiff must prove some <u>*false defamatory information*</u>, that was <u>*made to the public*</u>, <u>*in connection with his termination.*</u>

Even reading the plaintiff's factual allegation broadly, he cannot prove any of the elements of such a claim. At the outset it is important to note that the plaintiff was not terminated. He **resigned** in April 2001 after beginning a higher paying job in New Jersey. (Facts ¶¶ 60-63). He was not constructively discharged. In June 2000 when Cynthia Watts Elder learned that her efforts to get the plaintiff's durational job reclassified as a permanent ACC-1 position failed because DAS had determined that employees, such as Richard Gordon, were not performing the duties of an ACC-1 to justify that classification, she could have just let his durational term expire in June 2000. (Facts ¶ 44). The plaintiff would have been out of a job. (Facts ¶¶ 32, 43). Instead, Watts Elder hired the plaintiff into a permanent HRO Trainee position after he messed up his application for the HRO examination to get on the list of candidates for the higher paying

HRO representative position. (Facts ¶ 32, 44). The plaintiff did experience a cut in pay versus the inevitable result of unemployment when his durational job ended in June 2000, but the plaintiff was NOT terminated. (Facts ¶ 44).

The plaintiff does not allege exactly what false defamatory statements were allegedly disseminated about him to the public that so stigmatized him. In paragraph 53 Gordon alleges that Newton filed a grievance with the Statewide Grievance Committee alleging that he had engaged in the unauthorized practice of law. In fact, Newton never contacted the Statewide Grievance Committee and Gordon knows it. (Facts ¶¶ 85 and 125). More accurately, Newton responded TRUTHFULLY to an inquiry from the Bar Examining Committee, which then independently referred Gordon to the Statewide Grievance Committee for notarizing his own signature (as well as that of other people in Connecticut) when he was not admitted to the Connecticut Bar. (Facts ¶¶ 83, 90, 91).

Gordon's liberty interest claim against Newton is even more despicable and sanctionable because Gordon admitted to the unauthorized practice of law in Connecticut through a stipulation with the Statewide Grievance Committee in 2002. (Facts ¶ 98). So not only is Gordon's allegation that Newton filed a grievance against him false, but Newton's statement about Gordon's conduct of notarizing his own signature in Connecticut was absolutely true. (Facts ¶¶ 83, 85). Conspicuously absent from the plaintiff's proof will be any evidence that his failure to gain admission to the Connecticut bar was caused by any defamatory statement by the defendants. Therefore, as to Newton, the plaintiff cannot prove any of the elements of a constitutional due process claim.

Regarding Cynthia Watts Elder, the plaintiff alleges that in July 1999 Watts Elder made a public statement that the "plaintiff, as a member of a racial minority person hired by her predecessor, was not qualified to work at the CHRO." This is absolutely untrue. It is correct that in July 1999, Watts Elder was misquoted in a newspaper article about Louis Martin's hiring practices, but the article made no reference to the plaintiff. (Facts ¶ 19). Moreover, it was Watts Elder who renewed the plaintiff's durational status several times between May 1999 and July 2000, who attempted to get the plaintiff a permanent ACC-1 position, and hired him in July 2000 in a different permanent position so he would have a job when his durational position expired. (Facts ¶ 44). So whatever stigma the plaintiff imagines flowed from the July 1999 article, it did not involve him, and that alone does not sustain a constitutional claim. Any stigma flowed, not from anything Watts Elder did, but from the plaintiff's own admittedly improper conduct. (Facts ¶ 98).

In paragraph 59 of the Third Amended Complaint the plaintiff alleges a general claim as he does against all the defendants, that they continue to publish false and defamatory statements about him. What these statements are and how they have prevented him from gaining employment is unclear. The plaintiff remains employed in New Jersey to this date, and has actually increased his income. (Facts ¶ 128).

With respect to Dr. Pam Libby, there is simply no evidence that she published any defamatory statement to the public in connection with the plaintiff's resignation from the CHRO.

In sum, the plaintiff's due process liberty interest claim is the same as his other claims, a vacuous set of allegations with no substantive evidence to support a prime facie case. The plaintiff may indeed be angry and bitter because he did not get a job he wanted

41

and for which he felt entitled. He may also be embarrassed because of his own conduct that casts a shadow over his credibility. In any event, there is no constitutional claim here.

###         J.        DEFENDANTS NEWTON, LIBBY AND WATTS ELDER ARE ENTITLED TO QUALIFIED IMMUNITY.

If the Court finds that the plaintiff's §§ 1983 and/or 1981 claims are insufficient to satisfy a prima facie case, the qualified immunity issue need not be reached. However, even if the Court were to find that plaintiff's §1983 and § 1981 equal protection and/or the due process claims are sufficient to withstand summary judgment, then the defendants are entitled to the protection of qualified immunity and summary judgment must enter in their favor.

