**FILED**

2005 FEB -9  A II: 15

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

U.S. DISTRICT COURT
NEW HAVEN, CT

RICHARD A. GORDON              :
    Plaintiff,                      :        CASE NO. 3:01 CV 1656 (MRK)
                     :
                     :
                     :
COMMISSION ON HUMAN            :
RIGHTS AND OPPORTUNITIES       :
    Defendants.                     :        JANUARY 31, 2005

### RESPONSE AND OBJECTION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.    A MOTION FOR SUMMARY JUDGMENT MUST MEET THE MOST STRINGENT STANDARDS; IT IS IN EFFECT CAPITAL PUNISHMENT ON A PLAINTIFF'S CLAIMS.**

Defendant has moved for summary judgment; summary judgment can only be granted when there are <u>no</u> issues of material fact and thus the moving party is entitled to judgment as if all material allegations of Gordon were established uncontroversial facts. *Levin v. Analysis & Technology*, 960 F.2d 314, 316 (2d Cir. 1992). Thus, summary judgment is only appropriate after the court resolves <u>all ambiguities and inferences</u> from the underlying factual disputes in favor of the non-moving party. *See also, Tuck v. Henkel*, 973 F2d 371 (4th Cir. 1992).

Summary judgment normally is inappropriate when intent and state of mind are issues, as in employment litigation where or when the issue is hostility in the environment. In the instant case there are issues of what was defendant's intent and state of mind concerning Gordon's assertion of 1st amendment rights, his challenges to his treatment by

superior as well as his performance at work.  The file reeks of dislike by Gordon's supervisors of Gordon.

Because material facts remain in dispute summary judgment must be denied as to plaintiff's Complaint.  The affidavit attached as well as the transcripts of the numerous depositions show that the only reason Gordon left Connecticut was the abusive conduct of the defendant, its agents and employees.  This attitude toward Gordon is reflected in the defendant's memorandum.

For defendant to successfully challenge this claim it must either show that there is not even a single material issue of fact that Gordon could have a _prima facie_ case, or that there is not even a material fact that defendant's conduct, conceded in full for the purposes of this motion constituted harassing and intimidating of Gordon and were not improper and an abuse of discretion.  *See, Levin,* 960 F.2d at 316-17, cf. *St. Mary's Honor Center v. Hicks,* 61 U.S.L.W. 4782, 4784 (6-22-93).

*St. Mary's Honor Center* says that if the proffered non-discriminatory reason in a Title VII case is found erroneous then a jury may infer termination was unlawful.  *Id.*  It thus implies that in an employment case, summary judgment must be denied if a dispute over material fact exists over whether defendant's proffered reason is the real reason being incorrect as a matter of law.  This is particularly true if most of the "proffered reasons" are after discovered, i.e., a bootstrap effort to justify hostility.  Thus, as long as material issues of

- 2 -

fact remain over whether Gordon has proven a <u>prima facie</u> case, the defendants' Motion should be denied.

## II.     THE FACTUAL ISSUES CLEARLY AND UNEQUIVOCABLY SUPPORT GORDON'S CLAIMS.

The defendant has filed a brilliant effort to summarize a mass of facts and information which came from five depositions and a large number of exhibits but which by their very nature highlight the factual basis of the allegations.  In effect, the defendant is trying to substitute a summary judgment inappropriately for a fact finding trial.  Gordon is entitled to a fact finding hearing rather than an assembly with a massive number of pages for the court and counsel to wade through pertaining to the underlying facts.

Was Gordon a new employee, and a new attorney?  Of course!  Does he claim here in this proceeding perfection?  Of course not.  But references to him as "stupid" are unbecoming, unnecessary and part of the pattern of abuse to which he was subjected as an employee.  But that is not the issue.  What is the issue is how he was treated; was it related to his race or color and whether the court by way of Summary Judgment should preclude this being heard by the fact finder.  We submit that it should not.

Simply to delineate the massive document presented to this court by the State of Connecticut, we have treated the opening filings of an alleged Rule 56(a)(1) statement as if it was a statement under Summary Judgment rule for <u>undisputed</u> facts.  Clearly it is not such a statement but rather a long and detailed, but not precise, statement of allegations, many being past separation; as such is it far from a statement of <u>undisputed</u> facts.  However, Richard

- 3 -

Gordon will treat it as if it is a factual summary of the best evidence the State of Connecticut can offer. The rebuttal to this "statement" under oath is attached hereto as Appendix A.

