**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| RICHARD C. GORDON | : | CIVIL NO. 3:01CV1656(MKK) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| COMMISSION ON HUMAN RIGHTS | : | |
| AND OPPORTUNITIES, ET AL. | : | |
| *Defendants* | : | February 14, 2005 |

**REPLY TO PLAINTIFF'S RESPONSE TO SUMMARY JUDGMENT**

**INTRODUCTION**

Unfortunately, the plaintiff's memorandum in resistance to summary judgment is strong on hyperbole and obfuscation, but weak on law and facts. The plaintiff's failure to adduce a Rule 56(a)(2) statement of affirmative facts showing controverted material issues of fact is fatal to his claim. His memorandum is a vacuous recitation of conclusions and arguments without any affirmative evidence set forth in the manner required by the Local Rule establishing a prima facie case. It is NOT ENOUGH for counsel to simply say the that "defendants' arguments should be rejected" or "Gordon stands on his due process claim," or that " . . there is prima facie case."   Where is the evidence setting forth the elements of each claim? For instance, Gordon alleges a claim of the tort of false light. His entire argument on this issues reads:

> Plaintiff has claimed false light and defamation and considers the allegations set forth are specifically clear and there is a prima facie case as to what was done to him."

(Plaintiff's brief, page 23).  What is missing in the memorandum and his actual submission is any evidence showing what untrue statements were published about him. By whom? When? How was he damaged?  These are the elements of a defamation claim that must be proved.

The plaintiff's discussion on the legal standard for summary judgment is a mangled mess. As the defendants' brief points out, summary judgment is appropriate in employment cases. The quoted text from <u>Reeves v. Sanderson Plumbing Products, Inc</u>., 530 U.S. 133 (2000) appearing in the defendants' brief addresses the pertinent legal standard. The point to be made is that there is no requirement that the defendant prove the existence of no material facts. The burden rest with the <u>plaintiff</u> to adduce admissible evidence to prove a prima facie case under each claim. His failure to do so, as in this case, is fatal and entitles the defendants to summary judgment as a matter of law.

The Defendants remind the court that one of the underlying purposes of summary judgment is to test the legal sufficiency of the plaintiff's evidence to truly determine if a case exists. On page three of the memorandum, the plaintiff asserts that he is "entitled to" a fact finding jury. There is no such right. At this juncture, the plaintiff cannot rest on his opinions, allegations, speculation or emotion. **He has to produce EVIDENCE to support each element of a claim upon which a reasonable jury could find for him. This situation is exactly the type of case in which summary judgment is appropriate.** [1]

The plaintiff did not address many of the legal issues raised by the defendants' Motion for Summary Judgment and therefore they should be deemed <u>waived</u>. Instead, the plaintiff spends considerable time complaining about wading through what he describes as the Rule 56(a)(1) "minutia." The truth is that the defendants submitted a concise Rule 56(a)(1) statement of facts that addressed all of the allegations raised in the Amended Complaint, which contained 74 paragraphs and encompassed 50 pages. (Def.'s Ex. 1). What the plaintiff did in most of his memorandum was to cherry pick paragraphs from the

---

[1] Defendants inform the court that the plaintiff conducted. In fact, the plaintiff did not depose a single witness. Any failure of proof rests solely with the plaintiff.

2

defendants' Rule 56(a)(1) statement and then to disagree with them.  However, plaintiff failed to submit any evidence to support the elements of a prima facie case under any legal theory.

### PLAINTIFF HAS NOT PROVED SERVICE OF PROCESS ON DR. PAM LIBBY IN HER INDIVIDUAL CAPACITY

In paragraph 4 of their Rule 56(a)(1) statement (hereinafter the Defendants' Statement"),  Dr. Pamela Libby testifies that she was not personally served with process nor did she authorize anyone to accept service for her in her *individual capacity*.  In support of that factual statement the defendant attached Dr. Libby's sworn affidavit to that effect.

In his response[2] Gordon claims that Dr. Libby was served with process.  He has missed the point.  The service perfected upon the Attorney General's Office only applies to Dr. Libby in her official capacity. Gordon admits that he does not have sufficient knowledge to respond to the statement in defendants' ¶ 4, but attaches to his response as Exhibit 94 the return of service from the marshal showing that service for Dr. Libby was made upon Greg D'Auria, who works at the Attorney General's Office.  Under state law, the Attorney General is the agent for service upon state agencies. See C.G.S. § 52-64.  But the Attorney General is not statutorily authorized to accept personal service for anyone in their individual capacity. Dr. Libby testifies that she gave no authorization to any person to accept service for her in her individual capacity. (Facts ¶ 4).  Any first year law student should know that once personal jurisdiction is challenged, the burden rest with the plaintiff to prove proper service. Cole v. Aetna Life and Cas., 70 F. Supp. 2d 106, 109 (D. Conn 1999).   In short, the burden rest with Gordon  to show that Dr. Libby was served personally or in the alternative, that Mr.

