United States District Court
District of Connecticut
FILED AT        NEW HAVEN
May 6                    20 05
Kevin F. Rowe, Clerk
By Kenneth R. [signature] Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RICHARD A. GORDON            :        CASE NO. 3:01 CV1656 (MRK)
          Plaintiff,         :
                             :
V.                           :
                             :
COMMISSION ON HUMAN          :
RIGHTS AND OPPORTUNITIES, ET AL. :
          Defendants.        :
                             :        FEBRUARY 25, 2005

**EVIDENTIARY SUPPORT FOR PLAINTIFF'S REBUTTAL
TO DEFENDANT"S ALLEGED UNDISPUTED FACTS**

In order to avoid confusion the numbering hereinafter conforms to the numbers of the Rule 56 filing by defendants. In supports of Gordon's opposition to defendant's Motion for Summary Judgment and their Motion to Strike Gordon avers as follows:

1.   I was appointed as a "durational law clerk" and subsequently Assistant Commission Counsel I on June 18, 1999.

12.  As a result of Ms. Assegai's recommendation, plaintiff was hired around May 19, 2999 as a durational ACC-I. At no time did defendant represents that plaintiff was still classified as a "law clerk." Defendant even supplied business cards {Exhibit 12a) and published documents listing plaintiff as an Assistant Commission Counsel I. In fact, plaintiff was paid

(Exhibit 12b) on the authority of one of the defendant's principal agents in this action, Lee Anne Appleton, defendant's Business Manager.

13.     Louis Martin was hired as defendant's Executive Director in 1991. Soon after he arrived, he inquired of defendant's managers why there were not many, and in some cases, no women and minorities in the investigative positions in the oldest civil rights organization of its kind in the country -- CCHRO. Defendant's response was that no qualified candidates could be found. Thereafter, Louis Margin began hiring qualified women and minorities, mostly lawyers, in keeping with the requirements of defendant's Affirmative Action Policy. Concomitantly, Louis Martin incorporated an investigative methodology into the agency to be used as an investigative tool referred to as CHRO FIOGS. The FIOGs represented a systematic legal approach to the investigation of discrimination complaints, instead of the ad hoc approach which existed before institution of the FIOGs.

17.     In 1999 and beyond, all durational employees in the Full Investigation Unit at CHRO were minorities. CHRO classified all five minority employees as "durational employees," including plaintiff, (Ivan Carrisquello, born in Puerto Rico, Jose Guadelope, born in Puerto Rico, and Liona Richardson, Black female). (Exhibit 17) Of the five minority employees so classified, plaintiff was the only person who was a law school graduate. Plaintiff's durational

status customarily changed in January and June of each year, not February as represented by defendant.

18. Cynthia Watts Elder made defamatory and disparaging comments about minority employees at CHRO, she claimed were improperly hired by Louis Martin. Granted she did not specifically refer to plaintiff, but she referred to plaintiff in the class of employees about whom she referenced in the article. When she was pressed at a staff meeting about the specifics of her statement, she stated she was misquoted." When she was further pressed as to how she was misquoted, she declined to answer. Around September 1999, Ms. Elder represented to plaintiff that she was going to make all durational positions at CHRO permanent. Thereafter, on April 12, 2000, she sent a letter to plaintiff and other durational employees informing us that she the agency, was about to make the durational positions permanent. All durational employees, including plaintiff, relied on Ms. Watts-Elder's representation and did not pursue other employment.

21. Plaintiff was hired as a durational ACC-I in June 1999. At that time his salary was $48,000 annually. Three months later in September 1999, Ms. Watts-Elder told plaintiff that his durational position was about to be made permanent. If plaintiff had applied for a permanent HRO Representative position whether in his office or another regional office, he would have lost

- 3 -

$4,000 in salary, incurred a new six-month probationary period, and he would have lost his seniority he acquired through the ACC-I position, had he applied for and was hired for one of the alleged "permanent ACC-I vacancies. Contrary to defendant's representation, there were at least four vacancies at the West Central Regional Office in Waterbury, plaintiff's office. In early 2000, the West Central Regional Office had lost Thomas Mullins, ACC-I, Gwendolyn McDonald, ACC-I, Audrey Eckart, HRO Representative, and a few months later JoAnne Steinnagle, HRO Representative. Additionally, defendant's representation that it required its ACC-Is to be admitted to the Connecticut Bar within one year of appointment is contrary to its practice. Dawn Westbrooke was appointed as a durational ACC-I, just as plaintiff, in April 1997. Dawne Westbrooke later passed the Connecticut Bar Examination in April 1999, and was admitted one month later. Ms. Westbrooke was not demoted to an HRO Representative position in April 1998, as defendant's policy required. Rather, she was allowed to work as an ACC-I from April 1998 through May 1999, outside defendant's policy. Additionally, Donna Brewer, a White American female, worked at defendant's as an ACC-I for years before she passed and was admitted to the Connecticut Bar.

