defendant's West Central Regional Office Manager.  She was the highest ranking official/agent of defendant in the West Central Regional Office.

63.     Plaintiff testified he had accepted the position in New Jersey, but after consulting with his siblings, his oldest sister agreed to pay some of his bills if he really wanted to stay in Connecticut and help care for his sick mother.  Plaintiff subsequently applied for family leave from defendant, but when it became apparent that defendant would not grant plaintiff's family medical leave, plaintiff worked out other arrangements with his siblings and reported to Newark, New Jersey.

64.     Plaintiff admits in part.  Ms. Bogle-Assegai was terminated by defendant. However, for the five days Mr. Brothers supervised the West Central Regional Office, plaintiff was present at work on approximately one and a half days.  During the period Mr. Brothers supervised the West Central Regional Office he met with plaintiff alone on one occasion. During the meeting, Mr. Brothers spoke about the fact that the investigatory staff was too case-laden and he was promised help by Donald Newton.  (Exhibits 57b, c, and d)

65.     Defendant's position is contested.  Plaintiff admits he met with Mr. Brothers in plaintiff's response 64. Defendant claims plaintiff "at no time informed Mr. Brothers he was unhappy in his job, or he felt he was being forced out of his job . . ." This view is consistent with

- 18 -

the position defendant has taken throughout this case, to the extent defendant adheres to the position that somehow plaintiff should be happy with a $15,000 increase (31%) pay decrease, only months after plaintiff's financial obligations had increased (paying his mother's mortgage, etc.); that plaintiff should be happy with a demotion in pay as well as job title, from an Assistant Commission Counsel-I to an HRO Trainee. Defendant also adheres to the view that plaintiff had already filed an Equal Employment Opportunity Complaint against defendant in August 2000 regarding his demotion. Lastly, defendant was well aware that plaintiff was unhappy at being demoted, denied employment opportunities (please see #69 below), and loss of income by the fact he filed EEOC Complaints against both DAS and CHRO in August 2000, well in advance of his meeting with Mr. Brothers in April 2001.

66.     Around the end of March 2001, plaintiff discussed with Ms. Assegai the possibility of his taking a family leave to help care for his sick mother. Around that time, and prior to defendant's terminating Ms. Assegai, she signed a family leave document indicating she was aware of plaintiff's request or pending request for family leave. At this stage, Ms. Bogle-Assegai was also well aware plaintiff had already accepted a poison with the City of Newark, (Exhibit 66), although plaintiff had not discussed with her the fact that his sibling agreed to provide substantial help with his bills. The letter about which defendant refers was not

- 19 -

backdated as defendant claims, but rather the letter was written one week in advance of its mailing and some details were not extracted, while some were added.

67.    Please see plaintiff's response to 66.

68.    Please see plaintiff's responses to 62, 63, 64, 65, and 66.

69.    Plaintiff admits Dr. Libby may not have had anything to do with his family medical leave, but she was intimately involved with respect to plaintiff's demotion from his ACC-I to HRO Trainee position; she was intimately involved in defendant's continuing desire to perform a SCOPE survey at CHRO from Louis Martin's tenure to Cynthia Watts-Elder's tenure; and she was also intimately involved in defendant's decision to reject plaintiff's appealing his rejection from the CHRO Representative position in May 2000, despite the fact defendant had granted a White American female, Paul Ross, a position under identical circumstances.

Additionally, defendant DAS and perhaps Dr. Libby, also played a part in denying plaintiff a prospective employment at defendant CHRO in 1999. On this occasion, CHRO claimed it was conducting a search for a full-time Affirmative Action Manager late summer 1999. The starting salary was listed at approximately $75,000. JoAnne Steinnagle, a White American female and full-time permanent HRO Representative from the West Central Regional Office (Waterbury, same office as plaintiff), was the first person to express an interest in the

- 20 -

position, despite the fact that she had no prior experience as an Affirmative Action Manager. Ms. Steinnagle's salary while she was at the West Central Regional Office was approximately $53,000 annually.