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 2829 (1985); Giacolone v. Abrams, 850 F.2d 79, 84 (2d Cir. 1988). "The entitlement is an immunity from suit rather than a mere defense to liability . . ." Id. The principal purpose of the doctrine is to enable public officials to do their jobs without fear of subsequently facing liability for actions they could not reasonably have believed violated the law at the time, Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727 (1982), and to avoid disruption to effective government counsel by the burdens of litigation. Mitchell v. Forsyth, 105 S. Ct. at 2809. The test is one of objective reasonableness, and is determined by establishing whether a reasonable official in the defendant's position could have believed that his actions were lawful, in light of clearly established law. Anderson v. Creighton, 483 U.S. 635,107 S. Ct. 3034, 3039 (1987).

The test is a stringent one and requires that there be a very close factual fit between the case under consideration and previous case law establishing the illegality of the action or conduct at issue in order for the law to be characterized as "clearly established." Thus, in determining whether a particular right was clearly established, the Court must first identify the claimed right in a manner suited to the facts and circumstances of the particular case. Anderson, 107 S. Ct. at 3039; Soares v. State of Conn., 8 F.3d 917 (2d Cir. 1993). Then it must examine the case law of the Supreme Court and of the Circuit to determine whether, during the time period in question, the law was so clearly established that a reasonable official would understand that his actions were unlawful. Although the precise action in question need not have been held unlawful to defeat a claim of qualified immunity, the unlawfulness must be apparent under preexisting law. Anderson, 107 S. Ct. at 3039.

The Court must also decide whether it was clear at the time of the alleged violations of law that an exception did not permit the actions in question. Gittens v. LeFeure, 891 F.2d 38, 42 (2d Cir. 1989). Finally, and perhaps most importantly, even if the court concludes that the law was clearly established, the Court must determine whether it was objectively reasonable for the official to believe that his actions did not violate those rights. Oliveira v. Mayer, 23 F.3d 642, 648-49 (2d Cir. 1994). The subjective motivation of the officials is irrelevant to the inquiry. Anderson, 107 S. Ct. at 3040; Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991). Rather, the focus is on whether reasonable officials in the position of the defendants could have believed their actions were lawful. Where reasonable officials could disagree, the official is entitled to qualified immunity. Weg v. Macchiarola, 995 F.2d 15, 18 (2d Cir. 1993).

The Second Circuit has held that where the underlying §1983 claim requires a showing of intent, as in a claim of unconstitutional retaliation, a government official's motive or intent in carrying out the questioned conduct should be considered in the qualified immunity analysis. Musso v. Hourigan, 836 F.2d 736, 742 (2d Cir. 1988).

When the defense of qualified immunity is raised to a §1983 claim that is grounded in a state actor's unconstitutional motive as here, the federal district courts and Courts of Appeal have been placed in a quandary. "The 'clearly established law' and 'objective reasonableness' facets of current qualified immunity doctrine tug in opposite directions where . . . the 'clearly established law' itself contains a subjective component." Blue v. Koren, 72 F.3d at 1083. The Second Circuit recognizes that permitting consideration of motive could eviscerate the protection to which government officials are entitled by qualified immunity. In response, these courts have required that a plaintiff present proof of the unconstitutional motive of each defendant, and have imposed on plaintiffs a "heightened standard," requiring plaintiffs to provide particularized evidence of a direct or circumstantial nature that demonstrates the required state of mind in order to avoid summary judgment on the defense of qualified immunity.[4] Blue v. Koren, 72

---

[4]    The "heightened standard" required by the Second Circuit is different from the "heightened standard" that the D.C. Circuit imposed on plaintiffs in Crawford-El v. Britton, 93 F.3d 813 (D.C. Cir. 1997), which the Supreme Court held was improper. Crawford-El v. Britton, supra, 118 S.Ct. 1584 (1998). In Crawford-El, the D.C. Circuit required a prisoner to adduce clear and convincing evidence of improper motive in order to defeat a motion for summary judgment on the ground of qualified immunity. Thus, requiring the plaintiff to meet a heightened burden of proof.

The heightened standard "required by the Second Circuit requires the plaintiff to offer specific evidence of unconstitutional motive which "we [the Second Circuit] are doubtful that it imposes a burden greater than is already required under Fed. R. Civ. P. 56…[We] confess considerable doubt as to whether the heightened standard is really heightened or is simply an application of the rule that conclusory assertions are insufficient to defeat a motion for summary judgment." Blue, supra, 1083-84. The Second Circuit's approach was impliedly approved by the Supreme Court in Crawford-El, supra.

44

F.3d at 1084.  ("[T]he plaintiff must proffer particularized evidence of direct or circumstantial facts as suggested in Justice Kennedy's concurrence in <u>Siegert v. Gilley</u>, 500 U.S. 226, 111 S.Ct. 1789, 1795 (1991) supporting the claim of an improper motive in order to avoid summary judgment.")  Particularized evidence of improper motive includes expressions by the state officials regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken.  <u>Blue</u>, 72 F.3d at 1084.