For the convenience of the court and in an effort to try to summarize a complex history, we have placed next to the factual allegations presented by the State of Connecticut, the rebuttal from Richard Gordon. A review of this, set forth on Section A of this responsive memorandum clearly shows the repeated factual issues thrust forward into the proceeding. THIS CASE IS SATURATED WITH FACTUAL ISSUES SUBSTANTIALLY IN DISPUTE. DEFENDANTS' PURPORTED RULE 56 STATEMENT IS <u>NOT</u> AN UNDISPUTED STATEMENT OF FACTS.

This case simply is not suitable for Summary Judgment. Plaintiff has made a series of allegations and defendants have created a fog of minutia in an effort to obscure from the court the real issue – was the treatment of Gordon saturated with the racial animus which followed the executive director Louis Martin. That's the issue here, quite simply.

There are secondary issues which cloud the proceedings as to the presentation of a defense of Martin by Gordon, how many people read it, and to what extent it influenced and created an animus toward Gordon. It is clear that Gordon's memorandum concerning the procedure against Martin might not be definitive; however it certainly might be a reason for hostility toward him. In effect, the State of Connecticut bypasses this entirely and says the court should ignore that whole issue. We submit that it should not, in the status of a Motion for Summary Judgment.

- 4 -

### III.A.  SUMMARIZE FACTS.

This court should not continence or support a "shotgun" approach to summary judgment.  This is an important instrument of Federal Jurisprudence and procedure and should not be substituted for a thoughtful ruling by a tryor of fact.  A review of the defendant's Memorandum amply demonstrates how saturated it is with factual arguments which it demands the plaintiff and this court wade through over and over again.  Defendant asserts, "This is not true;" and sets forth his rebuttal in Appendix A.

The court is not asked to assume that Gordon's version of the facts is more accurate than the defendant's.  Obviously that is not the issue here.  Gordon simply affirms that there are in fact very substantial issues of fact which permeate the entire proceedings and should deny the State its Motion for Summary Judgment.

Paragraph 15 of the Complaint clearly alleges that a key question was presented when Martin's career at the CHRO was reviewed, i.e., had he "improperly hired minorities?"  The Complaint goes on in paragraph 20 to say that in an effort to rectify what was seen as an abuse, White American born females who were lesser qualified were hired.

It is also significant to note the "discoveries" concerning derelictions alleged against Gordon after he left his job.  See pages 2, 3, and 4 of defendant's Memorandum as an example.

What becomes clear reading the Memorandum is that CHRO and its defenders don't like Gordon.  Where in the past have you heard allegations such as he's "stupid," when one

- 5 -

discusses such a case? The defendant's Memorandum reeks of personal animosity and this reflects the way they felt about Gordon during his employment. Nothing more clearly says that there was a bias against Gordon than the tenor and tone of the defendant's Memorandum which, after all, reflects the input of his supervisors.

**III.B.**

The facts alleged by CHRO also spend an inordinate amount of time on discussion of "post separation evidence." At the onset plaintiff concedes, as indeed he must, that there are many times when post separation evidence is admissible to affect issues such as reinstatement (which incidentally is not requested here) and/or damages.

It has been conceded also by Gordon that he left employment at the State. His contention is he was forced to do so by the way he was treated and that is the central portion of the factual issues presented to the court. However, it is extremely difficult to shift through the 129 paragraphs set forth in the defendant's Rule 56(a)(1) statement to eliminate allegations concerning conduct discovered after the departure of Gordon. He did leave, and after he left, CHRO pursued a frantic effort to justify the way he was treated with facts that they didn't know at the time. So they obviously had nothing to do with how he was treated.

The issue of the utility of after-acquired evidence was settled, one would think, by *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352 (1995) which held that that evidence was admissible insofar as it might affect damages or restatement, but clearly should not be admissible in an issue involving whether there were discriminatory practices. A court

- 6 -

therefore should disregard the plethora of allegations of conduct, which are not conceded but still only serve to cloud the real issues in this case.   It is clear that the defendants have relieved extensively on allegations of misconduct all received after the separation of Richard Gordon from CHRO.  The court, for purposes of Summary Judgment, should disregard all such allegations as set forth in the Memorandum and Motion.