---

[2]     Gordon asserts that the issue of lack of service was not timely raised. It was included in the defendants' answer to the Amended Complaint as a defense as permitted by Rule 12 of the F. R.C.P. (Ex. 2, 6th Affirmative Defense).  See Bishop v. State of Connecticut, Case No. 3:01CV1140, (D. Conn.,  Doc. Entry #37, Covello, U.S.D.J.)(raising lack of service as defense  in Answer is sufficient).

3

D'Auria was authorized to accept service on behalf of Dr. Libby in her individual capacity. To meet his burden Gordon would need the testimony of D'Auria to create a contested issue of material fact. Since there is no such evidence, Gordon fails to controvert a material issue of fact with admissible evidence and hence, the claims against Dr. Libby personally must be dismissed for lack of service of process in her individual capacity.

### PLAINTIFF HAS FAILED TO SHOW THAT HE WAS DISCRIMINATED AGAINST BECAUSE OF HIS RACE, COLOR, GENDER OR IN RETLIATION FOR ALLEGEDLY OPPOSING ACTS OF DISCRIMINATION.

Most of the plaintiff's allegations revolve around his claim that he was promised a <u>permanent</u> ACC-1 position that did not occur as hoped for because the state Department of Administrative Services ("DAS") "red circled" (froze) the use of that job classification in the CHRO regional offices because a work (SCOPE) study revealed that not all agency employees were actually performing the legal tasks required for that job specification. From that disappointment, the plaintiff has fabricated a litany of alleged wrongs ranging from being demoted (hired in a lower paying permanent position), to not being properly trained and then to being retaliated against because of a 1997 law school paper he claims was circulated within the agency.

Despite his litany of allegations, the plaintiff cannot prove the elements of a prima case of discrimination. Nowhere in his brief does counsel show how Gordon's evidence (whatever that may be) meets the elements of a prima facie case. For instance, there is no dispute that Gordon is black, and therefore he is within a protected class. But where is the evidence showing that the decision not to convert his durational position into a permanent ACC-1 position was based on his race, color or national origin? There is none. Where is the evidence showing that the DAS SCOPE study was a pretext for racial discrimination? There

is none. In response, Gordon asserts without foundation that former Executive Director Louis Martin would not permit a SCOPE study and that Cynthia Watts Elder did. So what? That does not prove anything. In contrast, it was Watts Elder, a black female, who requested that Gordon's durational position be made permanent (Fact ¶ 26). It was Donald Newton who tried to help the plaintiff obtain a permanent position after learning about the red circling of the ACC-1 positions by telling him about the HRO Representative Examination. (Facts ¶ 33). Gordon has no evidence of a discriminatory motive. Gordon is just a disgruntled employee for whom things did not work out as planned. However, instead of acknowledging that things didn't work out, Gordon has assumed that his protected class status must have had something to do with it. It did not, and he has failed to produce any evidence to the contrary.

      More accurately, what the facts show is a legitimate non-discriminatory reason for Gordon's failure to be hired as a permanent ACC-1 position in 2000. It is true that both Gordon and the CHRO Executive Director expected that Gordon's durational status would be converted into a permanent position. Both were caught by surprise when the SCOPE study forced DAS to freeze the position and the CHRO request to reclassify Gordon and other durational employees was refused. Newton suggested to Gordon that he apply for a permanent HRO Representative position so as not to lose his job which was scheduled to expire in June 2000. From that point on, Gordon attributes a sinister motive to everything that did not go his way. He accuses Newton of "ordering" him to apply for a job that Newton was under no obligation to help him with. Gordon messed up the written application for the HRO examination that was faxed to him, and then accused the person who faxed the application to him of sending him an incomplete application as part of a conspiracy. Despite

5

the fact that the application he received was complete (one portion was faxed a second time, but it was complete) and that a copy was easily obtainable from various sources, Gordon never bothered to check to make sure that his materials were complete. When the application he submitted was rejected, he accused Dr. Libby of discrimination and a conspiracy. He voluntarily accepted a lower paying <u>permanent</u> position at the CHRO.  He then sought out a position in New Jersey, accepted the position, and announced that he was leaving the CHRO. Nevertheless, Gordon then applied for FMLA leave for time when he knew he would be working in New Jersey.   Over a week after he had already left the CHRO and begun his job in New Jersey, Gordon wrote a letter stating that he was leaving the CHRO <u>because</u> it had declined his request for full-time unpaid FMLA.  The defendants' evidence shows that Gordon had accepted the New Jersey job even before he applied for the FMLA leave!