22.     Plaintiff did not apply for any of these positions because defendant represented that "his position would be made permanent." Additionally, this representation was

- 4 -

memorialized in a letter from defendant's Executive Director, Ms. Watts-Elder to plaintiff and other similarly situated employees, dated April 13, 2000. (Please see defendant's assertion in #27). Plaintiff relied on these representations from defendant to his detriment, the Hispanic male to whom defendant refers quit about three weeks after his appointment to defendant. (Exhibit 19)

27.  Ms. Watts-Elder did not say that the change to durational employees was imminent. She also stated at a staff meeting where the plaintiff was present that all the durational positions were to be made permanent, and that it was imminent. Therefore, the letter from Ms. Watts-Elder dated April 13, 2000 merely memorialized what Ms. Watts-Elder had already stated back in September 1999. (Exhibit 19)

28.  Defendant's representation that both positions were identical is not accurate. Defendant DAS may have informed Defendant CHRO through the SCOPE survey it had been misusing the ACC-I position in the regional offices on the basis the ACC-I position was identical to the HRO position. Both positions were not identical. (Exhibit 32a) The ACC-I positions were required to sign off on subpoenas' HRO Representatives could not; all ACC-Is were trained lawyers who could perform legal analysis, while HRO Representatives did not have similar training; all ACC-Is were trained to read statutes, case law, regulations, prepare legal

- 5 -

memoranda, as well as the fact they knew the Rules of Evidence. HRO Representatives were not trained in any of these disciplines. All of these disciplines were utilized on a daily basis by ACC-Is.

30. Defendant's position here lacks credibility. Defendant's assertion that plaintiff recalls getting a copy of a document around April 26, 2000 concerning CHRO's misusing the ACC-I position is an intentional and blatant misrepresentation of plaintiff's testimony. What plaintiff stated was that the document published by DAS purporting to represent "misuse of the ACC-I position was dated April 27, 2000." However, plaintiff did not see a copy of the document until June 2000, when defendant sent a copy to plaintiff. (Exhibit 30) Defendant has published e-mails purporting to relate to publication of the April 27, 2000 letter from DAS. All the e-mails were exchanged between defendant's agents, LeeAnne Appleton, Susie Carlson, and others. How then would plaintiff have known about this document, or have seen in on April 27, 2000, when the document related to a decision DAS allegedly made on April 27, 2000? To further underscore defendant's misrepresentation, please see Defendant's Statement of Fact #33, where defendant admits that Donald Newton informed plaintiff that the ACC-I positions had been red-circled on April 27, 2000.

32. Defendant's position here lacks credibility. On Friday, April 28, 2000, at

approximately 4:00 p.m., plaintiff was called and was informed that the results of the Connecticut Bar had been published and that plaintiff had passed. Immediately thereafter, plaintiff informed his regional manager he had passed the Connecticut Bar Examination. Approximately 15 minutes later, plaintiff's regional manager, Femi Bogle Assegai, asked plaintiff to pick up his line for a call from Donald Newton. After plaintiff took Donald Newton's call, Mr. Newton directed plaintiff to apply for a vacant HRO Representative position in his office. At that point, plaintiff asked Mr. Newton why would plaintiff want to apply for a position that paid $4,000 less than plaintiff had been making at the time, especially since CHRO's Executive Director, Cynthia Watts-Elder, had represented only 15 days earlier that plaintiff's position was about to be made permanent. At this point, Mr. Newton told plaintiff the ACC-I positions had been red-circled by DAS. As a trained lawyer, I knew what this situation meant immediately. I then asked Mr. Newton what I needed to do. HE informed plaintiff he would direct Susie Carlson to send plaintiff a copy of the application materials via facsimile. Plaintiff said, "Okay!" Approximately five minutes later, Ms. Carlson sent plaintiff approximately 14 pages purporting to be the application for the vacant HRO Representative position, a competitive position. Plaintiff knew if he did not apply for the vacant position, his durational position would disappear by June 2000. (Exhibit 32a) Thereafter, when plaintiff spoke to Ms. Carlson on