Plaintiff learned about the search for an Affirmative Action Manager from other Assistant Commission Counsels (all minorities) who also had expressed similar interest in the position. Plaintiff wrote a letter to send to Ms. LeeAnne Appleton indicating his interest in the full-time position, but before he sent the letter, he learned that the position had "mysteriously reclassified as a part-time position with a starting salary of only $35,000." Plaintiff did not desire a part-time position, nor a salary of $35,000, so plaintiff did not apply, as did approximately 12 other African-American lawyers (ACC-I) at defendant CHRO. Ms. Steinnagle was interviewed for the part-time position; she received the part-time position; but a few weeks after Ms. Steinnagle started in the part-time Affirmative Action Manager's position, DEFENDANT RECLASSIFIED THE POSITION AS A FULL TIME POSITION AND MS. STEINNAGLE'S SALARY WAS IMMEDIATELY INCREASED TO $75,000. This increase in salary represented an increase of about $22,000 annually for Ms. Steinnagle, and $30,000 over the posted salary (or part-time Affirmative Action Manager's position).

Prior to joining defendant CHRO in June 1996, plaintiff worked for four years as a

- 21 -

Human Resources Manager in private industry.  One of plaintiff's responsibilities at the time was

Affirmative Action.  Plaintiff was responsible for the day-to-day administration of the company's

Affirmative Action Plan.  Additionally, plaintiff was responsible for this latter fact, which

prompted Louis Martin and Jewel Brown to conclude that plaintiff's background related directly

to the work CHRO performed.  Please see plaintiff's response #5.

70.    Defendant's position is not credible.  The letter from Ms. Appleton indicated that

"plaintiff's request for family medical leave would be granted, not on a 'part-time basis' as

defendant claims, bur rather on an 'INTERMITTENT' basis only.  (Please see Defendant's

Statement of Facts #73, line 5)."  Defendant requested for plaintiff to subject his mother for

examination by its doctors, despite the fact "plaintiff's mother's doctors had certified her various

conditions, including spontaneous fainting spells, and Alzheimer as chronic."  In other words,

defendant through its "granting agent, Lee Appleton, or more appropriately, Dr. Appleton" would

allow plaintiff family medical leave but only on days plaintiff's mother had doctors'

appointments.  (Exhibit 70)

71.    Please see plaintiff's responses 62, 63, 64, 65, 66, and 70.

72.    Please see plaintiff's responses to 62, 63, 64, 65, 66, and 70.  Additionally, the

envelope purporting to have contained the letter from plaintiff was not in his handwriting.

- 22 -

Additionally, it was post marked "Hartford," while plaintiff was working in Newark, New Jersey at the time.

73.     Please see plaintiff's responses to 62, 63, 64, 65, 66, 70, and 72.

74.     Plaintiff admits in part.  Plaintiff had already filed a Complaint with the EEOC against defendants CHRO and DAS.   With that in mind, defendants were already on notice that plaintiff was not happy at being demoted, denied employment opportunities, and loss of salary. (Please see Response 69)

75.     Please see plaintiff's responses to 62, 63, 64, 65, 66, 70, and 72.

76.     Defendant's position is not credible.  Please see plaintiff's responses 60, 62, and 66. Additionally, Ms. Bogle-Assegai was aware plaintiff had accepted an offer for employment in Newark around the middle of March 2001. (Exhibit 66) In fact, Ms. Bogle-Assegai informed the entire staff during a staff meeting that plaintiff had accepted the position of Corporation Counsel for the City of Newark.

77.     Defendant's position is not credible.  On February 15, 1991, plaintiff was invited to speak at the University of Hartford.  Plaintiff accepted the invitation and addressed an audience.

79.     Plaintiff admits in part.  Plaintiff admits he used defendant CHRO.  The total cost

- 23 -

of this use or these uses was less than $12.  Plaintiff used the postage meter for professional use benefiting defendant.  In fact, defendant has given plaintiff permission to use the postage meter on other occasions, and in similar situations.