While it may be clearly established that the plaintiff has certain rights under the Equal Protection and Due Process clauses, it is equally clear that Newton's, Watts Elder's and Libby's conduct was objectively reasonable under the circumstances.  The plaintiff has no credible evidence to suggest that under the circumstances described above, the decisions in connection with the red circling of the ACC-1 (actually done by DAS, not the defendants), the plaintiff's hire as a permanent HRO Trainee and the truthful information to the Bar Examining Committee about the plaintiff conduct while employed at the CHRO, violated clearly established law.  This is especially so in light of plaintiff's own admissions that his durational job was scheduled to end in June 2000, that he did indeed engaged in the unauthorized practice of law while employed by the CHRO, that he had been counseled about his work performance, that he did misuse state resources, and a complete dearth of any credible evidence of any conspiracy. (Facts ¶¶ 43, 57, 97, 98). There is simply no evidence suggesting an "unconstitutional motive" on the part of

---

"[F]irm application of the Federal Rules of Civil Procedure is fully warranted and may lead to the prompt disposition of insubstantial claims."  Id. at 1596, quoting <u>Harlow v. Fitzgerald</u>, <u>supra</u>, 102 S.Ct. at 2739, fn. 35).

defendants Newton or Appleton.  Therefore, if the Court reaches the issue of qualified

immunity, the individual defendants are entitled to summary judgment.

> **K.    THE PLAINTIFF'S FALSE LIGHT AND DEFAMATION
> CLAIMS FAIL FOR A LACK OF SPECIFIC
> ALLEGATIONS AND BECAUSE THE PLAINTIFF
> CANNOT PROVE A PRIMA FACIE CASE.**

Under Connecticut law, to establish an invasion of privacy by false light, a

plaintiff must show that the (a) the false light in which the other was placed would be

offensive to a reasonable person and (b) the actor had knowledge of or acted in reckless

disregard as to the falsity of the publicized matter and the false light in which the other

would be placed. <u>Stewart v.  Cendent Mobility Services Corp</u>., 267 Conn. 96, 837 A.2d

736 (2003).   The false statements must be made to the public at large.  <u>Id</u>.

Similarly for the related tort of defamation, the defendants must have published

false statements that harmed the plaintiff and that they were no privileged to do so.

<u>Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.</u>, 234 Conn. 1, 27, 262 A.2d 89

(1995).  Unlike the tort of false light, a defamatory comment need not be made to the

public at large.  However, for both theories, the plaintiff must PLEAD and PROVE  with

specificity exactly what was said and to whom so a trier of fact could evaluate the falsity

of the words used in connection with the remaining elements of a prima facie burden.

<u>Kloth v. Citibank, (South Dakota) N.A.</u>, 33 F.Supp. 2d 115 (D. Conn. 1998).

In the present case, the plaintiff does not plead with any specificity exactly what

defamatory words about the him were communicated to the public at large, when and to

whom.  Similarly, the plaintiff's allegations of defamation are overly general and

conclusory.

In other parts of this brief the defendant address the truthfulness of Donald Newton's comments to Bar Examining Committee, that were expressly authorized by Gordon through his execution of a waiver or liability and release. (Facts ¶¶ 77-85). Even if Newton's comments were not privileged by virtue of the plaintiff's waiver and release, and the information was truthful, which defeats both claims. Gordon admits that he is not admitted to practice the law in Connecticut, that he did engage in the unauthorized practice of law in Connecticut and that he did misuse state resources for his own use. (Facts ¶¶ 97, 98). To aid Mr. Gordon's memory, we remind this court that the unauthorized practice of law is a criminal offense that can be prosecuted. C.G.S. § 51-88.

Conspicuously absent from the plaintiff's proof will be any evidence of how he was damaged by any alleged defamatory remarks, assuming that he can prove that false statements were indeed published about him. Gordon testified that he was damaged financially when he was forced to accept the lower paying HRO Trainee position. But he was not "demoted" as he described it because of any defamatory statement about him personally made by the defendants. (Facts ¶ 58). Gordon also conveniently forgets that he was denied the HRO position because he submitted incomplete examination materials that he admits he could have checked to make sure the application was right . . ." (Facts ¶ 42).

Ironically, despite the professed financial harm he was forced to endure because of the lower salary for HRO Trainee position, Gordon admits that he applied for 12 weeks of **unpaid** FMLA leave in April 2001, as a way to help him financially if he chose to take care of mother. (Facts ¶ 66). Additionally, Gordon had no apparent problem obtaining a comparable job in New Jersey to the ACC-1 position. (Facts ¶ 63). So there

will be no evidence that any alleged defamatory statement harmed the plaintiff, except perhaps for his inflated ego.  The defendants will reserve space in its reply brief assuming that the plaintiff can offer admissible evidence to arguably state a prima facie case for defamation or the tort of false light.