## IV.     LEGAL STANDARDS TO BE MET.

Defendant in preparing this filing, has cited a number of cases and attached many of them to its filing.  However, none of these statements obviate the very basis premise of summary judgment, i.e., that "there is no material issue of fact."  While the defendant may summarize many reasons that may have been the reason, the fact of the matter is that plaintiff has presented a panorama of evidence supported by substantial portions prior to discovery.

Because of the court's familiarity with the summary judgment standard, we will certainly not recite endless cases that simply reiterate the basic standard.  The court must accept, for summary judgment purposes, the factual allegations made by Gordon concerning the incidents which led to his departure.  Efforts by defendant to guild their position and cloud their claims by referring to various employment issues, etc. are immaterial to the basic issue – was Gordon treated differently because of race, and was he retaliated against by raising this issue?  Was Gordon's treatment clouded by his article which supported Martin and criticized the manner in which he was treated?

- 7 -

There are issues of fact for the jury; for the defendant to claim the court can dismiss these issues would put the court into the position of making a decision on a serious disputed issue of fact crucial to the case. The defendants claim their filing is based upon undisputed facts. This is vigorously denied, as can be seen by the Attachment A. Gordon does indeed dispute many of the central factual allegations made by the defendants. THE DEFENDANTS CLAIM THAT THEIR RULE 56 STATEMENT IS UNDISPUTED, IS WRONG, AND THIS IS SUFFICIENT TO DENY <u>AB</u> <u>INITIO</u> DEFENDANTS' MOTION.

## V.    ATTACHED HERETO IS THE ALLEGED HISTORY OF THIS CASE PRESENTED BY THE STATE AS REBUTTED BY GORDON.

The State of Connecticut has presented its views and citations. Without conceding that many of these allegations are really meaningless for the presentation of a Summary Judgment, (because they are based on a one-sided presentation of allegedly undisputed facts) Gordon has still summarized the factual issues presented by that presentation by the State. Obviously we do not contend that <u>this</u> court <u>must</u> accept our version of the facts, but we do contend that there are material issues of fact in dispute.

While no counsel can fail to be impressed by the erudite and most detailed analysis presented by the State, the fact of the matter is that it fails to  meet the standards that there are no factual issues to be determined. Based upon this analysis alone Gordon asks this court to reject the Motion for Summary Judgment filed by the Connecticut Commission on Human Rights and its allies and let this case proceed in its normal pattern, ensuring Gordon of his day in court.

- 8 -

**VI.    ARGUMENT REBUTTAL**
**GORDON NOW WILL ADDRESS THE "SHOTGUN" OF CLAIMS OF LAW**
**PRESENTED BY THE DEFENDANTS.**

The claims of the defendants are numerous, and will be addressed in the order presented by defendants. In Section IV of the State's memorandum defendants claim Gordon "failed to obtain a right to sue letter" from the Department of Justice. This is labeled as "IV ARGUMENT A." We submit this is in error, factually and legally.

As to the defendant's assertion that a right to sue letter issued by DOJ is a jurisdictional prerequisite to a Title VII claim in federal court, they seem to be confusing an apparently ambiguity in statute which "does not expressly address the question of which agency should respond to a complainant's request for a right to sue letter *where Equal Employment Opportunities Commission ("EEOC") has not made a reasonable cause determination.*" Memorandum for the Acting Assistant Attorney General Civil Rights Division, dated October 7, 2000, posted on the DOJ's official website, containing extensive discussions of DOJ's responsibility vis-à-vis issuance of Right to Sue letters for Charges filed with EEOC.

To wit, the case relied on by the defendants in their "Reply to Plaintiffs' Memorandum in Resistance to Motion to Dismiss," dated November 19l 2003 (at p. 1), *Ying Shen v. Oklahoma State Dep't of Health*, 647 F.Supp. 189 (W.D. Okla. 1985), involves the question of the necessity of a Right to Sue letter from DOJ <u>in cases where the complainant</u>

- 9 -

sought and obtained the letter from EEOC before EEOC made any finding. That simply is not the scenario in this case.