Similarly, Gordon has no evidence that DAS denied him admission to the HRO Representative examination because of his race, color, or national origin. The defendants have produced admissible evidence showing that 16 other applicants were rejected for the same reason as Gordon's – an incomplete application. (Facts, ¶ 42). Gordon's claim that CHRO employee Paula Ross (white, female) was treated differently by DAS is also incorrect. Again, the defendants have offered detailed evidence showing Ms. Ross's DAS examination history that flatly refutes Gordon's allegations. (Def. Ex. 44, ¶ 23-25, Ex. 45). In fact, Ross's examination history shows that she was also rejected for an examination for a different position for the same reason as Gordon (failure to submit proper material), which clearly shows <u>similar treatment</u>. Where is Paula Ross's affidavit and where is her rejection letter for the HRO examination if Gordon's assertion is true? He has no such evidence.  In the end, the defendants have refuted Gordon's hodge-podge assumptions of race, gender and

6

national origin discrimination. He hopes that his brief can muddy the waters enough to get him past summary judgment. This Court must not allow it.

### GORDON CANNOT PROVE A FIRST AMENDMENT RETALIATION CLAIM

The plaintiff's First Amendment retaliation claim against the individual defendants is premised on a 1997 law school paper he wrote that he claims was informally "published" (distributed) throughout the CHRO. But in his deposition, Gordon admits that he has no evidence that any of the defendants ever saw or knew about his article. (Facts ¶ 109-112).

Gordon's sworn testimony on the issue reads:

> Q: First of all, you're, if I understand correctly, whether Leanne Appleton or Donald Newton ever saw your paper; is that right?
>
> A: I heard that it was being talked about in all sectors of CHRO.
>
> Q: But, in fact, you don't have any actual knowledge, do you, whether or not they actually saw your paper?
>
> A: No.

Gordon cannot prove that any of the defendants knew about an article that was purportedly distributed TWO YEARS before Watts Elder was even hired, much less show that he suffered any adverse action <u>because of</u> the article. This is simply another spurious claim by Gordon because he is angry that he was not given a permanent ACC-1 position. Again, the burden rests with the plaintiff to offer evidence on each element of a case, and he failed to do so.

**GORDON SHOULD BE SANCTIONED FOR HIS DEFAMATION AND FALSE LIGHT CLAIMS AGAINST DONALD NEWTON AND WATTS ELDER BECAUSE THIS CLAIM WAS BROUGHT IN BAD FAITH**

After he left the agency, the Connecticut Bar Examining Committee made an inquiry of the CHRO through the Chief of Field Operations, Mr. Donald Newton, about information <u>submitted by Gordon</u> in connection with his Connecticut bar application. Newton answered the Bar Examining Committee's inquiries truthfully. Gordon did indeed use the CHRO postage equipment without permission and notarized his own signature and that of others without being licensed in Connecticut. His explanation that he was confused, that he failed to read the statute, that it was the fault of his boss for not catching the mistake, or that he thought he could act as a notary because he is a licensed attorney in New Jersey, is a testament to both Gordon's ignorance and arrogance. In any event, everything Newton reported to the Bar Examining committee was truthful according to Gordon's own testimony. Therefore, Gordon's decision to sue Newton and Watts Elder personally despite an express *<u>release of liability</u>* he executed as part of his bar application, makes this aspect of the lawsuit frivolous and deserving of sanctions in the form of attorney's fees. Gordon has NO EVIDENCE that Newton acted in bad faith or that former Bar Examining Committee Assistant Director Shaddy Kessing ever conspired with anyone. Gordon states that he saw Kessing go into the building that houses the CHRO offices, and other agencies, in Hartford. Even if this were true, it does not prove anything, much less a conspiracy. Again, there is no evidence to support his claim against Newton, just the plaintiff's paranoia and his flights of fantasy.