Monday, May 1, 2000, Ms. Carlson faxed two more pages purporting to be the replacement pages from the blanks sent on April 28, 2000. (Exhibit 32b)

Plaintiff therefore knew he needed to mitigate his losses despite the fact he would incur a $4,000 loss in income, lost seniority, lost pension benefits, plus potential losses to his credit rating. Plaintiff also knew at this point he had relied on the representation of Cynthia Watts-Elder that all the durational positions would be made permanent, to his detriment.

After plaintiff received the (approximately) 14-page application from Ms. Carlson, plaintiff noted that approximately four pages were blank. Plaintiff immediately thereafter called Susie Carlson, but she did not answer her telephone.

That Friday, April 28, 2000, after plaintiff had spoken to defendant Newton and Ms. Carlson, Ms. Bogle Assegai informed plaintiff that when she took Mr. Newton's telephone call she informed him that plaintiff had passed the Connecticut Bar Examination. I later told Ms. Assegai why Mr. Newton had called me and she said that she found his behavior very curious, especially since he did not bother to mention to her why he had called me and what his intentions were.

On Monday, May 1, 2000, plaintiff called Susie Carlson to inform her that four pages from her facsimile were blank. Ms. Carlson and plaintiff then reviewed the pages she had sent,

- 8 -

together, and she re-sent the purported missing pages to plaintiff. At the time, Ms. Carlson informed plaintiff that he should send the application Virginia facsimile, regular mail, and certified mail to DAS. Since the closing date for the application was Wednesday, May 3, 2000, plaintiff informed Ms. Carlson he would also hand-carry a copy to DAS.

At no point did defendant mention the HRO Trainee *classified permanent non-competitive position* until late May 2000, after Mr. Newton's actions were revealed, and a meeting was convened to discuss what to do with Richard Gordon. (Exhibit 32c)

On May 3, 2000, plaintiff submitted the application for the vacant HRO Representative position in the West Central Regional Office. About one week later, plaintiff received a rejection letter form DAS informing plaintiff that he failed to compete the required examination. A copy of the examination was attached to the rejection letter, but most significantly, the examination information defendant sent to plaintiff was cut off at the section termed "Examination Instruction." (Exhibits 32a and d) Plaintiff called with respect to the rejection letter, and was told he was the most qualified candidate for the position.

33.     Plaintiff did not hear from Ms. Carlson with respect to the vacant HRO Representative position. It was Donald Newton who made the calls to plaintiff. All Susie Carlson did was transmit the application materials via facsimile to plaintiff on April 28, 2000 at

- 9 -

Donald Newton's direction. Please note that defendants had made exceptions in these cases in the past. Plaintiff was informed that there were instances at DAS where "incomplete application (examinations) had been submitted but where the candidate still made the list, and subsequently received the job. I later learned that one such case was specific to defendant, CHRO. Around the summer of 2000, plaintiff learned that Paula Ross had applied for a vacant HRO Representative position, but lacked the requisite examination, just a plaintiff. Plaintiff called Paula Ross abo9ut this development and she stated it had occurred just as in plaintiff's case. (Exhibit 32c)

35.   Defendant CHRO did not transmit the second part of the alleged application/ examination procedures to plaintiff on Friday, April 28, 2000, Monday, May 1, 2000, Tuesday, May 2, 2000, or Wednesday, May 3, 2000. As such, there were no instructions supplied to plaintiff warning as defendant alleges that "applicants who do not submit the required application and examination materials by the closing date will not be admitted into the examination and will not have the right to appeal this decision." (Exhibits 32a and d)

36.   Since the examination relating to the HRO Representative position plaintiff applied for on May 3, 2000 was an "experience and training examination," as defendant alleges, a personnel from DAS informed plaintiff he had the most experience on the job and the most

direct education relating to the position. Plaintiff did not submit the required material relative to the examination because it was either negligently or intentionally withheld from plaintiff. (Exhibit 32a)

37. On April 28, 2000, plaintiff was called by defendant Donald Newton and directed to apply for the vacant HRO position. At the time, Newton spoke as if all plaintiff had to do to gain the position was to complete the application material Susie Carlson was about to send him. (Exhibit 32a)

38. Please see plaintiff's responses 32, 35, and 37. Four of the pages Susie Carlson sent to plaintiff on April 28, 2000 were blank. Plaintiff called Ms. Carlson to inform her but she did not answer. On Monday, May 1, 2000, plaintiff spoke to Ms. Carlson and informed her that some pages were missing, later determined to be the critical "examination information."