The fact that Ms. Kessing called Mr. Newton and he may have said plaintiff did not have permission to use defendant's postage meter is not dispositive.  When plaintiff used the postage meter to send documents to the Connecticut Bar Examining Committee on September 22, 2000, plaintiff sent a check for $100 reimbursing defendant.  Plaintiff also received permission to use defendant's postage meter on other occasions at defendant from persons other than Donald Newton.

80.     This paragraph is contested insofar as it is misleading.  When plaintiff used defendant's postage meter in September 2000 it was for professional use, because defendant benefits from plaintiff's admission to the Connecticut Bar.  Additionally, plaintiff received permission from defendant's personnel to use its postage meter in the past. (Please see Gordon Deposition, Vol. II, pp. 361:10-19).

82.     Defendant's position is contested.  The release plaintiff signed specifically provided that there would be no liability if the compliance was in GOOD FAITH.  Plaintiff maintains that Mr. Kessing's entry into defendant's Central Office on February 15, 2001 was

- 24 -

designed for him to meet with Donald Newton to gather information on the frivolous grievance

the Connecticut Bar Examining Committee filed in April 2001, which was treated and dismissed

as such by the State of Connecticut Statewide Grievance Committee.

106.    Around August 2000, plaintiff learned that defendants CHRO and DAS had made

exceptions for Ms. Paula Ross, a White American female who had applied for a vacant HRO

Representative position in identical situations as plaintiff.  Sometime after August 2000, plaintiff

spoke directly to Ms. Ross and she confirmed that defendants had indeed made an exception in

an identical situation to plaintiff's.  Ms. Ross stated she had applied for the position but had not

completed the examination information; she received a rejection letter from DAS, but defendant

placed her in the position anyway at the exclusion of all other applicants.

107.    Please see plaintiff's response to 106.

112.    One of Gordon's colleagues at West Central Regional Office told plaintiff in

1997, he sent copies of the paper to the Central Office.

119.    Please see plaintiff's response to 69. Plaintiff prepared a letter of interest for the

position but learned it was reclassified as a part-time position.  Defendant thereafter placed

JoAnne Steinnagle in the position, reclassified the position as a full-time position, then defendant

raised Ms. Steinnagle's salary from $35,000 to $75,000.  Plaintiff had over four years of

- 25 -

experience as an Affirmative Action Manager, while Ms. Steinnagle did not have one day's experience.

120.    Yes, he did. Donald Newton directed plaintiff to apply for the vacant permanent HRO Representative position on April 28, 2000.

123.    This asserted "fact" relates to damages. But since defendants have raised the issue, Gordon notes as follows:

Plaintiff's credit rating was destroyed after defendant cut his salary by $15,000 annually; plaintiff was under contract on a piece of real estate on Brown Street in Hartford (Exhibit 44c), but after plaintiff's salary was cut, plaintiff was no longer qualified for the property. The selling price of the property was $137,000 in 2000. Since that time the property has appreciated in value to over $200,000. Additionally, because the property was a three-family unit, plaintiff would have made income of approximately $500 per month from the property. Plaintiff has also incurred many physical hardships as a result of defendant's conduct. Plaintiff had to drive over 800 miles each week to New Jersey from Connecticut to work. Since April 2001, plaintiff has driven over 115,000 miles to and from Connecticut. Related to this damage issue, plaintiff incurred tolls in excess of $200 per month.

- 26 -

All Exhibits referred to herein are on file in Gordon's original submission.

Submitted and averred to by

_____
Richard A. Gordon

Personally appeared, Richard A. Gordon, who averred to the truth of the foregoing facts set forth in support of his opposition to defendants' Motion for Summary Judgment, and subsequent Motion to Strike.

_____
Igor I. Sikorsky, Jr.
P.O. Box 38
Unionville, CT 06085
(860) 675-5313
Fed. Bar #04233

- 27 -

## **CERTIFICATE OF SERVICE**

This is to certify that the foregoing was mailed first-class, postage prepaid on

February 25, 2005, to the following:

Joseph A. Jordano
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

Igor I. Sikorsky, Jr.

–28–