> **L.    PLAINTIFF'S NEGLIGENT MISREPRESENTATION CLAIM IS BARRED BY CONN. GEN. STAT. § 4-165.**

In Count Eight the plaintiff alleges that defendants Watts Elder and Newton made misrepresentations of fact regarding him obtaining a permanent  position. The facts are uncontested that the plaintiff was hired into ***a permanent position*** in  July 2000, just not the one he expected.  Nowhere in the pleading or the letter from Watts Elder to all durational employees dated April 13, 2000, does Watts Elder promise Gordon that he will get a permanent ACC-1 position.  What Watts Elder stated was that the agency was in the process of making durational positions permanent. At the time, the plaintiff 's actual classification was that of a durational law clerk, even though the CHRO extended itself to pay the plaintiff at the higher salary rate comparable to an ACC-1. (Facts ¶ 12).  Watts Elder is not responsible for the results of the SCOPE study or decisions made by DAS or the Office of Policy and Management, both of which are referenced in her April 13th letter.  (Facts ¶ 27).

State officials such as the defendants Watts Elder and Newton sued in their individual capacities possess an immunity from suit under the provisions of Conn. Gen. Stat. § 4-165. State officials are personally liable under Conn. Gen. Stat. § 4-165 only for "wanton, reckless or malicious" acts.  Regarding this specific aspect of Count Eight dealing with negligent misrepresentation,  there are no allegations whatsoever that Watts Elder or Newton acted "wantonly, recklessly or maliciously."  Therefore these defendants

48

are immune from liability pursuant to the provisions of Conn. Gen. Stat. § 4-165 and

immunity provided by common law.  There is no evidence that Donald Newton ever

made any representations about the plaintiff obtaining permanent employment.

### M.    THE TORT OF INTENTIONAL REPRESENTATION REQUIRES PROOF OF FRAUD.

In Count Eight the plaintiff changes the language slightly in a paragraph to

mention alleged "intentional  misrepresentations" by defendants Watts Elder and

Newton.  However, for such a claim of intentional conduct, the plaintiff carries the

heightened burden of showing fraudulent conduct.  The elements of such an action

include: (1) a false representation was made as a statement of fact; (2) it was untrue and

known to be untrue by the party making it; (3) it was made to induce the other party to

act upon it; and (4) the other party did so act upon the false representations to his injury.

Billington v. Billington, 220 Conn. 212, 217, 595 A.2d 1377 (1991); Kilduff v. Adams,

Inc., 219 Conn. 314, 329, 593 A.2d 478 (1991).  The plaintiff must prove the first three

elements by the higher standard  of "clear and satisfactory" or "clear, precise and

unequivocal."  Rego v. Connecticut Ins. Placement Facility, 219 Conn. 339, 343, 593

A.2d 491 (1991).

As with all of his claims, there is no evidence of intentional misrepresentations by

Newton or Watts Elder. The plaintiff takes his interpretation of events and distorts into

representations that did not actually occur.  Richard Gordon was never promised a certain

permanent position.  More importantly, the plaintiff's claim that Watts Elder made

certain knowing about making durational positions permanent knowing them to be false

is flatly refuted by the testimony and documents showing that Watts Elder actually

worked through DAS to try to convert the plaintiff's durational position into a permanent

ACC-1 position.   There is no evidence showing that at the time Watts Elder made the

representations about durational positions that she actually knew: (1) the results of the

SCOPE study, or (2) that DAS would reject CHRO's request to convert the plaintiff into

a permanent ACC-1 position. As stated earlier, the plaintiff simply has no evidence of

intentional wrongdoing. The CHRO, as much as the plaintiff, was the victim of

circumstance when DAS red circled the ACC-1 position because since April 2000, the

agency has not been able to hire any employees for the regional offices in the ACC-1

classification. (Facts ¶ 103).  So the notion that Newton or Watts Elder intentionally

sought to deceive the plaintiff is baseless, and the plaintiff knows it.  (Facts ¶¶ 120, 121).

### N.      THE PLAINTIFF SHOULD BE SANCTIONED FOR FILING A FRIVOLOUS CLAIM AGAINST DONALD NEWTON.

Defendant Newton seeks sanctions against Gordon for filing frivolous

claims against him knowing that he had no evidence of misconduct on Newton's part.

Particularly, Newton objects to the claims for the alleged tortuous conduct of false light

and defamation. These claims are particularly frivolous because not only was the

information Donald Newton shared with the Bar Examining Committee truthful, but

Gordon has sued him knowing full well that he executed a release and waiver of liability

so prior employers could provide information to an inquiry from the Committee

regarding his character and fitness.

Rule 11 sanctions are appropriate when a party files pleading knowing that its if

frivolous, legally unreasonable or factually without foundation, even though not signed in

bad faith.  Wechsler v. Hunt Health Systems, Ltd., 216 F. Supp. 347, 356 (S.D.N.Y.