Here we have the opposite scenario, in which the Right to Sue letter was issued by EEOC after it dismissed the charge with a finding of "no reasonable cause to believe that discrimination has occurred." This scenario is unambiguously addressed by § 29 C.F.R. § 1601.28(d) (Exhibit D, appended hereto), which expressly directs that "[i]n all cases where the respondent is a government, governmental agency, or a political subdivision, the Commission [EEOC] will issue the notice of right to sue when there has been a dismissal of a charge," and [i]n all cases where the respondent is a government, governmental agency, or political subdivision, the Attorney General will issue the notice of right to sue . . . ."

EEOC controls the dismissal and "Right to Sue" letter process, in that EEOC determines whether it dismisses for "no reasonable cause," and whether DOJ sees Charges against government entities to all. To wit, requests for Right to Sue letters (unless DOJ has retained the case for litigation can be made only directly to EEOC, and not to DOJ, and EEOC then asks DOJ for the letter for the Complainant. 29 C.F.R. § 1601.28 (Exhibit D).

29 C.F.R. § 1601.28(d) is unequivocal that where the EEOC dismisses, as it did here, upon a finding of no reasonable cause to proceed, DOJ does not proceed to issue a Right to Sue Letter.

The DOJ's legal memorandum of October 7, 1999 explained the policy and justice interests served by the different treatment under 29 C.F.R. § 1601.28(d) for charges EEOC

- 10 -

dismisses for finding of no reasonable cause, and charges it never acts on before issuing a

Right to Sue letter upon request of the complainant:

> The EEOC's authority to issue a right-so-sue notice in any case in which it
> has dismissed a charge against a state or local governmental entity for lack
> of probable cause is not inconsistent with our conclusion here. The EEOC
> amended its regulations in 1989 to provide that it would issue right-to-sue
> letters in those circumstances. <u>See</u> 29 C.F.R. § 1601.28(d). That limited
> authority does not depend on a conjunctive reading of the "or" in section
> 706(f)'s reference to "the Commission, or the Attorney General . . . ." that
> would generally authorize either to issue the notice.   Rather, the
> Commission made the 1980 amendment in response to the Eighth
> Circuit's decision in *Shea v. City of St. Paul*, 601 F.2d 345 (1979),
> dismissing an action as untimely even though the plaintiff filed suit within
> 90 days of the Justice Department's right-to-sue letter issued pursuant to
> section 706(f). The court held that Shea's action was time-barred because
> she filed it more than 90 days after receipt of the EEOC's dismissal
> notification pursuant to a different statutory provision from the one at
> issue here – section 706(b), which directs the Commission, upon finding
> no probable cause, to "dismiss the charge <u>and promptly notify</u> the person
> claiming to be aggrieved and the respondent of its action." 42 U.S.C.
> 2000e-5(b) (emphasis added). *Shea*'s interpretation of the EEOC's section
> 706(b) dismissal notification as a right-to-sue letter triggering the 90-day
> limitations period meant that, if the Attorney General had continued the
> practice of issuing separate right-to-sue letters under 706(f), such letters
> would only create a trap for the unwary by erroneously suggesting that a
> complainant had 90 days from the Attorney General's notice within which
> to file her complaint. This Office found the 1980 regulatory amendments
> to be "not . . . inconsistent with the enforcement scheme that Congress
> contemplated in enacting § 706(f)(1)" [citations omitted].

Thus, plaintiff exhausted his administrative remedies when his Charge was

dismissed with a finding and Right to Sue letter from EEOC.  It would be plain

error to dismiss this aspect of Gordon's action for lack of jurisdiction based on

lack of a Right to Sue letter from DOJ.

- 11 -

The defendants cite only two inappositive trial court decisions for the proposition that failure to obtain a Right to Sue from DOJ is fatal to jurisdiction *in the instant case* The first, *Ying Shen v. Oklahoma State Dep't of Health*, 647 F.Supp. 189 (W.D. Okla. 1985), is in appositive because there, the court dismissed the complaint not just because the only Right to Sue letter came from EEOC, <u>but because EEOC had not yet made a finding</u>.