Gordon's claim of being cast in a false light has always been murky because Gordon has never articulated exactly what was done to him. At one point he claims that Newton told someone that Gordon was not an attorney. But Gordon has never produced any evidence of this fact, much less produce evidence in connection with this summary judgment showing that Newton made such a statement, when, or to whom. To prove such a tort, the plaintiff must show that some type of false "highly offensive" personal information about him was published by the defendants. As the Connecticut Supreme Court has noted, "The essence of a false light privacy claim is that the matter published concerning the plaintiff (1) is not true; . . . (2) is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position." <u>Goodrich v. Waterbury Republican-American, Inc.</u>, 188 Conn. 107, 448 A.2d 1317, 1330-31 (1982). As with Gordon's other claims, this one has no evidentiary support. Everything that Newton reported to the Bar Examining Committee about Gordon was absolutely true. It is certainly true that Gordon has no trouble imagining that things were said about him, but his imagination does not carry the burden of proving a case. His simple assertion that there are factual issues is certainly insufficient to overcome summary judgment.

**PLAINTIFF'S DUE PROCESS CLAIM FAILS BECAUSE THERE IS NO PROPERTY INTEREST IN A DURATIONAL JOB.**

Gordon was never deprived of his job as a durational employee. In fact, he worked as a durational ACC-1 until the job expired in June 2000. After that date, having accepted the lower paying permanent position as an HRO Trainee, he was paid at the lower rate. His service continued with the CHRO un-interrupted until he voluntarily left the agency for a higher paying job in New Jersey. Gordon could have declined the lower paying permanent position and gone on to a different job. Therefore, it is hard to understand what property

interest he was deprived of without due process. The plaintiff's brief offers no legal authority for his contention of a denial of due process.

It is recognized law that temporary, probationary and substitute employees have no constitutionally protected property right in their position. <u>Bd. of Regents of State Colleges v. Roth</u>, 408 U.S. 564 (1972); <u>Roche v. O'Meara</u>, 175 F. Supp. 2d 276 (D. Conn. 2001)(per diem employee has no property interest in job). Nowhere in the plaintiff's submission is there any legally recognized basis for his contention that his status as a durational employee entitled him to a property right in his position, and the plaintiff cannot claim that he was forced out of a permanent job.

### GORDON'S RESPONSE IS FRIVILOUS BECAUSE MUCH OF THE EVIDENCE THAT DEFEATS HIS CASE IS PREMISED UPON HIS OWN ADMISSIONS.

The defendants feel compelled to remind the court that a careful reading of the Defendant's Rule 56(a)(1) statement shows that much of the evidence contained therein that defeats Gordon's case are his own sworn admissions. For instance, despite his repeated allegations that Newton contacted the statewide grievance committee, Gordon testified that he has no such evidence. (Fact ¶ 85). He actually testified that he has no evidence that Newton and Kessing ever spoke, despite his repeated allegation of their conspiracy to keep him out of the Connecticut bar. Furthermore, Gordon testified that he did use the state postage meter for personal use and he admitted to the unauthorized practice of law in Connecticut. (Facts ¶¶ 97-98). The point of this testimony is that Gordon knows he has no evidence to support he claims against Mr. Newton. He should be <u>sanctioned</u> for suing Newton because Newton's representations to the Bar Examining Committee were both truthful and covered by the release Gordon had executed (which was sent to Newton).

Similarly, Gordon's own testimony defeats his retaliation claim under Title VII. Gordon testified that he premises his retaliation claim under Title VII on his filing of a CHRO complaint in August 2000 (Facts ¶ 122) about being hired as an HRO Trainee in July, 2000. Therefore, he cannot prove a retaliation claim which by definition, requires an adverse action that occurs AFTER one engages in protected activity. In his case, the purported adverse action took place <u>before</u> he filed his complaint!

## CONCLUSION

The defendants ask that their motion for summary judgment be granted, and that the court deny any more requests by Gordon for further time to supplement his response to summary judgment.

                        DEFENDANTS,

                        RICHARD BLUMENTHAL
                        ATTORNEY GENERAL

BY: _____
       Joseph A. Jordano
       Assistant Attorney General
       Federal Bar # ct21487
       55 Elm Street, P.O. Box 120
       Hartford, CT 06141-0120
       Tel: 860-808-5340
       Fax: 860-808-5383
       email: Joseph.Jordano@po.state.ct.us

## **CERTIFICATION**

The undersigned hereby certifies that on the 14th day of February, 2005, a true and accurate copy of the foregoing was sent by United State mail, first class postage prepaid, to the following:

Igor Sikorsky, Esq.
P.O. Box 38
Unionville, CT 06085

_____
Joseph A. Jordano
Assistant Attorney General