39. Please see plaintiff's responses 32, 35, 37, and 38. Defendant's position is contested. At no time did plaintiff inform Ms. Carlson or anyone at defendant's that "the only page" he identified as missing was from (a) March 2000 PLD-2 form. Additionally, defendant specifically asked plaintiff about this matter at his deposition and plaintiff testified that the transmission sent by Ms. Carlson on April 28, 2000 had four blank pages. Additionally, when plaintiff spoke to Susie Carlson on Monday, May 1, 2000, he informed her that there were four

pages missing, NOT one as defendant alleges.

44. Defendant Ms. Watts-Elder did not exercise benevolence by saving plaintiff by "not just letting plaintiff's employment end, so she hired plaintiff in a lower paying, permanent job, HRO Trainee position . . . that provided opportunity for advancement."

✓ The fact is that Ms. Watts-Elder called a meeting around the middle to the end of May 2000 after she learned what had happened with respect to plaintiff's application to DAS on May 3, 2000 regarding the HRO Representative position. (Exhibit 32c) Prior to Ms. Watts-Elder calling the meeting, she called me at the West Central Regional Office and asked me what happened. At this point, Ms. Watts-Elder stated that she heard it was my fault because I did not complete the examination accompanying the application. Plaintiff informed her that Donald Newton had directed me to apply for the vacant HRO Representative position in my office. Plaintiff also told her that Susie Carlson later sent me a facsimile, which consisted of approximately 14 pages. Plaintiff informed Ms. Watts-Elder that the 14 pages Ms. Carlson sent to him had four blank pages, including the examination information page. When the meeting convened in Ms. Watts-Elder's office, Mr. Newton was conspicuously absent – he later appeared about 10 minutes before the hour-long meeting ended.

During this meeting, plaintiff informed Ms. Watts-Elder, as well as other individuals, that

- 12 -

it was not his fault that the application had been rejected by DAS. Thereafter, plaintiff informed Ms. Watts-Elder as to what he believed would be appropriate remedies under the circumstances. Plaintiff informed her that since blame must go to CHRO personnel for their conduct in this matter, plaintiff wanted to maintain his ACC-I position, with his current salary at the time, of approximately $49,000, especially since defendant had paid others who had not passed or been admitted to the Connecticut Bar within one year in the ACC-I positions and with their ACC-I salary. (Dawn Westbrooke, an American female, placed in ACC-I position April 1997, passed Connecticut Bar, April 1999. Therefore she was not demoted as defendant's policy required and was paid as full salary as an ACC-I from April 1998 to May 1999. (Exhibit 44a) if that option was not available, plaintiff asked to be placed in the vacant HRO Representative position with the starting salary that came with the position -- $44,000, as defendant had done in the past (Paula Ross). At this point, plaintiff believes LeeAnne Appleton, who was present, stated he could also be placed in a non-competitive HRO Trainee position, which was permanent, but which came with a salary of $35,000. (Exhibit 44e) At that point, plaintiff protested to such a placement because if he took that position, he would lose almost $15,000 annually, but plaintiff asked that if this was the best defendant would do, then for defendant to pay plaintiff at the maximum salary for the job class of $43,000. (Exhibits 44a and b) Ms. Watts-Elder at this point

spoke about Ms. Pamela Libby at DAS. Plaintiff then asked if he could have an audience with Ms. Libby in an effort to convince her about the unfairness that has been meted out to me, and to learn about appeal options.

45.    Around August 2000, plaintiff learned that defendants CHRO and DAS had made exceptions for Ms. Paula Ross, a White American female, who had applied for a vacant HRO Representative position identical as plaintiff. Sometime after August 2000, plaintiff spoke directly to Ms. Ross and she confirmed that defendants had indeed made an exception in an identical situation as plaintiff's. Ms. Ross stated she had applied for the position but had not completed the examination information; she received a rejection letter from DAS, but defendant placed her in the position anyway.