2002);  Dangerfield v. Merrill Lynch, 2003 U.S. Dist. LEXIS 16908 (S.D.N.Y. 2003).

In the present case, the plaintiff advanced his claims against Newton for defamation and false light despite no factual basis for such a claim against Donald Newton. The uncontested evidence shows:

- Newton never contacted the Statewide Grievance Committee, nor did he file a complaint against Gordon;

- Newton responds to an inquiry from the Bar Examining Committee that specifically requested information about Gordon;

- Gordon executed a release and waiver for the Bar Examining Committee to obtain information about Gordon;

- Gordon admits to having notarized his own signature on CHRO documents though he is not admitted to practice law in Connecticut;

- Gordon admitted that he engaged in the unauthorized practice of law in Connecticut;

- Newton never met the Bar Examining Committee Assistant Administrative Director, Shaddy Kessing, who was the person who requested the information about Gordon;

- Gordon admits to having used state resources for his personal use;

-  Gordon has no evidence that anything Newton said to the bar Examining Committee was false;

- It was the Deputy Director for the Bar Examining committee that independently contacted the counsel or the Statewide Grievance Committee

51

- Gordon has no evidence that Newton acted in bad faith in responding to the specific inquiry from the Bar Examining Committee.

In Gordon's deposition he was questioned about his claim that Newton had contacted the Bar Examining Committee and filed a grievance against him. Gordon admitted that he has no evidence that Newton ever contacted the Statewide Grievance Committee, nor is there any evidence of any conspiracy between Newton and Shaddy Kessing, Assistant Administrative Director for the Bar Examining Committee. (Facts ¶¶ 84, 85). Gordon was warned to withdraw the claim or risk sanctions. (Facts ¶ 127). This type of baseless claim deserves and calls out for sanctions because Gordon should known better as an Attorney in New Jersey.

### O.  COUNT FOUR – AGAINST DEFENDANTS NEWTON, WATTS-ELDER AND LIBBY INDIVIDUALLY UNDER 42 U.S.C. § 1985(3) AND § 1988.

It is important to note at the outset that 42 U.S.C. § 1985(3) provides no substantive rights itself; like § 1983, it merely provides a remedy for violation of federal rights protected elsewhere in the law. Great American Federal Sav. & Loan Assn. v. Novotny, 442 U.S. 366, 372 (1979). Thus, since the defendants have not violated any of the plaintiff's rights protected elsewhere in the law, there can be no violation of § 1985(3). Also, the U.S. Supreme Court has not decided whether any protected class other than race is covered. United Bd. of Carpenters v. Scott, 463 U.S. 825, 828-9 (183). However, the Court has been quite clear that the alleged conspiracy must be motivated by a race-based animus. Griffin v. Breckenridge, 403 U.S. 88, 101-2 (1971).

52

Section 1985(3) provides a remedy for persons who have been intentionally deprived of any constitutional rights or privileges by the conspiracy of two or more persons.  Hayes v. Sweeny, 961 F. Supp. 467, 477 (W.D. N. Y. 1997).  The four elements of a § 1985(3) claim which plaintiff must show are :  (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of person of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the U.S. United Bd. of Carpenters, supra at 828-9.

A reading of Count Four of the plaintiff's complaint clearly shows that the plaintiff failed even to allege the four elements stated above.  The complaint contains nothing but conclusory allegations, and this is plainly insufficient:

> A complaint containing only conclusory, vague, or general allegations that the defendants engaged in a conspiracy to deprive the plaintiff of his rights is insufficient to survive a motion to dismiss.  Crespo v. New York City Police Com'r, 930 F.Supp. 109, 118 (S.D.N.Y. 1996) (citations omitted). Plaintiff must allege some facts from which the existence of a conspiracy could be inferred.  Id.  That is, plaintiff must allege that defendants engaged in acts that are reasonably related to promoting the claimed conspiracy.  Birnbaum v. Trussell, 347 F.2d 86, 89 (2d Cir. 1965).

Hayes, supra at 478.  There is no Respondent superior under § 1985(3).  Hamm v. Bd. of Regents, 708 F.2d 647, 650 (11th Cir. 1983).  In the present case, the plaintiff has not alleged ANY facts from which a conspiracy could be inferred, or that there was a racial animus behind the conspirators' action, and therefore the defendants are entitled to summary judgment on this claim.  Friends of Falun Gong v. Pacific Cultural Enterprise, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003).