The other case cited by the defendants, *Woods v. Missouri Dep't of Mental Health*, 581 F.Supp. 437, 442-44 (W.D. Mo. 1984), <u>supports plaintiff's position</u>. In *Woods*, EEOC <u>dismissed</u> the charge against a governmental entity and only EEOC would issue a Right to Sue letter. The court waived the requirement of a letter from DOJ, because "[p]laintiff should not be punished for the inability of the EEOC and Attorney General to follow the terms of the statute"). <u>See also</u>, *Dougherty v. Barry*, 869 F.2d 605, 611 (D.C. Cir. 1989) (observing that DOJ review is necessary only if EEOC finds probably cause and cannot obtain compliance through conciliation).

The defendants clearly state that an <u>attempt</u> to obtain the DJO letter is sufficient. They state categorically that no such attempt was made. However, this disregards the Affidavit of predecessor counsel attached hereto as Appendix C. Clearly an effort was made and this is a frivolous argument that should be

- 12 -

disregarded initio. Also, it should be noted this very issue was raised by the defendants and rejected once before.

In *Fouche v. Jekyll Island State Park Auth.*, 713 F.2d !518, 1524 (11th Cir. 1983), and *Ying Shen* , *supra* at 189), courts have held that EEOC's 1980 amendments to its regulations on issuing Right to Sue letters "conflicts with the express language of Title VII." Nonetheless, the court in *Fouche* also waived the requirement of a Right to Sue letter from DOJ, as have a number of other courts, see e.g., *Moore v. City of Charlotte*, 754 F.2D 1100, 1104 n.1 (4th Cir.) cert. denied, 472 U.S. 1021 (1985) (declining to penalize plaintiff for "any EEOC assumption of Justice Department duties"); *Solomon v. Hardison*, 746 F.2d 699, 701-2 (11th Cir. 1984) (waiving requirement of Right to Sue letter from DOJ as nonjurisdictional); *Fouche*, *supra* at 1525-26 (also waiving as nonjurisdictional); *Dillard v. Rumph*, 584 F.Supp. 1266, 1268 N.1 (N.D. Ga. 1984) (waived).

Plaintiff's prior counsel already on file with this court in this case asked EEOC to obtain a Right to Sue letter from DOJ, only to be told by EEOC that it is not possible under the law and under DOJ policy because EEOC dismissed the Charge upon a finding "no reasonable cause." Prior counsel has endeavored to verify this with the DOJ unit that issues the Right to Sue letters. See "Affidavit of Plaintiff's Counsel," already on file. In any event, obtaining a Right to Sue letter from DOJ, or making the two federal agencies conform to the defendants' notion

- 13 -

so what they should be doing appears to be futile and unrealistic for plaintiff to

accomplish.  The defendants are not prejudiced by the lack of a right to sue letter

from DOJ instead of EEOC, and the broad remedial purposes of Title VII urge

that the claim not be dismissed for something beyond plaintiff's powers to

accomplish.

## VII.  THE DEFENDANTS CLAIM THAT GORDON IS LIMITED STRICTLY TO THE   EXACT LANGUAGE THAT HE SET FORTH IN HIS FEDERAL EEOC FILING.

This obviously is not he law and Gordon has set forth in detail sufficiently broad

language to justify this court in considering all his claims.  The broad purposes of the Federal

Rules, and the remedial purposes of Title VII, suggest that the defendants' argument should

be rejected.

The courts have continued to view the EEOC charge as an alert to the defendants and

an effort to push EEOC investigation, rather than a blueprint for litigation.  See here for

example *Cheek v. Western and S. Life Ins. Co.*, 31 F.3d 497, 500, 65 FEP 727 (7th Cir. 1994)

(dual purpose of charge is to put defendant on notice of charges and to trigger EEOC

investigation); *Ajaz v. Continental Airlines*, 156 F.R.D. 145, 147 (S.D. Tex. 1994) (primary

purpose of charge is to provide notice to defendant, to activate \voluntary compliance and

conciliation functions of EEOC, and to trigger investigation).

Most courts continue to allow retaliation claims which are involved with the original

charge, which clearly took place in Gordon's case.  His conduct, his support of Louis Martin,

- 14 -

and the retaliation for this conduct which he claims clearly follows from his original charge which actually was made before his departure. For example, see *Saladin v. Turner*, 936 F.Supp. 1571, 1580 (N.D. Okla. 1996).

In the plaintiff's Memorandum delineated "IV. ARGUMENTS," plaintiff picks up in a Subsection C. a series of paragraphs all factually related to the claims and the claims that support defendants' position.