When Plaintiff met with Ms. Libby in June 2000, plaintiff explained to her that plaintiff was not sent the examination information. She replied that defendant, CHRO informed her that "it was entirely plaintiff's fault that the examination information had not been completed," to suggest that plaintiff had received the examination information.

Defendant's position is not accurate. During the meeting, Ms. Libby told plaintiff that there was no right of appeal available to him. However, C.G. Reg. § 5-22-a-1 contained very permissive language, "may" in various parts of the regulation. Additionally, line 4 of

- 14 -

Defendant's Statement of the Facts #45, speaks of ". . .the appeals process." Then in line defendant states "there is no appeal available where a rejection letter was sent based on an incomplete application." Yet, Paula Ross was placed in the HRO Representative position, despite the fact she sent an incomplete application to defendant DAS.

46. Defendant's position is not accurate. Plaintiff learned that defendant DAS had indeed made exception for other applicants for the same reason. Please see plaintiff responses 44 and 45. This is a key contested issue.

50. Defendant's position is contested, as one of the key issues of my case because after plaintiff received the rejection letter from defendant in May 2000, plaintiff called and spoke to personnel at DAS who informed Plaintiff that exceptions had been made with respect to non-White American female applicants in the past. More specifically, plaintiff spoke to Paula Ross who informed plaintiff that defendant made an exception for her in an identical situation to plaintiff's.

51. Defendant's position is not accurate. Plaintiff was demoted. Plaintiff's biweekly salary was approximately $1,800. After plaintiff was demoted to an HRO Trainee his salary was $1,100 biweekly. The HRO Trainee position COULD NOT be a "permanent hire" as defendant claims in #51, and be an "actual offer to hire plaintiff in a PERMANENT position . . ." at the

- 15 -

same time, as defendant claims in #52. In fact, around March 2001, plaintiff sent a memorandum to Ms. Watts-Elder requesting placement into a permanent position as defendant promised in May 2000, or alternately he be considered for a permanent HRO Representative position. Ms. Watts-Elder did not respond to plaintiff's memorandum. (Exhibits 44f1 and 44f2)

60.     Plaintiff admits. Defendant contend here that on March 16, 2001, plaintiff informed Manager Femi Goble-Assegai that he had accepted a position as an Assistant Corporation Counsel in New Jersey and would be leaving the agency. Thereafter, defendant contradicts itself in #62 by stating that, "The plaintiff did not inform the defendants that he was resigning his position."

Plaintiff did not assume that Ms. Bogle-Assegai had notified Ms. Watts-Elder and/or Donald Newton that he had accepted a position in Newark, New Jersey. Ms. Bogle-Assegai was the manager (an agent and official of defendant) of defendant West Central Regional Office and therefore, plaintiff's informing her of his resignation must be imputed to defendants. By title, West Central Regional Office Manager, Ms. Bogle-Assegai, was the highest ranking official in the West Central Regional Office from defendant's agency. Defendant would like to dismiss the fact that she was one of its managers, thereby negating the fact that plaintiff gave defendant notice he was resigning.

61.  Plaintiff admits in part. Plaintiff was never paid at an "ACC-I level as a durational law clerk," just as an Assistant Commission Counsel-I. To plaintiff's knowledge there is no position title at defendant's termed "ACC-I durational law clerk." While plaintiff worked for defendant as an ACC-I (June 1999-June 2000), defendant provided plaintiff with business cards which reflected plaintiff's title to be Assistant Commission Counsel-I. (Exhibit 12a) Defendant also made publications depicting and referring to plaintiff as an Assistant Commission Counsel. (Exhibit 12b) Additionally, the City of Newark made an offer to plaintiff sometime in the middle of March 2001. Plaintiff accepted the position, but as plaintiff also informed defendant, he was not totally settled on leaving his very sick mother to live five days of the week in New Jersey (Monday mornings through Friday afternoons). After defendant demoted plaintiff from the ACC-I position in June 2000, plaintiff actively began searching for employment in a desperate attempt to make up the approximate $15,000 cut in pay he experienced. (Exhibit 55)

62.  Defendant contradicts itself. Please see defendant's statement, and plaintiff's response with respect to #60. (In Response 60 defendant claims plaintiff informed Ms. Bogle-Assegai. While in #62, defendant claims plaintiff did not inform defendant . . . he was resigning . . .). Plaintiff did not testify he assumed Ms. Bogle-Assegai would notify defendant's Central Office of his resignation. Plaintiff testified that Ms. Bogle-Assegai was enough as she was