53

A plaintiff must provide some factual basis supporting a meeting of the minds, such that the defendants entered into an agreement, express or tacit, to achieve the unlawful end. Romer v. Moerganthau, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000). In the present case, the complaint alleges in paragraphs 88 and 89 that defendants violated the rights of "applicants for employment" (Fact ¶ 89a), that they were "maintaining policies . . . that violate the civil rights of employees . . ." (Fact ¶89b), that they denied "plaintiff employment and advancement in retaliation for his having made a labor grievance and complained of discrimination . ." (Fact ¶89c and d), and that they published false and defamatory statements about plaintiff (Fact ¶ 89e). None of these vague, conclusory allegations meet the above requirements. The plaintiff has not even alleged that any meeting of the minds occurred", obviously because there was none. Speculation and conjecture do not suffice to provide the existence of a conspiracy." Mattler v. Whitledge, 165 F. 3d 1197, 1206 (8th Cir. 1999).

Finally, it must be considered that all of the defendants are government officials who were simply doing their jobs. Under these circumstances, the courts have recently held that claims such as the plaintiff's are barred by the "intracorporate conspiracy doctrine", which is premised on the concept that a corporation generally cannot conspire with its employees or agents because all are considered a single legal entity. Baines v. Masiello, 288 F. Supp. 2d 376, 394 (N.D.N.Y. 2003). "The doctrine has been applied by several courts to bar Section 1985 claims where the conspirational conduct challenged is essentially a single act by a single governmental body acting exclusively through its own officers, each acting within the scope of his or her official capacity, regardless of the motive or intent of the act. Baines, supra at 394; Banhead v. Arkansas Dept. of Human

<u>Services</u>, 264 F. Supp. 2d 805, 827 (E.D. Ark. 2003); <u>Allen v. City of Chicago</u>, 828 F. Supp. 543, 564 (N.D. Ill. 1993); <u>Rabkin v. Dean</u>, 856 F. Supp. 543, 551 (N.D. Ca. 1994).

Lastly, the courts have ruled that Section 1985(3) is not a substitute for Title VII. The U.S. Supreme Court has held that a litigant cannot bring a claim under § 1985(3) to redress violations of Title VII. <u>Great American Svgs. And Loan Assn .v. Novotny</u>, 442 U.S. 366, 375-6 (1979). Otherwise, a litigant could simply avoid the administrative processes and limitations periods in Title VII, just as the plaintiff is attempting to do in this case. Finally, the defendants enjoy qualified immunity from Section 1985 claims, under the same analysis set forth, <u>supra</u>, with respect to § 1983 claims.

Again, it should be noted that the plaintiff never took a single deposition in this case, nor has he ever produced any other type of evidence to support his conspiracy claims. Therefore, the defendants are entitled to summary judgment. <u>Pitak v. Bell Atlantic</u>, 928 F. Supp. 1354, 1369 (D.N.J. 1996).

**P.     <u>COUNT FIVE</u> – AGAINST DEFENDANTS NEWTON, WATTS-ELDER AND LIBBY INDIVIDUALLY UNDER 42 U.S.C. § 1986 AND § 1988.**

Section 1986 provides that a person may be liable for refusing to prevent a § 1985 violation. The law is clear that in the absence of a viable claim under 42 U.S.C. § 1985, as in the present case, there can be no violation under § 1986. <u>Baines v. Masiello</u>, 288 F. Supp. 2d 376, 394-5 (W.D.N.Y. 2003). Also, Section 1986 has its own statute of limitations of one year, and the plaintiff's complaint in this case was not brought within one year of the alleged violations of his rights. This statute of limitations has been strictly construed. <u>Martinez v. Winner</u>, 548 F. Supp. 278, 329 N.87 (D. Colo. 1982).

55

Since the plaintiff cannot prevail under § 1985 or § 1986, he cannot recover attorneys

fees under 42 U.S.C. § 1988.

> **Q.      COUNT NINE – PLAINTIFF'S CLAIMS AGAINST
> NEWTON AND WATTS ELDER REGARDING
> PROMISSORY ESTOPPEL MUST FAIL.**

In Count Nine of his complaint, (Complaint ¶ 62, 63, and 64), the plaintiff

alleges that defendants Newton and Watts Elder made three promises to him

which must be enforced pursuant to the collateral estoppel doctrine.  Those three

alleged promises are as follows:

> 62.     As alleged, the defendants promised Plaintiff that he would
>
> be given permanent employment at CHRO.
>
> 63.     As alleged, defendants promised Plaintiff that his
>
> durational employment was in jeopardy in May 2001.
>
> 64.     The defendants promised to employ Plaintiff free of
>
> unlawful discrimination, harassment and retaliation.

By examining these three alleged promises one at a time, and by reviewing the law of

collateral estoppel, it becomes easily apparent that collateral estoppel cannot be applied.

The alleged promise in paragraph 62 could not be more vague.  According to the

plaintiff's allegation in this paragraph, there was no date or time by which said

"permanent employment" would be forthcoming, or what kind of permanent employment

it would be.  Furthermore, since the defendants did give the plaintiff permanent state

employment as an HRO Trainee beginning on July 1, 2000, this promise was kept.