These are claims deeply involved with factual issues concerning Tomaszewski, Roxanne Sinclair and "White females" hired involved factual issues set forth in the alleged statements of fact by the defendants and rebutted in Attachment A.

As to Subparagraph 4, found on page 15 of the defendants' Memorandum, it is interesting how clearly they delineate all the factual issues. For example, it stated on page 15, he (Gordon) "never actually applied for the positions when they opened up." What does "actually applied" mean and doesn't this open up a Pandora 's Box of factual issues? And then on the top of page 16 we have the remarkable statement, "Finally, it must be noted that no one ever made a flat out promise to give the plaintiff permanent ACC-1 position . . ." Whether they could do so or not is not the summary judgment presented the way defendants argue. What does the statement, "flat out promise" mean factually? We submit that the courts should, <u>on the record before it at this time</u>, reject this argument for summary judgment.

**VIII. REBUTTAL TO SECTION 5 RE: RETALIATION CLAIMS.**

- 15 -

The defendant has cited *Ambrosini v. National Realty*, 136 F. 3d 276, as the ruling law in the Second Circuit concerning retaliation claims. Perhaps the key issue here then is whether the plaintiff was engaged in a protective activity because all other aspects of the *Ambrosini* case are met. Clearly, he alleges that his employer, or at least senior management thereof, were aware of his article protecting Louis Martin. Whether in fact he was retaliated against is one of the central issues on this count as hereinbefore set forth and therefore Gordon asks the court to reject the arguments set forth in subparagraph 5, page 16 of the defendants' Memorandum.

Page 28 of the defendants' Memorandum does discuss again the claims of retaliation or assertion of free speech. While public employees' right to free speech is not absolute, as set forth in Section A, page 29 of the State's plea, it is clear that if <u>in fact</u> Gordon was perceived by the new management as a supporter of the old management (Martin) then an article that he wrote defending Martin must at least rise to the level of public concern.

We disagree most strongly with the assertion set forth in the Memorandum that Gordon's defense of Martin or in another sense his criticism of the way Martin was driven from office, is in fact a matter of public concern. When a head of a State agency is driven from office, isn't this a matter of "public concern?" Now this court does not have to decide whether Martin was right, or whether Gordon was right in defending him in his Memorandum. The question simply is whether this was a matter of public concern and whether it was so far out of the spectrum of public concern that it cannot be the basis of an

- 16 -

allegation that Gordon's position, as it is intertwined with the racial issues raised against Martin and in this Complaint, are also what is in issue here.

The court should also note the quote on page 33 of the defendant's Memorandum in which it is claimed that the First Amendment does not protect an "at will high level policy making employee from being fired because of job-related opinions," citing *Bolberg v. Pataki*, 917 F. Supp. 909. Isn't it stretching reality, given the allegations of the defendant herein about the position held by Gordon to say he was a "high-level policy-making employee?" Clearly, *Bolberg v. Pataki, supra* is not a protection for the defendant in this case.

## IX.    THIS COURT SHOULD REJECT THE CLAIMS SET FORTH AS PARAGRAPHS 6, 7 AND 8 ON PAGE 17 OF DEFENDANTS' MEMORANDUM.

Insofar as subparagraph 6 (page 17 of the defendant's Memorandum) relates to the exam, it is so saturated with factual claims, disputed in the affidavit (cite to affidavit of Gordon) that for the court to rule on this, on bare bones affidavits would be wrong.  Gordon asserts that this court can and indeed should reject the contentions of the State in subsection paragraph 6.

Equally, t he contentions of subsections 7 and 8 are so saturated with factual details concerning job applications and durational appointments, disputed by Gordon in his affidavit, these should be rejected by the court for purposes of summary judgment.  Gordon, in Appendix A has amply rebutted these allegations, or, as the very least demonstrated they raise issues in factual dispute.

- 17 -

Defendant has in Section H of his memorandum, claim there is "no evidence to support plaintiff's claim that he was retaliated against . . ." This has already been discussed in an earlier section. We would say however in passing that it is wrong in our opinion to claim that there is not a matter of public concern in the issues raised by Gordon in his article in defense of Louis Martin. This was a racial issue and did not involve simply one individual's termination or employment status. Far from it! What is at issue here is the allegation by Gordon that the attacks upon Louis Martin by the Legislature in the article constituted a racially biased animus. When Gordon argued that, he incurred the animosity of Martin's successors. This cannot be deemed merely a private employment allegation, but rather "a matter of public concern."