The alleged promise in paragraph 63 is not a promise at all. It seems to be a statement of fact – that plaintiff's durational employment was in jeopardy. Since "durational" positions in state service are short term and not permanent, they are always in jeopardy." Also, it should be noted that in May 2001, the plaintiff was no longer employed by the CHRO (Facts ¶ 76), so it would have been impossible for the defendants to make such a statement to him.

The alleged promise in paragraph 64, even if it was made, has no legal significance because the defendants are obligated by law to employ all persons "free of unlawful discrimination, harassment, and retaliation." The defendants have always complied with anti-discrimination laws pertaining to employment, and the plaintiff has not produced any evidence to the contrary.

Therefore, none of the alleged "promises" in Count Nine meet the legal definition of a promise which might be enforced via promissory estoppel. In <u>Stewart v. Cendant Mobility Services, Corp.</u>, 267 Conn. 96, 104, (2003) the Connecticut Supreme Court explained the doctrine of promissory estoppel as follows:

> Section 90 of the Restatement [(Second) of Contracts] states that under the doctrine of promissory estoppel [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action of forbearance is binding if injustice can be avoided only by enforcement of the promise. [1 Restatement (Second), Contracts § 90, p. 242 (1981).] A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promissor could reasonably have expected to induce reliance. Thus, a [**105] promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all." (Citations omitted; internal question marks omitted.) <u>D'Ulisse-Cup v. Board of Directors of Notre Dame High School</u>, 202 Conn. 206, 213, 520 A.2d 217 (1987).

It is obvious that none of the alleged "promises" in paragraphs 62, 63, or 64 rise to the level of this legal standard, and the plaintiff certainly cannot amend his complaint at this late date to allege that other promises were made.

While the defendants do not waive their objection to the consideration of any other "promises" other than those three specifically alleged in Count Nine, the defendants will now address plaintiff's allegation in paragraph 29 of the complaint that the defendant Watts Elder made a promise to plaintiff in "a letter dated April 13, 2000, stating that CHRO was in the process of making all durational positions at CHRO permanent . . . " The plain language of this alleged "promise" clearly shows that it does not meet the legal definition set forth in <u>Stewart v. Cendant Mobility</u>, <u>supra</u> because Cynthia Watts Elder only stated that CHRO was <u>in the process</u> of making durational positions permanent.

This April 13, 2000 letter to which the plaintiff refers appears as Exhibit 4, page 45 [Exhibit I] in the documents submitted by the defendants in support of this Motion for Summary Judgment. Although the plaintiff failed to mention it in paragraph 29 of his complaint, that letter also included the following sentence "CHRO is working with the Department of Administrative Services and the Office of Policy and Management to effectuate these changes." Therefore, the defendant Watts Elder clearly put the plaintiff on notice that CHRO could not accomplish its goal of making the durational positions permanent without cooperation from DAS and OPM, and she also put him on notice that this was a work in progress and that it was not complete. (Facts ¶¶ 13, 20).

At his deposition, the plaintiff admitted that he did not know if Watts Elder had the authority to make such a promise. (Facts ¶ 121). Therefore, this was certainly not a "clear and definite promise", and "judged by an objective standard" the plaintiff certainly

could not rely upon it, as the Court stated in <u>Stewart v. Condent Mobility, Services Corp.</u>, <u>supra</u>.  Watts Elder's letter clearly reflected a statement of hope that durational positions would become permanent at some point in the future, and this is not a legally sufficient promise:

> Additionally, the promise must reflect a present intent to commit as distinguished from a mere statement of intent to contract in the future.  See <u>D'Ulisse-Cupo v. Board of Directors of Notre Dame High School</u>, <u>supra</u>, 202 Conn. at 214-15, 520 A.2d 217.  "[A] mere expression of [*743} intention, hope, desire, or opinion, which shows no real commitment, cannot be expected to induce reliance."  3 A. Corbin, Contracts, supra, at § 8.9, pp. 29-30; and, therefore, is not sufficiently promissory.

<u>Stewart</u>, <u>supra</u> at 105.

Finally, it should be noted that since the plaintiff was still in a durational student law clerk position at the time he received this letter, he could not possibly interpret it to mean that he would get a permanent ACC-1 position.  Even if Watts Elder had been successful in ultimately persuading DAS and OPM to make all the durational positions at CHRO permanent (which of course she was not), then the plaintiff would only have had a permanent student law clerk position and he would have had to seek reclassification of that position to ACC-1.  He would also have had to gain membership to the Connecticut Bar within one year.  (Facts ¶ 101).  Again, all of this assumes <u>arguendo</u> that this Court allows plaintiff to bootstrap his inaccurate allegation in paragraph 29 of his complaint into Count Nine, to which the defendants object.