It is interesting that in the memorandum filed by the defendants that they raise the issue as to whether Gordon's arguments should be disregarded because "the disruptive effect of the speech outweighs any First Amendment protection," a rather interesting argument for the Commission on Human Rights to raise.

## X.    DEFENDANTS' ARGUMENTS SET FORTH IN SECTION D (PAGE 18 OF DEFENDANTS' MEMORANDUM SHOULD BE REJECTED.

Insofar as subsection D of the defendant's Memorandum alleging that the plaintiff's claim should be discarded, Gordon can only point to the fact that this seems to be predicated on some mind reading. CHRO claims that Gordon "knew" that Robert Brothers and others at CHRO (parties unnamed and unsupported by any factual evidence presented to this court) would "soon discover all of plaintiff's deficiencies." The sentence itself is confusing, as is

- 18 -

the legal connotation. In effect, CHRO seems to be saying, as best we can perceive it, that Gordon knew that Roberts and some unnamed "others" would "soon discover" all of plaintiff's deficiencies." This is nonsense to be presented in a summary judgment and cannot survive the standards of summary judgment or at the very least it shows an animus existing prior to Gordon's departure, thus clearly a "hostile environment by defendants' own argument.

**XI.      INSOFAR AS DEFENDANT' SUBSECTION D ARGUES, THESE ARGUMENTS ARE FAXTUAL RECITATION OF ISSUES IN DISPUTE AND      SHOULD BE REJECTED.**

There is some confusion here about the numbering and lettering of the defendant's Memorandum. We will assume that we should proceed labeling as the defendant had. At the top of page 19 of the defendant's Memorandum there is a claim that the "Title VII" claims are "vague, and . . . cannot be considered." They are not vague and they certainly grow out of the straightforward complaint filed by Gordon. His complaint has been "simple, concise, and direct."

Perhaps we should back up for a moment here and just look at what really happened at what Gordon has alleged.

There is no question that CHRO was in turmoil and Lewis Martin became its director. Martin did reverse previous policies of the administration favoring non-minorities and opened the door to a number of minorities. All of these steps were taken by Martin in accordance with the procedures and policies of the State of Connecticut. CHRO and the State of Connecticut which stands behind it in this issue, has never challenged that Martin

- 19 -

sought to equalize employment opportunities at CHRO. Nothing in these proceedings or in any other earlier case related thereto challenges his good faith efforts.

When Martin was driven from office there became a very serious effort to review those personnel decisions which she had made. Ultimately, the efforts to selectively challenge and purge all of the Martin employees are what this case is about. Factually it is confusing and complex, but it is not that abstract. Martin hired a number of people and his successors challenged those appointments across the board. There is no question that that took place, and there is no question that evidence can be shown that that took place. Richard Gordon was one of the victims of that dispute which was clearly racial in its underlying foundation.

It is not clear exactly what is claimed, but clearly this is not an issue for Summary Judgment. Are the charges "vague?" Well, that is certainly subject to discovery. Defendants have had five full long days of depositions, so it is hard to conceive why they consider these charges vague. There are other instruments for trying to delineate pleadings, but clearly the defendants know what this case is all about; after a very extensive discovery, endless depositions, they know what he is claiming and the allegation that these claims should be dismissed as "vague" is certainly not a legitimate status for Summary Judgment.

- 20 -

## XII.    QUESTION OF SERVICE OF PROCESS.

Plaintiff has raised the issue of lack of "service of personal process" in several points in this Memorandum.  To begin with it was noted that this was not raised at any point until after the Third Amended Complaint.  Plaintiff cites *Chaeffer v. Village of Ossining* (citation found on page 20 of defendants' Memorandum of Law).  But here we have a total confusion by the defendants of that service.  In fact, Libby obviously did receive the document and in fact responded to it.  Clearly she did not object to the service at any point until after a Third Amended Complaint, over a year after the process had been started.  This is a technical detail which is late in being raised and certainly not properly raised by Summary Judgment.