**R.    PLAINTIFF'S SECTION 1981 CLAIM AGAINST THE INDIVDIUAL DEFENDANTS MUST BE DISMISSED BECAUSE 42 U.S.C. § 1983 IS THE EXCLUSIVE REMEDY FOR ALLEGED STATE ACTORS.**

The Plaintiff alleges a claim under 42 U.S.C. § 1981 against individual defendants Watts Elder, Newton and Libby. However, his Section 1981 claims must be denied as 42 U.S.C. § 1983 is the exclusive federal remedy for the alleged violations of Gordon's constitutional rights.  See Burbank v. Office of Atty. Gen. of State of CT, 240 F. Supp. 2d 167, 175 (D.Conn. 2003).

Section 1981 provides, in relevant part,

All persons within the jurisdiction of the United States shall have the same right ... To make and enforce contracts, ... And to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens ...

Since the Plaintiff's claims involve a "state actor," his exclusive remedy lies in an action under 42 U.S.C. § 1983.  The Supreme Court first set out this rule of law in 1989.  Jett v. Dallas Independent School District, 491 U.S. 701, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989).  In Jett, the Supreme Court examined the relationship between Section § 1983 and § 1981.  Concluding that in enacting Section 1983 Congress intended that it was enacting the exclusive remedy against state actors for the violation of constitutional rights, the Court stated:

The historical evidence surrounding the revisions of 1874 further indicates that Congress thought that the declaration of rights in § 1981 would be enforced against state actors through the remedial provisions of § 1983.

Id. at 733-34.

60

In 1991, Congress amended Section 1981 to include the phrase" the rights protected by this section are protected against . . . impairment under color of state law." Subsequently, plaintiffs have argued unsuccessfully to other Circuit Courts that the amendment to § 1981 overruled Jett.   The Fourth, Fifth, Eighth and Eleventh Circuits have concluded that the amendment to section 1981 did not change the rule set forth in the Jett case.  After examining the legislative history of the amendment, these circuits concluded that the purpose of the amendment was to clarify that Section 1981 applies to nongovernmental entities, not to reverse or alter the holding in Jett.  See, Oden v. Oktibbeha County, 246 F.3d 458 (5th Cir. 2001);  Butts v. County of Volusia, 222 F.3d 891, 894 (11th Cir. 2000); Dennis v. County of Fairfax, 55 F.3d 151, 156 n. 1 (4th Cir. 1995);  Cerrato v. San Francisco Community College Dist., 26 F.3d 968 (9th Cir. 1994); Williams v. Little Rock Mun. Water Works, 21 F.3d 218 (8th Cir. 1994).

In Felton v. Polles, 315 F.3d 470, (5th Cir. 2002), the Fifth Circuit determined that the rule set out by the Supreme Court in Jett equally applies to state officials sued in their individual capacity. In so holding, the Fifth Circuit reasoned that the Supreme Court did not make a distinction between state entities and individuals acting pursuant to color of state law.

Recently the district court in Connecticut held that Congress did not abrogate Jett when they added subsection (c) in the Civil Rights Act of 1991.[5]  Burbank v. Office of Attorney General, et al.,  240 F. Supp. 2d 167, 174 (D.Conn. 2003) citing, Felton v. Polles, 315 F.3d 470, 480-81 (5th Cir. 2002); other citations omitted); cf Federation of African Amer. Contractors v. City of Oakland, 96 F.3d 1204 (1996).   Although on its

---

[5]    Subsection (c) states "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of law." 42 U.S.C. § 1981(c).

face the subsection appears to provide a cause of action against state actors, courts use the fact that Congress "neither expressed its intent to overrule Jett, nor explicitly created a remedy against state actors in addition to § 1983," to hold that they are unwilling to deviate from the Supreme Court's precedent.  Id. (citing, Felton 315 F.3d at 480-81).  Accordingly, the Section 1981 claim against the individual defendants must be dismissed.

Formatted: Underline

Formatted: Underline
Formatted: Underline
Formatted: Underline

## **CONCLUSION**

For all of the above stated reasons, the defendants' motion for summary judgment should be granted.

DEFENDANTS,

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:    _____
       Joseph A. Jordano
       Assistant Attorney General
       Federal Bar # ct21487
       55 Elm Street, P.O. Box 120
       Hartford, CT 06141-0120
       Tel: 860-808-5340
       Fax: 860-808-5383
       E-mail: Joseph.Jordano@po.state.ct.us

BY:    _____
       David M. Teed
       Assistant Attorney General
       Federal Bar # ct09102
       55 Elm Street, P.O. Box 120
       Hartford, CT 06141-0120
       Tel: 860-808-5210
       Fax: 860-808-5385
       E-mail: David.Teed@po.state.ct.us

## <u>CERTIFICATION</u>

The undersigned hereby certifies that on the 10th day of November, 2004, a true

and accurate copy of the foregoing Memorandum in Support of Summary Judgment was

sent by United State mail, postage prepaid, to the following:

Igor I. Sikorsky, Jr., Esq.
P.O. Box 38
Unionville, CT 06085

_____
Joseph A. Jordano
Assistant Attorney General

63