## XIII.    IN CONNECTION WITH GORDON'S DUE PROCESS CLAIM HE STANDS ON THE FILE AS PRESENTED

In connection with the defendant's Memorandum set forth in their paragraph "I" following page 35, whether there is a due process claim here, Gordon claims and asserts that there is a collective property interest here, and whether Gordon would be a "permanent employee" does require certain due process protection.  It is impossible to review all of the facts in this case without relating to the prior history of racial animosity to Martin's appointees.  Plaintiff's due process claim is <u>not</u> "confusing and obtuse."  We might incidentally state at this point that the State of Connecticut has engaged in its attack on Richard Gordon with a series of personal attacks, i.e., he's been called "stupid" and "obtuse

- 21 -

and confusing." Gordon has already set forth clearly that he believed that he was an employee made representations and promises in accordance with an administration which assumed direction of the Connecticut Commission on Human Rights and Opportunities, i.e., Louis Martin. Martin fell afoul of various other problems which are not pertinent here, but in the efforts to resolve these problems, blame did in fact fall upon Martin's appointees and those employees that he tried to recruit for employment at the Commission. Richard Gordon was in the middle of this conflict, an innocent victim in one sense but clearly a victim. His position in this lawsuit is clear and we submit unambiguously.

Plaintiff has asserted due process claims as a Constitutional violation. Admittedly these are encompassed in the middle of so much of what he has already alleged and fall within the confines of the Title VII. We do call the attention of the court to the rambling conduct of the argument in the body of the defendants' memorandum.

Plaintiff has been accused of having "no evidence to support a due process claim." In the body of the memorandum prepared by the defendants, starting at page 35 and following through to page 41 at the top, we have repeated attacks on Gordon as an individual. The use of such phrases as "despicable," or "stupid," or that "he may be embarrassed because of his own conduct that cast a shadow over his credibility," really are out of keeping with the issues presented. Gordon feels he has presented a claim which he has tried to delineate in this Memorandum. To the best of his ability here it is.

- 22 -

## XIV.        QUALIFIED IMMUNITY.

Gordon stands by his assertions up to now, which he contends is a matter of law for violation of his due process rights. In that Memorandum, defendants assert that they now are entitled to "QUALIFIED IMMUNITY." GORDON DISAGREES. Clearly qualified immunity, by definition, can be lost if there is an improper motive. This case has been saturated with a claim of improper motive. We have reiterated that over and over and would refer the court to earlier sections of this Memorandum.

## XV.        FALSE LIGHT AND DEFAMATION.

Plaintiff has claimed false light and defamation and considers that the allegations set forth are specifically clear and that there is a prima facie case as to what was done to him.

## XVI.        MICELLANEOUS OTHER DEFENSES.

Defendants claim that Statute 4-165 bars any claims. This claim relates to the Qualified Immunity Claim which we have already discussed in this brief and will not repeat that. Subsection M of the defendants' brief talks in terms of intentional representation requiring proof of fraud. That is fairly clear and the law is not quarreled with. However, what is quarreled is with the representation that the plaintiff has not set forth a sufficient claim on intention. The intention was to "purge" the appointees of Louis Martin. That was a clear stated intention.

- 23 -

## XVII.     NEWTON.

The claim on page 50 of the Affidavit which follows the other claims against individual defendants that follow for the balance of the Memorandum all involved questions of fact as to whether the defendants in fact pursued the policy of purging Martin's appointees, one of whom obviously was Gordon. It should be noted however in passing that Gordon is not the only one who suffered from this treatment. The court should note the case of *Femi Bogle-Assegri v. CHRO*, Docket No. 3:02CV 2292 (HBF).

<strong>CONCLUSION</strong>

Respectfully submitted by counsel for Richard Gordon, with the request that this court reject the Summary Judgment Motion of this State and set the matter down for proceedings in accordance with law and the statutory unconstitutional right of Richard Gordon.

PLAINTIFF,

BY

Igor I. Sikorsky, Jr.
P.O. Box 38
Unionville, CT 06085
(860) 675-5313
Fed. Bar #04233

- 24 -

## CERTIFICATE OF SERVICE

This is to certify that the foregoing was mailed first-class, postage prepaid on this 31st day of January, 2005, to the following:

Joseph A. Jordano
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

Mr. Richard Gordon
1 Mayfair Court
Bloomfield, CT 06002

Igor I. Sikorsky, Jr.

- 25 -